UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
ALBANY DIVISION

| | |
|---|---|
| **JERRY BAUDIN**, **JOSEPHINE DUFFNEY** and **KARISHMA PERSAUD**, individually and on behalf of all other similarly situated individuals,<br><br>                    Plaintiffs,<br><br>v.<br><br>**RESOURCE MARKETING CORP., LLC**,<br><br>                    Defendant. | Case No.:  1:19-CV-386 [MAD/CFH]<br><br>**COLLECTIVE AND CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiffs JERRY BAUDIN, JOSEPHINE DUFFNEY and KARISHMA PERSAUD ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, hereby bring this Collective and Class Action Complaint against Defendant RESOURCE MARKETING CORP., LLC ("Defendant"), and state as follows:

## INTRODUCTION

1.     This is a collective and class action brought pursuant to 29 U.S.C. § 216(b) and Fed. R. Civ. P. 23 by Plaintiffs, individually and on behalf of all similarly situated persons employed by Defendant, arising from Defendant's willful violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, among other laws.

2.     Defendant is a nationwide marketing call center that "specializes in providing extremely targeted, high quality leads to businesses by way of live call transfers." (*See https://www.resourcemarketingcorp.com/* (last visited on March 8, 2019).) Defendant "offers live consumer transfers for mortgage lending, solar energy, home security, credit repair and tax relief...." (*See  https://www.resourcemarketingcorp.com/careers* (last visited on March 12,

2019).)

3.      In order to carry out its business model, Defendant employs non-exempt hourly call center employees, hereinafter referred to as account representatives or transfer agents ("Agents"), to verify and prescreen inbound leads over the telephone and then delivery them via hot call transfer to a sales person.

4.      More specifically, Defendant employs automatic dialing software (the "Auto Dialer") that automatically dials telephone numbers of inbound customer leads. Once the call has been answered, the Auto Dialer connects the call to an Agent, who, using a script provided by Defendant, asks a series of questions to determine, based upon criteria provided by Defendant, whether to qualify the customer as a hot lead and initiate a hot call transfer to a sales person. Defendant employs the majority of these Agents at its brick-and-mortar call center facility in Clifton Park, New York. Defendant also employs remote Agents, who work for Defendant from home using a personal computer to remotely connect to Defendant's Auto Dialer.

5.      The U.S. Department of Labor ("DOL") recognizes that call center jobs, like those held by Defendant's Agents, are homogenous; in July 2008, it issued Fact Sheet #64 to alert call center employees to some of the abuses that are prevalent in the industry. (Exh. A, DOL Fact Sheet #64.)

6.      One of those abuses, which is occurring in this case, is the employer's refusal to pay for work "from the beginning of the first principal activity of the workday to the end of the last principal activity of the workday." (*Id*. at 2.)

7.      More specifically, DOL Fact Sheet #64 condemns an employer's non-payment of an employee's necessary pre-shift activities: "An example of the first principal activity of the day for agents/specialists/representatives working in call centers includes starting the computer to

download work instructions, computer applications and work-related emails." (*Id.*) Additionally, the FLSA requires that "[a] daily or weekly record of all hours worked, including time spent in pre-shift and post-shift job-related activities, must be kept." (*Id.*)

8.    Defendant requires its Agents to work a full-time schedule, plus overtime. However, Defendant does not compensate its Agents for all hours worked; instead, Defendant requires its Agents to perform compensable work tasks before and after their scheduled shifts and during their unpaid meal periods, but trains and instructs its Agents not to record this time on their timesheets. In addition, Defendant maintains a common policy and practice of compensating its Agents for only such time that they are connected to Defendant's Auto Dialer, meaning that they are only paid for time spent on the phones (i.e., "on the dialer") and are not paid for any time spent disconnected from the Auto Dialer. These policies result in Agents not being paid for all time worked, including overtime.

9.    In the course of performing their job responsibilities, Defendant's Agents use essential computer software programs, applications and phone systems. The time Agents spend booting up and logging into these programs and applications before and after their shifts is compensable because the programs and applications are an integral, indispensable and important part of the Agents' work, and they cannot perform their jobs effectively without them.

10.    Defendant's Agents perform the same basic job duties and are required to use the same or similar computer software programs, applications and phone systems.

11.    The individuals Plaintiffs seek to represent in this action are current and former at-home and brick-and-mortar Agents who are similarly situated to each other in terms of their positions, job duties, pay structure and Defendant's violations of federal and state law.

12.    Defendant knew or could have easily determined how long it takes Agents to

complete their off-the-clock work, and Defendant could have properly compensated Plaintiffs and the putative Collective and Class for this work, but deliberately chose not to.

13. Plaintiffs seek a declaration that their rights, and the rights of the putative Collective and Class, were violated, an award of unpaid wages and liquidated damages, injunctive and declaratory relief, attendant penalties, and an award of attorneys' fees and costs to make them whole for damages they suffered, and to ensure that they and future workers will not be subjected by Defendant to such illegal conduct in the future.

## JURISDICTION

14. This Court has subject matter jurisdiction over Plaintiffs' FLSA claims pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under 29 U.S.C. § 201, *et seq.*

15. Additionally, this Court has jurisdiction over Plaintiffs' FLSA claims pursuant to 29 U.S.C. § 216(b), which provides that suit under the FLSA "may be maintained against any employer … in any Federal or State court of competent jurisdiction."

16. Moreover, this Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). This is a class action in which the aggregate claims of the individual Class members exceed the sum value of $5,000,000 exclusive of interest and costs, there are believed to be in excess of 100 Class members, and at least some members of the proposed Class have a different citizenship than Defendant.

17. Defendant's annual sales exceed $500,000 and Defendant has more than two employees; thus, the FLSA applies in this case on an enterprise basis. Defendant's employees engage in interstate commerce or in the production of goods for commerce; therefore, they are also covered by the FLSA on an individual basis.

18.     The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because the state law claims and the federal claims are so closely related that they form part of the same case or controversy under Article III of the United States Constitution.

19.     The Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

20.     The Court has personal jurisdiction over Defendant because Defendant conducts business within the state of New York, employs individuals within the state of New York, and is registered with the New York Department of State.

21.     Personal jurisdiction also applies to Defendant because Defendant has purposefully availed itself of the privilege of conducting activities in the state of New York and has established minimum contacts sufficient to confer jurisdiction over it; and the assumption of jurisdiction over Defendant will not offend traditional notions of fair play and substantial justice and is consistent with the Constitutional requirements of due process.

## VENUE

22.     Venue is proper in the Northern District of New York because Defendant employs Agents at its brick-and-mortar call center facility in Saratoga County, New York. Therefore, a substantial part of the events forming the basis of this suit (including implementation of the illegal pay practices alleged in this litigation) occurred in the Northern District of New York.

## INTRADISTRICT ASSIGNMENT

23.     A substantial part of the events or omissions giving rise to the claims alleged herein occurred in Saratoga County, New York; therefore, this action is properly assigned to the Albany Division.

## PARTIES

24.     Plaintiff JERRY BAUDIN ("Plaintiff Baudin") is a New York resident who worked for Defendant as an Agent at its Clifton Park, New York call center facility from mid-December 2018 through January 2019. Defendant compensated Plaintiff Baudin through the payment of an hourly wage equal to $13.00 per hour, plus nondiscretionary bonuses and commissions for correctly screening and qualifying inbound customer leads and initiating hot call transfers to a sales person. (Exh. B, Baudin Pay Stub.) Plaintiff Baudin signed a consent form to join this collective action lawsuit, attached hereto as Exh. C.

25.     Plaintiff JOSEPHINE DUFFNEY ("Plaintiff Duffney") is a New York resident who worked for Defendant as a Team Leader, Supervisor and Agent at its Clifton Park, New York call center facility from October 2016 until December 2018. Defendant compensated Plaintiff Duffney through the payment of an hourly wage, most recently at the rate of $16.00 per hour, plus nondiscretionary bonuses and commissions for correctly screening and qualifying inbound customer leads and initiating hot call transfers to a sales person. (Exh. D, Duffney Pay Stub.) Plaintiff Duffney signed a consent form to join this collective action lawsuit, attached hereto as Exh. E.

26.     Plaintiff KARISHMA PERSAUD ("Plaintiff Persaud") is a New York resident who worked for Defendant as an Agent at its Clifton Park, New York call center facility from November 2017 until June 2018, at which time she began working for Defendant remotely from her New York residence. Plaintiff Persaud worked for Defendant as a remote Agent from June 2018 until August 2018, at which time she returned to Defendant's brick-and-mortar call center facility until her employment with Defendant was terminated in March 2019. Defendant compensated Plaintiff Persaud through the payment of an hourly wage, most recently at the rate

of $13.00 per hour, plus nondiscretionary bonuses and commissions for correctly screening and qualifying inbound customer leads and initiating hot call transfers to a sales person. (Exh. F, Persaud Pay Stub.) Plaintiff Persaud signed a consent form to join this collective action lawsuit, attached hereto as Exh. G.

27.    Defendant RESOURCE MARKETING CORP., LLC is a Delaware Limited Liability Company (File Number 6149749) with a Principal Office at 800 Route 146, Suite 175, Clifton Park, New York 12065. Defendant is licensed to do business in the state of New York (DOS ID#: 5126968), and its registered agent for service of process is Harvard Business Services, Inc., 16192 Coastal Hwy, Lewes, Delaware 19958.

28.    According to its website, "Resource Marketing Corp. specializes in providing extremely targeted, high quality leads to businesses by way of live call transfers. All of our leads begin as an inbound application from an online source. These warm leads are then called and further qualified before we initiate a hot call transfer to a sales person. The result is a lead that is highly motivated, double verified, prescreened and transferred in real time." (*See https://www.resourcemarketingcorp.com/* (last visited on March 8, 2019).)

29.    Upon information and belief, Defendant has employed hundreds of at-home and brick-and-mortar Agents—including Plaintiffs—in the last six years to perform services that include verifying and prescreening inbound customer leads over the telephone and then delivering them via hot call transfer to a sales person.

## GENERAL ALLEGATIONS

30.    Defendant employed Plaintiffs as Agents in the state of New York within the last six years. In that position, Plaintiffs were compensated pursuant to an hourly wage, plus nondiscretionary bonuses and commissions for correctly qualifying warm leads and initiating hot

call transfers to a sales person.

31.     Plaintiffs were typically scheduled to work for Defendant Monday through Thursday from 9:00 a.m. until 7:00 p.m., and from 9:00 a.m. until 2:00 p.m. on Friday, resulting in overtime hours on a weekly basis. Defendant promises its Agents a one-hour unpaid lunch break each Monday through Thursday. Thus, Agents are typically scheduled to work 41 hours each week (nine hours per day Monday through Thursday and five hours on Friday). Nevertheless, Defendant does not pay overtime to its Agents, nor does Defendant issue pay stubs to its Agents reflecting the number of hours worked in a pay period. (*See* Exh. B, D and F.) Rather, Plaintiffs' pay stubs falsely represent that Plaintiffs are paid a salary. (*See* Exh. B and F.)

32.     Throughout their employment with Defendant, Plaintiffs were required to work a substantial amount of unpaid time, including overtime, as part of their jobs as Agents.

33.     Defendant's Agents are responsible for, among other things: (a) booting up their computers and logging into essential computer software programs and applications before taking live calls; (b) verifying and prescreening inbound customer leads over the telephone and then delivering them via hot call transfer to a sales person; (c) ensuring that every live call is accounted for in the Auto Dialer; and (d) logging out of the computer software programs and applications and shutting down the computer.

34.     Defendant has strict expectations that its Agents will remain on the phones during scheduled meal and rest breaks if there are not enough Agents to cover the phones or if the Agent is stuck on a live call; and Defendant threatens discipline if an Agent fails to do so.

35.     Defendant requires its Agents to manually track their hours worked during each shift but trains and instructs its Agents not to record time spent performing pre-shift, mid-shift and post-shift work tasks, meaning that they are not paid for pre- and post-shift login/logout

activities or time spent logging back into the Auto Dialer during their unpaid lunch breaks. Failing to accurately account and pay for all of the time actually worked by employees is a clear violation of the FLSA's record keeping requirements. *See* 29 U.S.C. § 211(c).

36.     Agents are assigned by Defendant to work on several different call campaigns, including mortgage lending, solar energy, home security, reverse mortgages, debt resolution, auto warranty, credit repair, and tax relief.

37.     During his employment with Defendant, Plaintiff Baudin was assigned to work on the solar energy campaign. Plaintiff Duffney was assigned by Defendant to work on several different call campaigns including mortgage lending, solar energy, home security, and auto warranty. Likewise, Plaintiff Persaud was assigned by Defendant to work on several different call campaigns including mortgage lending, solar energy, debt resolution, auto warranty, and credit repair. Plaintiffs Duffney and Persaud regularly worked on multiple call campaigns at the same time, often during the same shift.

38.     Defendant's unlawful pay policies and timekeeping practices, as well as the Agents' job duties, are substantially the same irrespective of the call campaign they are assigned to and irrespective of whether they work from home or from Defendant's brick-and-mortar call center facility.

39.     Defendant's Auto Dialer automatically dials telephone numbers of inbound customer leads. Once the call has been answered, the Auto Dialer connects the call to an Agent, who, utilizing a script provided by Defendant, asks a series of questions to determine, based upon criteria provided by Defendant, whether to qualify the customer as a hot lead and initiate a hot call transfer to a sales person. Defendant's script and pre-established qualification criteria, along with the requirement that the Agents strictly adhere to the same, create a predictable

conversation and easy-to-follow qualification process that can be replicated across call campaigns. *See https://www.resourcemarketingcorp.com/about* ("We found that this same strategy of generating high quality inbound leads, verifying and prescreening them and then delivering them via hot call transfer is a recipe for success in any vertical.") (last visited on March 15, 2019).

40.    Upon information and belief, all Agents are and were hourly, non-exempt employees.

41.    Defendant's Agents use the same or substantially similar computer software programs and applications in the course of performing their job responsibilities. These programs and applications are integral and an important part of the Agents' work, and they cannot perform their jobs effectively without them.

42.    Defendant's Agents receive substantially the same training, are subject to the same disciplinary policies, and are subject to quality assurance reviews based on the same or similar criteria.

43.    Defendant expressly instructs and trains Agents to have all their computer software programs and applications open and ready at the start of their scheduled shifts so that they can change their status to "Active" in the Auto Dialer and begin taking live calls at the moment their shifts begin.

44.    If Agents are not "on the dialer" and ready to take calls promptly at the start of their scheduled shifts or at the end of their scheduled meal and rest breaks, they are subject to penalties and disciplinary action (referred to by Defendant as "demerits"), including but not limited to: written and verbal reprimands, suspension, and monetary penalties in the form of an hourly pay reduction or forfeiture of earned commissions. It is axiomatic that an employer

cannot impose a monetary fine or withhold wages from an employee for being late to work, especially when, as here, Agents are rarely ever late for work, but instead are sometimes late logging onto the phones if they are unable to boot up their computers and connect to the Auto Dialer by 9:00 a.m. When an Agent is unable to make it onto the phones by 9:00 a.m. it is usually due to circumstances outside of their control, such as technical issues with the computer or the Auto Dialer. Nevertheless, if an Agent is not connected to the Auto Dialer by 9:00 a.m. or returns late from a meal/rest break, he or she is penalized in some fashion.

45.     When an Agent receives a demerit, Defendant furnishes the Agent with a document explaining the nature of the "violation" and the penalty (i.e., the "demerit") imposed upon the Agent for the violation. The Agent must sign the document, certifying that the Agent understands the nature of the violation and the penalty being imposed, and that the Agent "accepts" the demerit.

46.     These policies reinforce that Agents are required to have the essential computer software programs and applications open and ready at the start of their shifts so that they can change their status in the Auto Dialer to "Active" and begin taking live calls at the moment their shifts begin.

47.     Defendant imposes additional penalties if an Agent is connected to the Auto Dialer but is not on the phone with a live call. Defendant refers to this time as "dead time." If an Agent's "dead time" exceeds 31% (calculated by dividing "dead time" by the total amount of time that the Agent is connected to the Auto Dialer), he or she is subject to a demerit, which, as stated above, may include a monetary penalty. Thus, the Agents' compensation is not only a function of the time spent "on the dialer," but is also dependent, in part, upon there being live calls on the other end of the phone, which is completely outside of the Agents' control. Indeed,

the Agents are regularly required to remain at their workstation waiting to be connected to a live call, but, paradoxically, face disciplinary action if the dearth of live calls causes the Agents' "dead time" to eclipse 31%.

48.     Defendant requires its Agents to track their hours worked each and every day by manually recording their time on paper timesheets provided by Defendant. At the end of each pay period, the Agents must tally and record on their timesheets the number of hours worked during the pay period, sign their timesheets, and submit them to Defendant's managers for approval. Defendant, however, will not approve an Agent's timesheet unless the hours recorded on the timesheet substantially adhere to the Agent's scheduled working hours, meaning that the Agents must record a clock-in time that matches their scheduled start-of-shift time and a clock-out time that matches their scheduled end-of-shift time, while also deducting a mandatory one-hour lunch break for their Monday through Thursday shifts.

49.     Because Defendant trains and instructs its Agents not to record time spent performing pre-shift, mid-shift and post-shift work tasks, Defendant's compensation system fails to properly account for and compensate Agents for all time worked, including their overtime hours, during each day and during each workweek.

50.     The hours reflected on the Agents' timesheets are not accurate, are contrived by Defendant, and are not related to the hours the Agents actually worked for Defendant. This is because Defendant requires its Agents to perform compensable work tasks before and after their shifts and during their unpaid meal periods but trains and instructs them not to record this time on their timesheets.

51.     As a result of Defendant's compensation policy, Plaintiffs and all other Agents are deprived of pay for compensable time worked, including overtime.

A.      **Pre-Shift Off-the-Clock Work**

52.     Pursuant to Defendant's policies, training and direction, Defendant's Agents are required to start up and log into essential computer software programs and applications in order to access information and take live calls. The pre-shift startup and login process takes substantial time on a daily basis, in the range of 5 to 10 minutes per shift, or even longer when technical issues arise. Before each shift and before taking live phone calls, Agents must undertake the following essential work tasks in chronological order:

   a.  Locate their workstation and turn-on/warm-up their computer.

   b.  Log into Microsoft Windows by clicking a single sign on button and wait for the computer to establish an internet connection.

   c.  Open Google Chrome by clicking the Google Chrome icon and go to Ytel.com.

   d.  Log into Ytel (the Auto Dialer) using a user ID (a four digit number provided by Defendant) and password (last four digits of the Agent's Social Security Number), select your campaign (i.e., mortgage lending, solar energy, home security, credit repair, tax relief, etc.), and wait for the dashboard to appear. Once the dashboard appears, it will display three overlapping menus/panels, which the Agents must rearrange or resize so that they can simultaneously view each menu.

   e.  Clear the cache in Google Chrome, which entails the following:

       i.   From the "**Menu**" button in the upper-right corner of the Chrome window, choose "**More Tools**" > "**Clear browsing data….**"

       ii.  Select the period of time you wish to delete cached information using the "**Clear the following items from**" drop down menu. From there, choose "**Cached images and files**".

       iii. Select the "**Clear browsing data**" button and wait for Chrome to clear the cache.

   f.  Change status in Ytel to "**Active**" and wait for the Auto Dialer to connect to a live call.

53.     Agents who work from home are required to undertake the exact same login steps.

54.     This mandatory boot-up and login process is performed *before* the Agents'

scheduled shifts, as Defendant expressly instructs and trains its Agents to have all their software programs and applications open and ready at the start of their shifts to ensure they are prepared to take live calls (i.e., are "phone ready") at the moment their shifts begin. Consequently, Agents are required to arrive at their workstations approximately 5 to 10 minutes before their scheduled shifts to complete the startup and login process.

55.    Defendant's Agents are not compensated for this time because Defendant trains and instructs its Agents not to record this time on their timesheets. This policy results in Agents performing no less than 5 to 10 minutes of unpaid pre-shift work each and every day.

56.    The unpaid work performed prior to each shift by Plaintiffs and all other Agents directly benefits Defendant, and the tasks undertaken in connection with the off-the-clock work are integral and indispensable to their job duties and responsibilities as Agents.

**B.    Meal-Period Off-the-Clock Work**

57.    Defendant promises its Agents one unpaid 60-minute meal period each Monday through Thursday. However, in reality, Agents regularly work through unpaid meal periods—or take them late—when there are not enough Agents to cover the phones or when the Agent is stuck on a live call.

58.    Under federal law, in order to deduct an unpaid meal period from an employee's compensable time, an employee must be completely relieved of his or her employment duties for the entire meal break. 29 C.F.R. § 785.19(a) states:

> ***Bona fide meal periods***. Bona fide meal periods are not work time. Bona fide meal periods do not include coffee breaks or time for snacks. These are rest periods. The employee must be *completely relieved* from duty for the purposes of eating regular meals. Ordinarily 30 minutes or more is long enough for a bona fide meal period. A shorter period may be long enough under special conditions. The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating. For example, an office employee who is required to eat at his desk or a factory worker who is required to be at his machine is

14

working while eating. (emphasis added).

59.     Instead of complying with the law, Defendant does not provide Agents with bona fide meal periods because it requires the Agents to resume taking live calls promptly at the end of their scheduled meal breaks, meaning that the Agents must return to their computer stations prior to the end of their unpaid meal breaks to log back in and reconnect to the Auto Dialer.

60.     The work performed by Agents during their unpaid meal breaks takes substantial time on a daily basis, in the range of 5 minutes per shift, but Agents are not paid for this time.

**C.      Post-Shift Off-the-Clock Work**

61.     Pursuant to Defendant's policies, training and direction, at the conclusion of their scheduled shifts, Defendant's Agents are required to log out of and shut down the computer software programs and applications and shut down the computer. The post-shift logout and shutdown process takes substantial time on a daily basis, ranging from 2 to 3 minutes per shift, but can take as long as 10 minutes if the Agent experiences technical problems with the computer, software or applications.

62.     Defendant's Agents are not compensated for this time because Defendant trains and instructs its Agents not to record this time on their timesheets. This policy results in Agents performing no less than 2 to 3 minutes of unpaid post-shift work each and every day.

63.     The unpaid work performed subsequent to each shift by Plaintiffs and all other Agents directly benefits Defendant, and the tasks undertaken in connection with the off-the-clock work are integral and indispensable to their job duties and responsibilities as Agents.

**D.      Additional Off-The-Clock Work**

64.     In addition to training and instructing its Agents not to record their pre-shift, meal-period, and post-shift time, Defendant engaged in additional wage violations by failing to

pay its Agents for all of the time reflected on their timesheets. This is undisputed. For example, a representative sample of Plaintiff Persaud's timesheets (Exh. H) and her corresponding payroll reports[1] (Exh. I) reveal the following:

a.  Plaintiff Persaud's timesheet for the pay period covering October 9 - 25, 2018 reflects 98.50 hours worked. (Exh. H at 1.) Her payroll report for the same pay period shows that she was paid for only 97.12 hours of work (Exh. I at 1), meaning that Defendant deducted 1.38 hours from Plaintiff Persaud's compensable time.

b.  Plaintiff Persaud's timesheet for the pay period covering December 26, 2018 to January 8, 2019 reflects 73 hours worked. (Exh. H at 2.) Her payroll report for the same pay period shows that she was paid for only 72.58 hours of work (Exh. I at 2), meaning that Defendant deducted 0.42 hours from Plaintiff Persaud's compensable time.

c.  Plaintiff Persaud's timesheet for the pay period covering January 26 to February 8, 2019 reflects 82 hours worked. (Exh. H at 3.) Her payroll report for the same pay period shows that she was paid for only 77.34 hours of work (Exh. I at 3), meaning that Defendant deducted 4.66 hours from Plaintiff Persaud's compensable time.

d.  Plaintiff Persaud's timesheet for the pay period covering February 9 - 22, 2019 reflects 80.75 hours worked. (Exh. H at 4.) Her payroll report for the same pay

---

[1] At the conclusion of each pay period, Defendant creates a payroll report summarizing the Agent's compensable time, base wages, and commissions, and any adjustments made thereto, for the pay period. (*See, e.g.,* Exh. I.) Defendant presents the payroll report to the Agent, who must sign (i.e., rubberstamp) and date the payroll report acknowledging that they have reviewed the payroll report and "agree" with the calculations. (*Id.*)

period shows that she was paid for only 80.49 hours of work (Exh. I at 4), meaning that Defendant deducted 0.26 hours from Plaintiff Persaud's compensable time.

65.     In sum, Defendant deducted 6.72 hours of compensable time from Plaintiff Persaud during the four representative pay periods identified above. (*See* Exh. H-I.)

66.     Defendant's pay violations illustrated above stem, at least in part, from Defendant's decision to compensate its Agents for only such time that they are connected to Defendant's Auto Dialer, meaning that they are only paid for time spent on the phones (i.e., "on the dialer") and are not paid for any time spent disconnected from the Auto Dialer.

67.     In this regard, Defendant tracks the amount of time that its Agents are not "on the dialer," deducts all such time from its Agents' compensable time, and fraudulently induces its Agents to sign off on this illegal policy by requiring its Agents to sign payroll reports at the end of each pay period acknowledging that they have reviewed the payroll report and "agree" with the calculations, while at the same time failing to disclose to the Agents the illegal nature of its pay policy.

68.     Agents spend significant amounts of compensable time disconnected from the Auto Dialer, but Defendant does not pay them for this time.

69.     For instance, if an Agent accumulates too much "dead time," meaning that the Agent is connected to the Auto Dialer but is not on the phone with a live call, Defendant's managers will manually boot the Agent from the Auto Dialer. The Agent is not paid for this time because they are no longer connected to the Auto Dialer, nor are they paid for the time spent logging back into and reconnecting to the Auto Dialer.

70.     In addition, the Agents are regularly booted off the Auto Dialer due to technical

issues but are required to remain at their workstation until the technical issues are resolved, which usually necessitates a restart of Microsoft Windows before logging back into the Auto Dialer, which typically takes 5 to 10 minutes, but could also entail a complete shut down and restart of the entire computer system, which typically takes 15 minutes, but can take up to 20 minutes or more if the shutdown causes the computer to undergo a system upgrade. Because they are no longer connected to the Auto Dialer, the Agents are not paid for this technical downtime, nor are they paid for the time spent logging back into and reconnecting to the Auto Dialer.

71.     Defendant deducts additional time from the Agents if they are not "on the dialer" and ready to take calls promptly at the end of their scheduled rest breaks, prompting Defendant's managers to manually boot the Agents from the Auto Dialer. The Agents are not paid for this time because they are no longer connected to the Auto Dialer, nor are they paid for the time spent logging back into and reconnecting to the Auto Dialer.

72.     Additionally, if the Agents work through all or a portion of their unpaid lunch breaks and report this time on their timesheets, Defendant will deduct such time and will not compensate the Agents for working through lunch. The evidence shows that Plaintiff Persaud failed to record a full one-hour lunch break for numerous shifts and that Defendant edited her time to eliminate all or some of the work she performed during her lunch breaks. Specifically, the evidence shows that:

      a.  On January 31, 2019, Plaintiff Persaud worked a 10-hour shift and recorded 9.5 hours worked on her timesheet. (Exh. H at 3.) Her payroll report, however, shows that she was paid for only 9 hours of work (Exh. I at 3), meaning that Defendant deducted 0.5 hours from Plaintiff Persaud's compensable time.

      b.  On February 1, 2019, Plaintiff Persaud worked an 8-hour shift and recorded 7.75

hours worked on her timesheet. (Exh. H at 3.) Her payroll report, however, shows that she was paid for only 7 hours of work (Exh. I at 3), meaning that Defendant deducted 0.75 hours from Plaintiff Persaud's compensable time.

c.   On February 5, 2019, Plaintiff Persaud worked a 10-hour shift and recorded 9.5 hours worked on her timesheet. (Exh. H at 3.) Her payroll report, however, shows that she was paid for only 9.06 hours of work (Exh. I at 3), meaning that Defendant deducted 0.46 hours from Plaintiff Persaud's compensable time.

d.   On February 6, 2019, Plaintiff Persaud worked a 10-hour shift and recorded 9.75 hours worked on her timesheet. (Exh. H at 3.) Her payroll report, however, shows that she was paid for only 9 hours of work (Exh. I at 3), meaning that Defendant deducted 0.75 hours from Plaintiff Persaud's compensable time.

e.   On February 7, 2019, Plaintiff Persaud worked a 10-hour shift and recorded 9.75 hours worked on her timesheet. (Exh. H at 3.) Her payroll report, however, shows that she was paid for only 9.59 hours of work (Exh. I at 3), meaning that Defendant deducted 0.16 hours from Plaintiff Persaud's compensable time.

f.   On February 8, 2019, Plaintiff Persaud worked an 8-hour shift and recorded 8 hours worked on her timesheet. (Exh. H at 3.) Her payroll report, however, shows that she was paid for only 7 hours of work (Exh. I at 3), meaning that Defendant deducted 1 hour from Plaintiff Persaud's compensable time.

73.   These policies result in Agents performing significant amounts of unpaid work each and every week. Because Agents typically work 40 or more hours per week, this policy also deprives them of overtime pay.

74.   The unpaid work performed by Plaintiffs and all other Agents during their unpaid

lunch breaks and during periods when they are disconnected from the Auto Dialer directly benefits Defendant, and the tasks undertaken in connection with the off-the-clock work are integral and indispensable to their job duties and responsibilities as Agents.

**E.     Exemplary Pay-Periods to Illustrate Pre-Shift, Meal-Period, and Post-Shift Compensation Deficiencies**

75.     An example of specific workweeks where Defendant failed to pay Plaintiffs all overtime due for hours worked in excess of 40 hours (as mandated by the FLSA) includes the following:

**Pay Period of 01/11/2019 to 01/25/2019**

- Plaintiff Baudin was paid gross wages equal to $1,615.36 for the pay period.

- With unpaid pre-shift, meal-period, and post-shift time, in a range of 12 to 18 minutes per shift, at 11 shifts for the pay period, Plaintiff Baudin should have been paid an additional 132-198 minutes at his overtime rate of pay.

(Exh. B, Baudin Pay Stub.)

**Pay Period of 09/09/2018 to 09/24/2018**

- Plaintiff Duffney was paid gross wages equal to $1,382.05 for the pay period.

- With unpaid pre-shift, meal-period, and post-shift time, in a range of 12 to 18 minutes per shift, at 11 shifts for the pay period, Plaintiff Duffney should have been paid an additional 132-198 minutes at her overtime rate of pay.

(Exh. D, Duffney Pay Stub.)

**F.     Defendant Benefited from the Uncompensated Off-the-Clock Work**

76.     At all relevant times, Defendant directed and directly benefited from the work performed by Plaintiffs and similarly situated employees in connection with the above-described pre-shift, mid-shift, and post-shift activities performed by Agents.

77.     At all relevant times, Defendant controlled the work schedules, duties, protocols, applications, assignments and employment conditions of its Agents.

78.     At all relevant times, Defendant was able to track the amount of time Agents spent in connection with the pre-shift, mid-shift, and post-shift activities. However, Defendant failed to do so and failed to compensate Agents for the off-the-clock work they performed.

79.     At all relevant times, Agents were non-exempt hourly employees, subject to the requirements of the FLSA.

80.     At all relevant times, Defendant used its attendance and adherence policies against the Agents in order to pressure them into performing the pre-shift, mid-shift, and post-shift off-the-clock work.

81.     Defendant expressly trained and instructed its Agents to perform the above-described pre-shift activities *before* the start of their scheduled shifts, to ensure they were prepared to take live calls (i.e., were "phone ready") at the moment their shifts began.

82.     At all relevant times, Defendant's policies and practices deprived Agents of wages owed for the pre-shift, mid-shift, and post-shift activities they performed. Because Defendant's Agents typically worked 40 hours or more in a workweek, Defendant's policies and practices also deprived them of overtime pay.

83.     Defendant knew or should have known that the time spent by Agents in connection with the pre-shift, mid-shift, and post-shift activities was compensable under the law. Indeed, in light of the explicit DOL guidance cited above, there is no conceivable way for Defendant to establish that it acted in good faith.

84.     Despite knowing Agents performed work before and after their scheduled shifts and during their unpaid meal breaks, Defendant failed to make any effort to stop or disallow the off-the-clock work and instead suffered and permitted it to happen.

85.     Unpaid wages related to the off-the-clock work described herein are owed to

Agents at the FLSA mandated overtime premium of one and one-half their regular hourly rate because Agents regularly worked in excess of 40 hours in a workweek.

## FLSA COLLECTIVE ACTION ALLEGATIONS

86.     Plaintiffs bring this action pursuant to 29 U.S.C. § 216(b) of the FLSA on their own behalf and on behalf of:

> **All similarly situated current and former hourly brick-and-mortar and/or at-home Account Representatives or Transfer Agents who work or have worked for Defendant at any time during the three years preceding the filing of this Complaint through judgment.**

(hereinafter referred to as the "FLSA Collective"). Plaintiffs reserve the right to amend this definition if necessary.

87.     Defendant is liable under the FLSA for, *inter alia*, failing to properly compensate Plaintiffs and other similarly situated Agents.

88.     Excluded from the FLSA Collective are Defendant's executives and administrative and professional employees, including computer professionals and outside salespersons.

89.     Consistent with Defendant's policy and pattern or practice, Plaintiffs and the FLSA Collective were not paid premium overtime compensation when they worked beyond 40 hours in a workweek.

90.     Defendant assigned and/or was aware of all of the work that Plaintiffs and the FLSA Collective performed.

91.     As part of its regular business practices, Defendant intentionally, willfully and repeatedly engaged in a pattern, practice and/or policy of violating the FLSA with respect to Plaintiffs and the FLSA Collective. This policy and pattern or practice includes, but is not limited to:

a.   Willfully failing to pay its employees, including Plaintiffs and the FLSA Collective, premium overtime wages for hours worked in excess of 40 hours per workweek; and

b.   Willfully failing to record all of the time that its employees, including Plaintiffs and the FLSA Collective, worked for the benefit of Defendant.

92.   Defendant is aware or should have been aware that federal law required it to pay Plaintiffs and the FLSA Collective overtime premiums for hours worked in excess of 40 per workweek.

93.   Defendant's unlawful conduct has been widespread, repeated and consistent.

94.   A collective action under the FLSA is appropriate because the employees described above are "similarly situated" to Plaintiffs under 29 U.S.C. § 216(b). The employees on behalf of whom Plaintiffs bring this collective action are similarly situated because (a) they have been or are employed in the same or similar positions; (b) they were or are performing the same or similar job duties; (c) they were or are subject to the same or similar unlawful practices, policy, or plan; and (d) their claims are based upon the same factual and legal theories.

95.   The employment relationships between Defendant and every proposed FLSA Collective member are the same. The key issues - the amount of uncompensated pre-shift start-up/log-in time, unpaid meal period time, and the amount of post-shift shut-down/log-out time owed to each employee - do not vary substantially among the proposed FLSA Collective members.

96.   Many similarly situated current and former Agents have been underpaid in violation of the FLSA and would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join it.

97.   Court-supervised notice of this lawsuit should be sent to the FLSA Collective pursuant to 29 U.S.C. § 216(b).

98.     Those similarly situated employees are known to Defendant, are readily identifiable, and can be located through Defendant's records.

99.     Plaintiffs estimate the proposed FLSA Collective, including both current and former employees over the relevant period, will include hundreds of workers. The precise number of FLSA Collective members should be readily available from a review of Defendant's personnel and payroll records.

## RULE 23 CLASS ACTION ALLEGATIONS

100.     Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(3) on their own behalf and on behalf of the following classes:

> *All similarly situated current and former hourly brick-and-mortar and/or at-home Account Representatives or Transfer Agents who work or have worked for Defendant in New York at any time during the applicable statutory period.*

(hereinafter referred to as the "Rule 23 New York Class"). Plaintiffs reserve the right to amend the putative class definition if necessary.

> *All similarly situated current and former hourly brick-and-mortar and/or at-home Account Representatives or Transfer Agents who work or have worked for Defendant at any time during the applicable statutory period.*

(hereinafter referred to as the "Rule 23 Nationwide Class"). Plaintiffs reserve the right to amend the putative class definition if necessary.

101.     Excluded from the Rule 23 Classes are Defendant's executives and administrative and professional employees, including computer professionals and outside salespersons.

102.     The Rule 23 Classes are so numerous that joinder of all Rule 23 Class members in this case would be impractical. Plaintiffs reasonably estimate there are hundreds of Rule 23 Class members. Rule 23 Class members should be easy to identify from Defendant's computer systems and electronic payroll and personnel records.

103.    There is a well-defined community of interest among Rule 23 New York Class members and common questions of law and fact predominate in this action over any questions affecting individual members of the Rule 23 New York Class. These common legal and factual questions include, but are not limited to, the following:

      a.     Whether Plaintiffs and the Rule 23 New York Class were compensated at a rate of one-and-one-half times their regular hourly rate for all hours worked in excess of 40 in a workweek pursuant to New York state wage and hour laws;

      b.     Whether Defendant employed Plaintiffs and the Rule 23 New York Class within the meaning of the New York Minimum Wage Laws, 12 NYCRR §§ 142-1, *et seq.*

      c.     Whether Defendant unlawfully failed to pay overtime wages in violation of 12 NYCRR § 142-2.2;

      d.     Whether Defendant failed to keep accurate time and payroll records for Plaintiffs and the Rule 23 New York Class;

      e.     Whether Defendant's policy of failing to pay the overtime wage was instituted willfully or with reckless disregard of the law;

      f.     The proper measure of damages sustained by Plaintiffs and the Rule 23 New York Class; and

      g.     Whether Defendant should be enjoined from such violations in the future.

104.    There is a well-defined community of interest among Rule 23 Nationwide Class members and common questions of law and fact predominate in this action over any questions affecting individual members of the Rule 23 Nationwide Class. These common legal and factual questions include, but are not limited to, the following:

      a.     Whether the time Rule 23 Nationwide Class members spent on pre-shift, mid-shift and post-shift off-the-clock work activities is compensable time;

      b.     Whether Rule 23 Nationwide Class members are owed wages for time spent performing off-the-clock work activities, and, if so, the appropriate amount thereof; and

      c.     Whether Defendant's non-payment of wages for all compensable time

amounted to a breach of contract and/or unjust enrichment.

105.     Plaintiffs' claims are typical of those of the Rule 23 Classes in that they and all other Rule 23 Class members suffered damages as a direct and proximate result of Defendant's common and systemic payroll policies and practices. Plaintiffs' claims arise from the same policies, practices, promises and course of conduct as all other Rule 23 Class members' claims, and their legal theories are based on the same legal theories as all other Rule 23 Class members.

106.     Plaintiffs will fully and adequately protect the interests of the Rule 23 Classes and have retained counsel who are qualified and experienced in the prosecution of nationwide wage and hour class actions. Neither Plaintiffs nor their counsel have interests that are contrary to, or conflicting with, the interests of the Rule 23 Classes.

107.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because, *inter alia*, it is economically infeasible for Rule 23 Class members to prosecute individual actions of their own given the relatively small amount of damages at stake for each individual along with the fear of reprisal by their employer. Prosecution of this case as a Rule 23 Class action will also eliminate the possibility of duplicative lawsuits being filed in state and federal courts throughout the nation.

108.     This case will be manageable as a Rule 23 Class action. Plaintiffs and their counsel know of no unusual difficulties in this case, and Defendant has advanced, networked computer and payroll systems that will allow the class, wage, and damages issues in this case to be resolved with relative ease.

109.     Because the elements of Rule 23(b)(3) are satisfied in this case, class certification is appropriate. *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) ("By its terms [Rule 23] creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action").

110.    Because Defendant acted and refused to act on grounds that apply generally to the Rule 23 Classes and declaratory relief is appropriate in this case with respect to the Rule 23 Classes as a whole, class certification pursuant to Rule 23(b)(2) is also appropriate.

**COUNT I**
**(29 U.S.C. § 216(b) Collective Action)**
**VIOLATION OF FLSA, 29 U.S.C. § 201, _et seq._**
**FAILURE TO PAY OVERTIME WAGES**

111.    Plaintiffs re-allege and incorporate all previous paragraphs herein.

112.    At all times relevant to this action, Defendant was engaged in interstate commerce, or in the production of goods for commerce, as defined by the FLSA.

113.    At all times relevant to this action, Plaintiffs and the FLSA Collective were "employees" of Defendant within the meaning of 29 U.S.C. § 203(e)(1) of the FLSA.

114.    Plaintiffs and the FLSA Collective, by virtue of their job duties and activities actually performed, are all non-exempt employees.

115.    Plaintiffs and the FLSA Collective either: (1) engaged in commerce; or (2) engaged in the production of goods for commerce; or (3) were employed in an enterprise engaged in commerce or in the production of goods for commerce.

116.    At all times relevant to this action, Defendant "suffered or permitted" Plaintiffs and the FLSA Collective to work and thus "employed" them within the meaning of 29 U.S.C. § 203(g) of the FLSA.

117.    At all times relevant to this action, Defendant required Plaintiffs and the FLSA Collective to perform no less than 12 to 18 minutes of off-the-clock work per shift, but failed to pay these employees the federally mandated overtime compensation for the off-the-clock work.

118.    The off-the-clock work performed every shift by Plaintiffs and the FLSA Collective was an essential part of their jobs, and these activities and the time associated with

these activities were not *de minimis*.

119.    In workweeks where Plaintiffs and other FLSA Collective members worked 40 hours or more, the uncompensated off-the-clock work time, and all other overtime, should have been paid at the federally mandated rate of one and one-half times each employee's regular hourly wage, including shift differentials and nondiscretionary incentive pay where applicable. 29 U.S.C. § 207.

120.    Defendant's FLSA violations were knowing and willful. Defendant knew or could have determined how long it takes its Agents to perform their off-the-clock work. Further, Defendant could have easily accounted for and properly compensated Plaintiffs and the FLSA Collective for these work activities, but deliberately chose not to.

121.    The FLSA, 29 U.S.C. § 216(b), provides that as a remedy for a violation of the Act, an employee is entitled to his or her unpaid wages (including unpaid overtime), plus an additional equal amount in liquidated damages (double damages), plus costs and reasonable attorneys' fees.

### COUNT II
### RULE 23 NEW YORK CLASS ACTION
### 12 NYCRR § 142-2.2 – FAILURE TO PAY OVERTIME WAGES

122.    Plaintiffs re-allege and incorporate all previous paragraphs herein.

123.    12 NYCRR § 142-2.2 provides that "An employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate in the manner and methods provided in" the FLSA.

124.    Plaintiffs worked over 40 hours in many weeks.

125.    Defendant failed to pay Plaintiffs one and one-half times their regular rate of pay for all hours in a workweek in excess of 40.

126.    A six year statute of limitation applies to each such violation pursuant to NY CLS

Labor § 663(3).

127.     Defendant's conduct and practice, described above, was and/or is willful, intentional, unreasonable, arbitrary and in bad faith.

128.     As a result of the foregoing, Plaintiffs were illegally deprived of overtime wages earned, in such amounts to be determined at trial, and are entitled to recovery of total unpaid amounts, liquidated damages, prejudgment interest, costs, and reasonable attorney's fees pursuant to NY CLS Labor § 663(1).

**COUNT III**
**RULE 23 NATIONWIDE CLASS ACTION**
**BREACH OF CONTRACT**

129.     Plaintiffs re-allege and incorporate all previous paragraphs herein.

130.     At all times relevant to this action, Defendant had a contract with Plaintiffs and every other Rule 23 Nationwide Class member to pay each employee for each hour they worked at a pre-established (contractual) regular hourly rate.

131.     Each Rule 23 Nationwide Class member's contractual hourly rate is identified in pay stubs and other records that Defendant prepares as part of its regular business activities.

132.     Plaintiffs and every other Rule 23 Nationwide Class member performed under the contracts by doing their jobs and carrying out the off-the-clock activities that Defendant required or accepted.

133.     By not paying Plaintiffs and the Rule 23 Nationwide Class the agreed upon hourly wage for all of the work they performed each shift, Defendant systematically breached its contracts with Plaintiffs and the Rule 23 Nationwide Class.

134.     Plaintiffs' and the Rule 23 Nationwide Class' remedies under the FLSA are inadequate in this case to the extent Defendant paid them more than the federally mandated minimum wage of $7.25 per hour but less than 40 hours per week (i.e., pure gap time claims).

135.     Defendant also breached its duty of good faith and fair dealing by failing to keep track of the time Plaintiffs and the Rule 23 Nationwide Class spent performing off-the-clock activities, which is a fundamental part of an employer's job.

136.     As a direct and proximate result of Defendant's breaches of the contracts alleged herein, Plaintiffs and the Rule 23 Nationwide Class have been damaged, in an amount to be determined at trial.

**COUNT IV**
**RULE 23 NATIONWIDE CLASS ACTION**
**UNJUST ENRICHMENT**

137.     Plaintiffs re-allege and incorporate all previous paragraphs herein.

138.     This Count is pled in the alternative to Count III, *supra*, pursuant to Fed. R. Civ. P. 8(d)(2)-(3).

139.     At all times relevant to this action, Defendant promised Plaintiffs and the Rule 23 Nationwide Class a pre-established regular hourly rate in consideration of the work duties Plaintiffs and the Rule 23 Nationwide Class performed for the benefit of Defendant.

140.     Plaintiffs and the Rule 23 Nationwide Class relied upon Defendant's promise for the pre-established regular hourly rate and performed by doing their jobs and carrying out their required work duties.

141.     By not paying Plaintiffs and the Rule 23 Nationwide Class the agreed upon hourly wage for the pre-shift, mid-shift and post-shift off-the-clock work they performed each shift, Defendant was unjustly enriched.

142.     Plaintiffs and the Rule 23 Nationwide Class performed off-the-clock work tasks at the request of and without objection by Defendant.

143.     Defendant received and accepted the above-referenced off-the-clock work services from Plaintiffs and the Rule 23 Nationwide Class and enjoyed the benefits derived therefrom.

144.     Upon information and belief, Defendant used the monies owed to Plaintiffs and the Rule 23 Nationwide Class to finance its various business ventures or pay its equity owners.

145.     Defendant has been unjustly enriched by the retention of monies received pursuant to the services Plaintiffs and the Rule 23 Nationwide Class performed for Defendant's benefit, without having compensated Plaintiffs and the Rule 23 Nationwide Class for the same.

146.     Plaintiffs and the Rule 23 Nationwide Class suffered detriment due to Defendant's failure to compensate them for the off-the-clock work described herein, in that Plaintiffs and the Rule 23 Nationwide Class were deprived of the ability to utilize that time, effort and their resources in a profitable manner.

147.     As a direct and proximate result of Defendant's actions, Plaintiffs and the Rule 23 Nationwide Class suffered damages, including but not limited to, loss of wages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the putative FLSA Collective and Rule 23 Classes, request judgment as follows:

a.     Certifying this case as a collective action in accordance with 29 U.S.C. § 216(b) with respect to the FLSA claims set forth herein (Count I);

b.     Certifying this action as a class action (for the Rule 23 New York Class) pursuant to Rule 23(b)(2) and (b)(3) with respect to Plaintiffs' New York state law claims (Count II);

c.     Certifying this action as a class action (for the Rule 23 Nationwide Class) pursuant to Rule 23(b)(2) and (b)(3) with respect to Plaintiffs' breach of contract and unjust enrichment claims (Counts III-IV);

d.     Ordering Defendant to disclose in computer format, or in print if no computer readable format is available, the names and addresses of all collective action Class members and Rule 23 Class members, and permitting Plaintiffs to send notice of this action to all those similarly situated individuals, including the publishing of notice in a manner that is reasonably calculated to apprise the Class members of their rights by law to join and participate in this lawsuit;

e.     Designating Plaintiffs as the representatives of the FLSA collective action Class

and the Rule 23 Classes, and undersigned counsel as Class counsel for the same;

f.      Declaring Defendant violated the FLSA and the DOL's attendant regulations as cited herein;

g.      Declaring Defendant's violation of the FLSA was willful;

h.      Declaring Defendant violated New York state wage and hour laws as cited herein;

i.      Declaring Defendant's violation of New York state wage and hour laws was willful;

j.      Declaring Defendant breached its contracts with Plaintiffs and the Rule 23 Nationwide Class (or, in the alternative, that Defendant was unjustly enriched) by failing to pay them for each hour they worked at a pre-established (contractual) regularly hourly rate;

k.      Granting judgment in favor of Plaintiffs and against Defendant and awarding Plaintiffs and the collective action Class and the Rule 23 Classes the full amount of damages and liquidated damages available by law;

l.      Awarding reasonable attorneys' fees and costs incurred by Plaintiffs in filing this action as provided by statute;

m.      Awarding pre- and post-judgment interest to Plaintiffs on these damages; and

n.      Awarding such other and further relief as this Court deems appropriate.

## **JURY DEMAND**

Plaintiffs, individually and on behalf of all others similarly situated, by and through their attorneys, hereby demand a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure and the court rules and statutes made and provided with respect to the above-entitled cause.

Dated: April 1, 2019              Respectfully Submitted,

/s Jason T. Brown
Jason T. Brown (*NY Bar ID# 4389854*)
BROWN LLC
111 Town Square Place, Suite 400
Jersey City, New Jersey 07310

Phone: (877) 561-0000
jtb@jtblawgroup.com
nicholasconlon@jtblawgroup.com

Kevin J. Stoops (will *pro hac vice*)
Rod M. Johnston (will *pro hac vice*)
SOMMERS SCHWARTZ, P.C.
One Towne Square, 17th Floor
Southfield, Michigan 48076
Phone: (248) 355-0300
kstoops@sommerspc.com
rjohnston@sommerspc.com

*Attorneys for Plaintiffs and the putative
Class/Collective action members*