# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| TONYA HERBIN, JENNIFER TABOR, and BRETT TYSON, individually and on behalf all others similarly situated, | : : : : : | |
| Plaintiffs, | : : | Case No.  2:19-cv-00696-CB |
| v. | : : | |
| THE PNC FINANCIAL SERVICES GROUP, INC. and PNC BANK, N.A., | : : : | |
| Defendants. | : : | |

|  |  |  |
|---|---|---|
| CASEY MINOR and ALEXIS YARBROUGH, individually and on behalf all similarly situated individuals, | : : : : | |
| Plaintiffs, | : : | Case No.  2:20-cv-00058-CB |
| v. | : : | |
| PNC BANK, N.A., | : : | |
| Defendant. | : : | |

## PLAINTIFFS' UNOPPOSED MOTION TO APPROVE COLLECTIVE ACTION SETTLEMENT, AUTHORIZE NOTICE MAILING, AND DISMISS WITH PREJUDICE

Plaintiffs Tonya Herbin, Jennifer Tabor, Brett Tyson, Casey Minor, and Alexis Yarbrough (collectively, "Plaintiffs") hereby request that the Court grant approval of a settlement reached by the parties, as further set forth in Plaintiffs' Memorandum of Law in Support of Plaintiffs' Unopposed Motion to Approve Collective Action Settlement, Authorize Notice Mailing, and Dismiss with Prejudice and the Declarations of Justin M. Swartz, Matthew L. Turner, and Rod M. Johnston, filed concurrently with this Motion. A Proposed Order is attached as Exhibit 2 to the Declaration of Justin M. Swartz.

Respectfully submitted,
By: */s/ Justin M. Swartz*

**OUTTEN & GOLDEN LLP**
Justin M. Swartz*
Chauniqua D. Young**
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone: (212) 245-1000
E-mail: jms@outtengolden.com
E-mail: cyoung@outtengolden.com

**CARLSON LYNCH, LLP**
Gary F. Lynch
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
E-mail: glynch@carlsonlynch.com

**SHAVITZ LAW GROUP, P.A.**
Gregg I. Shavitz*
Paolo Meireles*
Logan A. Pardell*
951 Yamato Road
Boca Raton, Florida 33431
Telephone: (561) 447-8888
E-mail: gshavitz@shavitzlaw.com
E-mail: pmeireles@shavitzlaw.com
E-mail: lpardell@shavitzlaw.com

*Attorneys for the Herbin Plaintiffs and the
Putative Collective*

**SOMMERS SCHWARTZ, P.C.**
Matthew L. Turner**
Rod M. Johnston*
One Towne Sq., Ste. 1700
Southfield, MI 48076
(248) 355-0300
E-mail: rjohnston@sommerspc.com
E-mail: mturner@sommerspc.com

*Admitted *Pro Hac Vice*
***Pro hac vice* motion forthcoming

*Attorneys for the Minor Plaintiffs and the Putative Collective*

## CERTIFICATION OF SERVICE

I hereby certify that on January 21, 2019 the above document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

By: */s/ Justin M. Swartz*
    Justin M. Swartz

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| TONYA HERBIN, JENNIFER TABOR, and BRETT TYSON, individually and on behalf all others similarly situated, | : : : : : | Case No. 2:19-cv-00696-CB |
| Plaintiffs, | : : | |
| v. | : : | |
| THE PNC FINANCIAL SERVICES GROUP, INC. and PNC BANK, N.A., | : : : | |
| Defendants. | : : | |

|  |  |  |
|---|---|---|
| CASEY MINOR and ALEXIS YARBROUGH, individually and on behalf all similarly situated individuals, | : : : : | Case No. 2:20-cv-00058-CB |
| Plaintiffs, | : : | |
| v. | : : | |
| PNC BANK, N.A., | : : | |
| Defendant. | : : | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION TO APPROVE COLLECTIVE ACTION SETTLEMENT, AUTHORIZE NOTICE MAILING, AND DISMISS WITH PREJUDICE

i

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND............................................................ 2

I.    Factual Allegations .......................................................................................... 2

II.    Overview of Investigation, Litigation and Settlement Negotiations ................... 2

    A.    The *Herbin* Action ................................................................................ 2

    B.    The *Minor* Action ................................................................................. 3

    C.    Subsequent Settlement Negotiations......................................................... 4

SUMMARY OF THE SETTLEMENT TERMS .............................................................. 4

I.    The Settlement Fund ....................................................................................... 5

II.    Notice Process............................................................................................... 5

III.    Release ........................................................................................................ 6

IV.    Settlement Awards ......................................................................................... 6

V.    Service Payment............................................................................................ 7

VI.    Attorneys' Fees and Litigation Costs................................................................ 7

VII.    Settlement Claims Administration .................................................................... 7

ARGUMENT ......................................................................................................... 8

I.    A One-Step Approval Process Is Standard for FLSA Settlements ...................... 5

II.    The Court Should Approve the Parties' Negotiated Settlement Agreement. ...................... 9

    A.    The Settlement Agreement Is a Compromise of a Bona Fide Dispute. ............... 10

    B.    The Settlement Is Fair, Reasonable and Adequate. ............................................. 11

    C.    The Settlement Furthers the Goals of the FLSA.................................................. 14

III.    The Service Awards Should Be Approved as Fair and Reasonable. .................................. 14

IV.    The Court Should Approve the Proposed Settlement Notice and Claim Form. .................. 16

V.    The Requested Attorneys' Fees Should Be Approved as Fair and Reasonable. ............... 16

VI.     Plaintiffs' Counsel Is Entitled to Recover Their Reasonable Costs. ................................. 21

CONCLUSION .......................................................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**                                                **Page(s)**

*Acevedo v. Brightview Landscapes, LLC*,
No. 13 Civ. 2529, 2017 WL 4354809 (M.D. Pa. Oct. 2, 2017) ................................. 12

*Arrington v. Optimum Healthcare IT, LLC.*,
No. 17 Civ. 3950, 2018 WL 5631625 (E.D. Pa. Oct. 31, 2018) ................................. 17, 19, 20

*Bettger v. Crossmark, Inc.*,
No. 13 Civ. 2030, 2015 WL 279754 (M.D. Pa. Jan. 22, 2015) .................................. 9

*Brown v. TrueBlue, Inc.*,
No. 10 Civ. 00514, 2013 WL 5408575 (M.D. Pa. Sept. 25, 2013) ........................... 8

*Castagna v. Madison Square Garden, L.P.*,
No. 09 Civ. 10211, 2011 WL 2208614 (E.D.N.Y. June 12, 2013)........................... 13

*In re Cendant Corp., Derivative Action Litig.*,
232 F. Supp. 2d 327 (D.N.J. 2002) ................................................................. 17, 18

*In re Chickie's & Pete's Wage & Hour Litig.*,
No. 12 Civ. 6820, 2014 WL 911718 (E.D. Pa. Mar. 7, 2014)........................... 9, 11, 14

*Creed v. Benco Dental Supply Co.*,
No. 12 Civ. 01571, 2013 WL 5276109 (M.D. Pa. Sept. 17, 2013) ......................... 14

*Deitz v. Budget Renovations and Roofing, Inc.*,
No. 12 Civ. 0718, 2013 WL 2338496 (M.D. Pa. May 29, 2013) ............................ 12

*Espenscheid v. DirectSat USA, LLC*,
688 F.3d 872 (7th Cir. 2012) ........................................................................... 15

*Fein v. Ditech Fin., LLC*,
No. 16 Civ. 660, 2017 WL 4284116 (E.D. Pa. Sept. 27, 2017)............................. 15

*Girsh v. Jepson*,
521 F.2d 153 (3d Cir. 1975) .......................................................................... 10, 11

*Halle v. W. Penn Allegheny Health Sys. Inc.*,
842 F.3d 215 (3d Cir. 2016) ............................................................................. 9

*Hernandez v. Merrill Lynch & Co., Inc.*,
No. 11 Civ. 8472, 2013 WL 1209563 (S.D.N.Y. Mar. 21, 2013) ........................... 14

*Hubbs v. Big Lots Stores, Inc.*, 15 Civ. 01601,
2018 WL 5264143 (C.D. Cal. July 11, 2018) ....................................................... 11

*In re Rite Aid Corp. Sec. Litig.*,
    396 F.3d 294 (3d Cir. 2005).........................................................................20

*In re Safety Components, Inc. Sec. Litig.*,
    166 F. Supp. 2d 72 (D.N.J. 2001) ................................................................21

*Kapolka v. Anchor Drilling Fluids USA, LLC*,
    No. 18 Civ. 01007, 2019 WL 5394751 (W.D. Pa. Oct. 22, 2019)...................*passim*

*Keller v. TD Bank, N.A.*,
    No. 12 Civ. 5054, 2014 WL 5591033 (E.D. Pa. Nov. 4, 2014)...........16, 18, 20, 21

*Koszyk v. Country Fin. a/k/a CC Servs., Inc.*,
    No. 16 Civ. 3571, 2016 WL 5109196 (N.D. Ill. Sept. 16, 2016)..........................14

*Layton v. Percepta, LLC*,
    No. 17 Civ. 1488, 2018 WL 5492850 (M.D. Fla. Sept. 21, 2018) ........................13

*Leap v. Yoshida*,
    No. 14 Civ. 3650, 2016 WL 1730693 (E.D. Pa. May 2, 2016) ..............................19

*Lynn's Food Stores, Inc. v. United States*,
    679 F.2d 1350 (11th Cir. 1982) ......................................................................8, 9

*Matter of Cont'l Ill. Sec. Litig.*,
    962 F.2d 566 (7th Cir. 1992) ..........................................................................18

*In re Milos Litig.*,
    No. 08 Civ. 6666, 2010 WL 199688 (S.D.N.Y. Jan. 11, 2010)..........................16

*Morris v. Affinity Health Plan, Inc.*,
    No. 09 Civ. 1932, 2011 WL 6288035 (S.D.N.Y. Dec. 15, 2011)........................16

*O'Connor v. Oakhurst Dairy*,
    No. 14 Civ. 00192, 2015 WL 2452678 (D. Me. May 22, 2015) .............................8

*Owens v. Interstate Safety Serv., Inc.*,
    No. 17 Civ. 0017, 2017 WL 5593295 (M.D. Pa. Nov. 21, 2017)..........................10

*Prena v. BMO Fin. Corp.*,
    No. 15 Civ. 9175, 2015 WL 2344949 (N.D. Ill. May 15, 2015) .............................8

*Singleton v. Domino's Pizza, LLC*,
    976 F. Supp. 2d 665 (D. Md. 2013) ................................................................15

*Spellman v. Am. Eagle Exp., Inc.*,
    No. 10 Civ. 1764, 2011 WL 4102301 n.1 (E.D. Pa. May 18, 2011) ........................8

*Sullivan v. DB Investments, Inc.*,
   667 F.3d 273 (3d Cir. 2011) ................................................................................. 14

*United States v. Lindow*,
   738 F.2d 1057 (9th Cir. 1984) ............................................................................. 11

**Statutes**

29 U.S.C. § 216(b) ..................................................................................................... 16

**INTRODUCTION**

Plaintiffs Tonya Herbin, Jennifer Tabor, Brett Tyson, Casey Minor, and Alexis

Yarbrough (collectively, "Plaintiffs") and Defendants, The PNC Financial Services Group, Inc.

and PNC Bank, N.A. (collectively, "PNC" or "Defendants,"), have agreed, subject to Court

approval, to resolve this wage and hour lawsuit on a collective-wide basis for significant

monetary relief. The settlement resolves two pending federal court cases, *Herbin v. The PNC*

*Financial Services Group, Inc.*, and *Minor v. PNC Bank, N.A.*[1]

The parties' settlement negotiations followed a thorough investigation by two sets of

plaintiffs' counsel, motion practice, and informal mediation-related discovery. The settlement

was reached after two private mediation sessions with two respected mediators, The Honorable

Kenneth Benson (Ret.) and Arthur H. Stroyd Jr., and satisfies the criteria for approval of a Fair

Labor Standards Act ("FLSA") collective action settlement. It resolves a bona-fide dispute, was

reached after contested litigation, was the result of arm's-length settlement negotiations between

experienced counsel, and provides good value to the workers whom it will benefit, especially

given the risks of litigation.

Plaintiffs respectfully request that the Court issue an order: (1) approving the settlement

set forth in the Joint Stipulation of Settlement and Release ("Settlement Agreement"); (2)

approving the proposed Notice of Settlement and Consent to Join and Release Form ("Notice

Packet") (attached as Exhibit A to the Settlement Agreement) and directing its distribution; (3)

---

[1] As more fully set forth below, Plaintiffs Herbin, Tabor, and Tyson (the "*Herbin* Plaintiffs")
filed their claim for unpaid wages in this Court on June 14, 2019 (the "*Herbin* Action"). *Herbin*
*v. The PNC Financial Services Group, Inc.*, No. 19 Civ. 696, ECF No. 1. Plaintiffs Casey Minor
and Alexis Yarbrough (the "*Minor* Plaintiffs") filed their claim for upaid wages in the Western
District of Michigan Southern Division on February 12, 2019. *Minor v. PNC Bank, N.A.* (the
"*Minor* Action," together with the *Herbin* Action, the "Actions"), No. 19 Civ. 114 (W.D. Mich.).
The *Minor* Action was transferred to this Court on January 14, 2020. *Minor v. PNC Bank, N.A.*,
No. 20 Civ. 58, ECF No. 24.

1

approving Service Payments to the Plaintiffs and the Opt-in Plaintiff; (4) approving Plaintiffs'

request for attorneys' fees and expenses; (5) incorporating the terms of the Settlement

Agreement; and (6) dismissing the Actions.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

**I.**     **Factual Allegations**

Plaintiffs are former employees of Defendants who worked as Customer Service

Representatives ("CSRs") for PNC in Pennsylvania and Michigan.  Swartz Decl. ¶ 15;

Declaration of Matthew L. Turner ("Turner Decl.") ¶ 9; Declaration of Rod M. Johnston

("Johnston Decl.") ¶ 9.  Defendants employ CSRs to work at home and at call center locations

throughout the United States. Swartz Decl. ¶ 15.  CSRs are responsible for answering customer

telephone calls and providing customer service related to PNC's financial products and services.

*Id.*

Plaintiffs allege that PNC required CSRs to work off-the-clock and did not pay them for

all hours worked, including for time spent booting up and shutting down their computers and

logging into computer software programs and applications, in violation of the Fair Labor

Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA") and various state laws. Swartz Decl. ¶ 16;

Turner Decl. ¶ 9; Johnston Decl. ¶ 9.  Defendants deny that they committed any wrongdoing and

dispute Plaintiffs' claims.  *Id.*

**II.**    **Overview of Investigation, Litigation and Settlement Negotiations**

**A.**     **The *Herbin* Action**

On October 15, 2018, counsel for the *Herbin* Plaintiffs contacted PNC to explore a

potential pre-suit resolution of CSRs' federal and state law claims.  Swartz Decl. ¶ 18.  After

---

[2] A Proposed Order is attached as Exhibit B to the Settlement Agreement and also attached as
Exhibit 2 to the Declaration of Justin M. Swartz ("Swartz Decl.") for the Court's convenience.

months of settlement discussions, the *Herbin* Plaintiffs and PNC agreed to attend a day long

mediation on April 30, 2019 with Judge Benson in Pittsburgh, Pennsylvania. *Id.* In preparation

for the mediation, the parties exchanged detailed correspondence setting forth their positions. *Id.*

¶ 19. Defendants also produced job descriptions, the *Herbin* Plaintiffs' personnel files,

workweek and payroll data for CSRs nationwide, and records showing CSRs' duties and

responsibilities and Defendants' timekeeping policies, which counsel reviewed and analyzed. *Id.*

The parties were unable to reach a resolution at the April 30th mediation and the *Herbin*

Plaintiffs filed a Class and Collective Action Complaint on behalf of themselves and similarly

situated CSRs who worked for PNC throughout the United States. *See Herbin*, No. 19 Civ. 696,

ECF No. 1.

### B.    The *Minor* Action

While the *Herbin* parties were preparing for mediation, on February 12, 2019, the *Minor*

Plaintiffs filed their Collective and Class Action Complaint, in the Western District of Michigan,

on behalf of themselves and all other similarly situated CSRs who worked for PNC.  Turner

Decl. ¶ 8; Johnston Decl. ¶ 8.  PNC answered the Complaint on April 29, 2019, contesting each

substantive allegation pertaining to the *Minor* Plaintiffs' off-the-clock work and asserting various

defenses, including that PNC's written timekeeping policies ensure that Plaintiffs properly record

their time and that any uncompensated time that Plaintiffs worked was *de minimis*.  Turner Decl.

¶ 10; Johnston Decl. ¶ 10.  On May 1, 2019, the *Minor* Plaintiffs filed a Pre-Discovery Motion

for Conditional Collective Certification and Court-Authorized Notice to Potential Plaintiffs

Pursuant to 29 U.S.C. § 216(b) (the "Conditional Certification Motion").  Turner Decl. ¶ 11;

Johnston Decl. ¶ 11. PNC opposed the Conditional Certification Motion on May 29, 2019.

Turner Decl. ¶ 11; Johnston Decl. ¶ 11. *See also* Defs. Mem. of Law In Opp. to Pls. Mot. for

3

Conditional Certification, *Minor*, No. 20 Civ. 58, ECF No. 15. The Conditional Certification

Motion was fully briefed on June 11, 2019. Turner Decl. ¶ 11; Johnston Decl. ¶ 11.

### C.    Subsequent Settlement Negotiations

On August 6, 2019, the *Herbin* Plaintiffs, the *Minor* Plaintiffs, and PNC participated in a

second mediation, this time before Mr. Stroyd, an experienced mediator who is well-versed in

employment law class and collective actions.  Swartz Decl. ¶ 21; Turner Decl. ¶ 17; Johnston

Decl. ¶ 17.

With the help of Mr. Stroyd, and building on the progress made before Judge Benson, the

parties reached an agreement and executed a settlement term sheet. Swartz Decl. ¶ 22.  During

the ensuing months, the parties negotiated and reached agreement on all of the settlement terms,

which were memorialized in the Settlement Agreement and fully executed on January 7, 2020.

*Id*.

## SUMMARY OF THE SETTLEMENT TERMS

### I.    The Settlement Fund

The Settlement Agreement establishes a Gross Fund of $2,750,000.00 to settle claims

against Defendant (the "Gross Fund").  Ex. 1 (Settlement Agreement) ¶ III(B).  The Gross Fund

covers Putative Collective Members' settlement awards;[3] the employees' share of payroll taxes

arising from those awards; attorneys' fees and costs; service payments; and the fees and costs of

the Settlement Claims Administrator.  *Id*.

---

[3] The Putative Collective Members are individuals who were employed as CSRs by PNC
anywhere in the United States between August 16, 2016 through the date of full execution of the
Settlement Agreement.  Ex. 1 (Settlement Agreement) ¶ I(A).

## II.   <u>**Notice Process**</u>

Within seven days of the Court's approval of the settlement agreement becoming a final non-appealable order, Defendants will provide the Settlement Claims Administrator with an Excel chart of the names, employee identification numbers, last known addresses, last known telephone numbers, any last known personal e-mail addresses, Social Security numbers, dates and states of employment, for Putative Collective Members. *Id.* ¶ III(A)(1). Upon receipt of that information, the Settlement Claims Administrator will attempt to confirm the accuracy of the addresses through the United States Postal Service's National Change of Address database and other commercially available means. *Id.* Within twenty-one days of the Court's approval of the settlement becoming a final non-appealable order, the Settlement Claims Administrator will send, via first class U.S. mail and e-mail, Notice Packets to Plaintiffs and Putative Collective Members along with an enclosed postage-paid return envelope. *Id.* ¶ III(A)(2), Ex. A (Notice Packet). The Notice Packet will inform Putative Collective Members of the terms of the settlement, the approximate amount of their individual settlement awards, and the procedure for submitting a Consent to Join and Release Form. Ex. 1 (Settlement Agreement) ¶ III(F)(2)(c), Ex. A (Notice Packet). Putative Collective Members may return their completed Consent to Join and Release Form by e-mail, facsimile, or through an online portal, and must do so within 60 days in order to participate in the settlement. Ex. 1 (Settlement Agreement) ¶ IIII(A)(3).

The Settlement Claims Administrator will attempt to obtain a correct address for any Putative Collective Member for whom a Notice Packet is returned as undeliverable, using the Putative Collective Members' social security numbers and last known address, and will re-mail notice to those individuals. *Id.* ¶ III(A)(2).

Within seven days after the close of the Opt-in Period, the Settlement Claims Administrator will provide the Parties with a list of all Qualified Claimants.[4] *Id.* ¶ III(A)(10). Within seven days after receiving the list of Qualified Claimants, PNC will pay to the Settlement Fund the total amount necessary to satisfy all Individual Payments to the Qualified Claimants, and the total amount necessary to pay the employer's share of payroll taxes arising out of the Individual Payments to Qualified Claimants. *Id.* ¶ III(G)(1). Within seven days after PNC makes such payment, the Settlement Claims Administrator will mail each Qualified Claimant a settlement check. *Id.* ¶ III(G)(2). One hundred and fifty days after that mailing, any amounts of the Net Fund not claimed by a Plaintiff or Putative Collective Member will revert to Defendant. ¶ III(G)(5).

## III.  **Release**

Qualified Claimants will release all federal, state, and local wage and hour claims relating to their employment as CSRs, back to the full extent of the federal and state statutes of limitations and continuing through the date of full execution of the Settlement Agreement, including claims for unpaid overtime wages, liquidated damages, penalties, attorney's fees, and interest. Ex. 1 (Settlement Agreement) ¶ IV(A), Ex. A (Notice Packet). Potential Collective Members who do not submit a Consent to Join and Release Form will not release their wage and hour claims.

## IV.  **Settlement Awards**

Each Putative Collective Member will be allocated a proportionate share of the Net Fund based on his or her points, which are assigned based on the number of weeks and hours he or she worked during the relevant period according to PNC's records. Ex. 1 (Settlement Agreement)

---

[4] Qualified Claimants are Plaintiffs and Putative Collective Members who timely return a Consent to Join and Release Form. *Id.* ¶ III(A)(9).

¶ III(F)(2).  To compute each Putative Collective Member's share of the Net Fund, the

Settlement Claims Administrator will divide each Putative Collective Member's points by the

total number of points for all Putative Collective Members, and multiply that fractional amount

by the amount of the Net Fund.  *Id*. ¶ III(F)(2)(c).  The estimated amount of each Putative

Collective Member's share of the Net Fund will be disclosed to the Putative Collective Member

in the Notice Packet.  *Id*. ¶ III(F)(2)(c)(iii), Ex. A.

## V.    Service Payment

Under the Settlement Agreement, subject to Court approval, Plaintiffs each request

service payments of $8,333.33 each, on behalf of themselves and the Opt-in Plaintiff, in

recognition of the services they rendered to the Putative Collective Members in obtaining the

benefits of the settlement, as well as the risks they took in doing so.  Ex. 1 (Settlement

Agreement) ¶ III(F)(3).

## VI.    Attorneys' Fees and Litigation Costs

Subject to Court approval, the Settlement Agreement provides for one-third of the Gross

Fund as attorneys' fees, plus reimbursement of actual out-of-pocket costs of $13,626.10.  Ex. 1

(Settlement Agreement) ¶ III(F)(4); Swartz Decl. ¶ 36; Declaration of Gregg I. Shavitz ("Shavitz

Decl.") (attached as Ex. 2 to the Swartz Decl.) ¶ 12; Turner Decl. ¶ 38; Johnston Decl. ¶ 38.

## VII.    Settlement Claims Administration

The Parties have retained Rust Consulting, Inc. ("Rust"), an experienced wage and hour

claims administrator, to serve as the Settlement Claims Administrator.  Ex. 1 (Settlement

Agreement) ¶ III(D)(1); Turner Decl. ¶ 51; Johnston Decl. ¶ 51.  The Settlement Claims

Administrator's fees, which are estimated to be no more than $67,250.00, will be paid from the

Gross Fund.  Ex. 1 (Settlement Agreement) ¶ III(D)(3).  These fees and costs will cover

preparing the notice; preparing and launching a website where Putative Collective Members may

review information regarding the settlement and submit their Consent to Join and Release Forms;

determining the amount of payments due to Putative Collective Members along with the amount

of all payroll tax deductions to be withheld; claims processing; providing regular status reports to

Defendants' and Plaintiffs' Counsel regarding the status of the notice process; cutting checks and

mailing them to Qualified Claimants and Plaintiffs; establishing a Qualified Settlement Fund;

wiring Court-approved attorneys' fees and costs to Plaintiffs' Counsel; providing W-2s and 1099

forms as required under the Settlement Agreement and applicable law; establishing, controlling,

and maintaining the Settlement Fund; and filing all required tax returns for the Settlement Fund

and paying all taxes due.  *Id.* ¶ III(D)(2).

## ARGUMENT

### I.    A One-Step Approval Process Is Standard for FLSA Settlements.

Throughout the country, a one-step approval process is appropriate in FLSA settlements

that do not include classes under Federal Rule of Civil Procedure 23 ("Rule 23").[5]  *Brown v.*

*TrueBlue, Inc.*, No. 10 Civ. 00514, 2013 WL 5408575, at *1 (M.D. Pa. Sept. 25, 2013) ("Once

employees present a proposed settlement agreement to the district court pursuant to Section

216(b), the Court may enter a stipulated judgment if it determines that the compromise 'is a fair

and reasonable resolution of a bona fide dispute over FLSA provisions.'" (citation omitted)).

This is because collective actions under Section 216(b) of the FLSA do not implicate the same

due process concerns as Rule 23 class actions.  *O'Connor v. Oakhurst Dairy*, No. 14 Civ. 00192,

2015 WL 2452678, at *4 (D. Me. May 22, 2015) ("The due process safeguards built into Rule 23

---

[5] *See, e.g.*, *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350 (11th Cir. 1982); *Prena v.
BMO Fin. Corp.*, No. 15 Civ. 9175, 2015 WL 2344949, at *1 (N.D. Ill. May 15, 2015) ("One
step is appropriate because this is an FLSA collective action, where collective members must
affirmatively opt-in in order to be bound by the settlement (including the settlement's release
provision).").

class actions are not necessary in the FLSA collective action context."). "In contrast to class actions brought pursuant to Federal Rule of Civil Procedure 23, the FLSA requires collective action members to affirmatively opt in to the case." *Spellman v. Am. Eagle Exp., Inc.*, No. 10 Civ. 1764, 2011 WL 4102301, at *1 n.1 (E.D. Pa. May 18, 2011). Where, as here, individuals are not part of the settlement unless they decide to participate in it, there is no need to require that the settlement provide for opt-outs or objections. *Halle v. W. Penn Allegheny Health Sys. Inc.*, 842 F.3d 215, 225 (3d Cir. 2016) (the "'opt-in' requirement . . . is the most conspicuous difference between the FLSA collective action device" and a Rule 23 class action).

## II.  **The Court Should Approve the Parties' Negotiated Settlement Agreement.**

Courts in the Circuit review FLSA settlements pursuant to the standards outlined in *Lynn's Food Stores, Inc. v. United States*, 679 F.2d at 1354-55. *See In re Chickie's & Pete's Wage & Hour Litig.*, No. 12 Civ. 6820, 2014 WL 911718, at *2 (E.D. Pa. Mar. 7, 2014) (in the absence of Third Circuit precedent "district courts in this circuit have referred to the considerations set forth in *Lynn's Food Stores*"). A settlement "resolves a bona fide dispute when it 'reflect[s] a reasonable compromise over issues, such as FLSA coverage or computation of back wages, that are actually in dispute.'" *Id.* at *2 (alterations in original) (quoting *Lynn's Food Stores, Inc.*, 679 F.2d at 1354). "An agreement resolves a bona fide dispute when there is some doubt as to whether the plaintiff would succeed on the merits at trial." *Bettger v. Crossmark, Inc.*, No. 13 Civ. 2030, 2015 WL 279754, at *4 (M.D. Pa. Jan. 22, 2015) (citing *Lynn's Food Stores, Inc.*, 679 F.2d at 1354). If the proposed settlement reflects a reasonable compromise over contested issues, the court should approve the settlement. *Lynn's Food Stores, Inc.*, 679 F.2d at 1354.

Once the court is satisfied that an agreement resolves a bona fide dispute, the next step is a two-part analysis: "first, the court assesses whether the agreement is fair and reasonable to the

plaintiff employee; second, it determines whether the settlement furthers or impermissibly frustrates the implementation of the FLSA in the workplace." *Bettger*, 2015 WL 279754, at \*4 (internal quotation marks and citation omitted). While the Third Circuit has not directly addressed the considerations for determining the fairness and reasonableness of settlement agreements in FLSA collective actions, courts in the Circuit have applied the factors used for approving Rule 23 class settlements. *See, e.g.*, *Owens v. Interstate Safety Serv., Inc.*, No. 17 Civ. 0017, 2017 WL 5593295, at \*2 (M.D. Pa. Nov. 21, 2017) (district courts in the Third Circuit look to "the factors set out by the Third Circuit for approving class action settlements" when approving FLSA settlements). Those factors are:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the [collective] action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh v. Jepson*, 521 F.2d 153, 156-57 (3d Cir. 1975) (ellipses and citations omitted) (the "*Girsh* Factors"). As discussed below, because the proposed Settlement Agreement resolves a bona fide dispute, represents a fair and reasonable resolution of that dispute in light of the *Girsh* Factors, and does not frustrate the goals of the FLSA, it should be approved.

### A.     The Settlement Agreement Is a Compromise of a Bona Fide Dispute.

The settlement resolves a bona fide dispute. Plaintiffs allege that they routinely worked off-the-clock, before, during, and after their shifts, and were not paid for all of the time that they worked. Swartz Decl. ¶ 16; Turner Decl. ¶ 9; Johnston Decl. ¶ 9. Defendants dispute the number of hours Plaintiffs allege they worked and contend that their timekeeping policies and practices

10

ensure that Plaintiffs properly record their time such that they are compensated for all hours

worked. Swartz Decl. ¶ 16; Turner Decl. ¶ 32; Johnston Decl. ¶ 32. Accordingly, the proposed

settlement resolves a "bona fide" dispute of factual legal issues.

###### B. The Settlement Is Fair, Reasonable and Adequate.

Application of the *Girsh* Factors also weighs in favor of a finding that the Settlement is

fair and reasonable.[6]

<u>First</u>, the complexity of the case and the likely duration of the litigation supports

settlement approval. Specifically, absent settlement, the parties would have had to litigate nearly

every aspect of Plaintiffs' claims, including the number of hours Plaintiffs and the Putative

Collective Members worked off-the-clock. Defendants dispute the number of hours that

Plaintiffs allege they and the Putative Collective Members worked and would contend that any

such hours are non-compensable because they are *de minimis*. *See, e.g.*, *Hubbs v. Big Lots*

*Stores, Inc.*, 15 Civ. 01601, 2018 WL 5264143, at *4 (C.D. Cal. July 11, 2018) ("Periods of

approximately ten minutes per day may be treated as *de minimis* when there is not a practical,

administrative means to record or calculate the time. This includes if the amount varies from day

to day." (citing *United States v. Lindow*, 738 F.2d 1057, 1063 (9th Cir. 1984))). "Settlement of

the case now, while it is still in the earlier stages, allows both parties to avoid further legal

---

[6] Notwithstanding that the settlement agreement satisfies the *Girsh* factors, because the parties
are represented by experienced counsel, employed an experienced mediator to assist them in
negotiating their settlement, and reached their settlement agreement through the mediation
process, the Court may begin with the presumption that the settlement is fair and reasonable. *See*
*Kapolka v. Anchor Drilling Fluids USA, LLC*, 18 Civ. 01007, 2019 WL 5394751, at *3 (W.D.
Pa. Oct. 22, 2019) ("[I]f the parties are represented by competent counsel in an adversary
context, the settlement they reach will, almost by definition, be reasonable." (internal quotation
marks and citation omitted)).

expenses that would be significant if this case proceeded to trial and then potentially to appeals."
*In re Chickie's & Pete's Wage and Hour Litig.*, 2014 WL 911718, at *3.

Second, the stage of proceedings and amount of discovery completed, *Girsh*, 521 F.2d at
156, weighs in favor of approval. As noted above, the settlement of the Actions early on
conserves the parties' and the Court's resources. With respect to the amount of discovery
completed, the parties exchanged sufficient information during the settlement process to permit
all sides to evaluate the risks of further litigation. *See supra*, II.A; Swartz Decl. ¶ 19; Turner
Decl. ¶¶ 26, 36; Johnston Decl. ¶¶ 26, 36. *See Acevedo v. Brightview Landscapes, LLC*, No. 13
Civ. 2529, 2017 WL 4354809, at *10-11 (M.D. Pa. Oct. 2, 2017) (finding the third *Girsh* Factor
weighed in favor of approval where parties had engaged in informal exchange of data and
documents in advance of mediation); *Kapolka*, 2019 WL 5394751, at *5 (same). Moreover, prior
to taking on these actions, Plaintiffs' Counsel conducted a thorough investigation into the merits
of the case, performing in-depth interviews with Plaintiffs to understand their hours, wages and
timekeeping practices, and conducted background research on Defendants' corporate structure
and facilities. Swartz Decl. ¶ 17; Turner Decl. ¶ 24; Johnston Decl. ¶¶ 24-25. Thus, "the parties
had an adequate appreciation of the merits of the case before negotiating" a resolution of the
claims. *Deitz v. Budget Renovations and Roofing, Inc.*, No. 12 Civ. 0718, 2013 WL 2338496, at
*6 (M.D. Pa. May 29, 2013) (quoting *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent
Actions*, 148 F.3d 283, 319 (3d Cir. 1998)).

Third, settlement is appropriate because a trial on the merits would involve significant
risks for the Plaintiffs as to both liability and damages. Although Plaintiffs believes they could
ultimately establish Defendants' liability, Defendants could prevail on their *de minimis* defense.
Defendants would also contend that their timekeeping practices and policies demonstrate their

good faith effort to comply with the FLSA, which would preclude an award of liquidated damages. Turner Decl. ¶ 33; Johnston Decl. ¶ 33.

Fourth, although Plaintiffs believe that they would prevail on any motion for conditional certification, including on the fully-briefed motion in the *Minor* Action, there is a risk that they would not succeed in maintaining a collective through trial. Defendants contend that the differences among CSRs' job duties, tasks, start times, supervision, job locations, and methods of time entry preclude conditional certification, or would warrant decertification of any collective. Swartz Decl. ¶ 24; Turner Decl. ¶ 32; Johnston Decl. ¶ 32. Although Plaintiffs disagree with these claims, defendants have prevailed on such arguments. *See Layton v. Percepta, LLC*, No. 17 Civ. 1488, 2018 WL 5492850, at *4 (M.D. Fla. Sept. 21, 2018) (finding "individualized inquiries" precluded certification of putative class of call center employees alleging off-the-clock work), *report and recommendation adopted*, 2018 WL 5442729 (M.D. Fla. Oct. 29, 2018).

Fifth, the Gross Fund represents a good recovery, especially in light of the aforementioned litigation risks that Plaintiffs face. By Plaintiffs' estimate, the Gross Fund represents more than 90% percent of Putative Collective Members' expected recovery. Swartz Decl. ¶ 25. If Defendants were to prevail on their *de minimis* defense, the Putative Collective Members would likely have recovered nothing.

Because the *Girsh* Factors support the reasonableness of the settlement,[7] the settlement should be approved.

---

[7] The second *Girsh* factor—"the reaction of the class to the settlement"—is "not directly applicable in the context of an FLSA collective action, where the settlement class will consist of voluntary opt-in plaintiffs, all of whom wish to settle this matter in accordance with the terms of the proposed settlement agreement." *Kapolka*, 2019 WL 5394751, at *4 (quoting *Deitz*, 2013 WL 2338496, at *6). As to the seventh *Girsh* Factor, although Defendants may have been able to withstand a greater judgment, a "defendant's ability to withstand a greater judgment, standing alone, does not suggest that the settlement is unfair." *Castagna v. Madison Square Garden, L.P.*,

13

C.    **The Settlement Furthers the Goals of the FLSA**.

The public nature of the settlement assists with general FLSA compliance.  Unlike

confidential settlements, the Settlement Agreement does not frustrate the "implementation of the

FLSA in the workplace." *In re Chickie's & Pete's Wage & Hour Litig.*, 2014 WL 911718, at *3.

It is publicly available and there is no confidentiality provision.  Plaintiffs may discuss the

litigation and their claims with other workers, furthering the informational objectives of the

FLSA. *See id.* (settlement agreement did not frustrate the purposes of the FLSA where the

plaintiffs would "be permitted to discuss the matter with fellow employees and others").

III.    **The Service Awards Should Be Approved as Fair and Reasonable.**

Plaintiffs request modest service payments of $8,333.33 each, for themselves and one

Opt-In Plaintiff.  Ex. 1 (Settlement Agreement) ¶ III(F)(3). Courts routinely approve service

awards equal to or greater than the awards requested here.  *See, e.g.*, *Creed v. Benco Dental

Supply Co.*, No. 12 Civ. 01571, 2013 WL 5276109, at *7 (M.D. Pa. Sept. 17, 2013) (approving

award of $15,000 to named plaintiff in FLSA collective action settlement); *Kapolka*, 2019 WL

5394751, at *13 (collecting cases and noting service awards range up to $12,500).[8]

Service awards serve the important purpose of compensating plaintiffs for the time and

effort expended in assisting the prosecution of the litigation, the risks incurred by becoming a

litigant, and any other burdens sustained by plaintiffs, and are commonly awarded to those who

serve the collective's interests.  *See Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 333 n. 65 (3d

No. 09 Civ. 10211, 2011 WL 2208614, at *7 (E.D.N.Y. June 12, 2013) (citation and internal
quotation marks omitted).  Accordingly, the second and seventh factor do not preclude the Court
from approving the settlement.

[8] *See also Koszyk v. Country Fin. a/k/a CC Servs.*, *Inc.*, No. 16 Civ. 3571, 2016 WL 5109196, at
*3 (N.D. Ill. Sept. 16, 2016) ($10,000 service awards for assistance to collective early in
lawsuit); *Hernandez v. Merrill Lynch & Co.*, *Inc.*, No. 11 Civ. 8472, 2013 WL 1209563, at *10
(S.D.N.Y. Mar. 21, 2013) (approving service awards of $15,000 and $12,500 to class
representatives and $4,000 to an opt-in plaintiff in wage and hour action).

Cir. 2011) ("The purpose of [service] payments is to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation, and to reward the public service of contributing to the enforcement of mandatory laws." (citation and internal quotation marks omitted)); *see also Kapolka*, 2019 WL 5394751, at *13 (service awards "reward the public service of contributing to the enforcement of mandatory laws").

Here, the Plaintiffs and Opt-in Plaintiff undertook substantial financial, reputational and personal risks. They assumed significant risk that "should the suit fail, [they could] find [themselves] liable for the defendant's costs or even, if the suit [was] held to have been frivolous, for the defendant's attorneys' fees." *Espenscheid v. DirectSat USA, LLC*, 688 F.3d 872, 877 (7th Cir. 2012). They risked retaliation from future employers for the benefit of the Putative Collective Members. *See Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 691 (D. Md. 2013) (named plaintiffs risk future employers finding out, through a simple Google search, that they filed a class action lawsuit against their prior employer).

Plaintiffs and the Opt-in Plaintiff also took substantial actions to protect the interests of Potential Collective Members. Plaintiffs and the Opt-in Plaintiff sat for extensive pre-suit interviews, provided documents crucial to establishing their claims and the claims of the collective, reviewed the claims presented, helped Plaintiffs' counsel prepare for the mediation by providing information relevant to the claims and Defendants' defenses, made themselves available for the mediation, and reviewed the Settlement Agreement. Swartz Decl. ¶ 27; Turner Decl. ¶ 49; Johnston Decl. ¶ 49. Courts in this circuit have approved service awards for similar activities. *See, e.g.*, *Fein v. Ditech Fin., LLC*, No. 16 Civ. 660, 2017 WL 4284116, at *11 (E.D. Pa. Sept. 27, 2017), at *11 (awarding service payments where the plaintiffs "provided documents to class counsel, provided information concerning their experiences and Defendant's practices,

supplied testimony and documents critical to investigation of the Class Members' claims, and
made themselves available for the mediation").

IV.    **The Court Should Approve the Proposed Settlement Notice and Claim Form.**

The Court should approve the proposed Notice of Settlement and Consent to Join and
Release Form (the "Notice Packet") because it provides accurate and timely notice of the
settlement that will allow Putative Collective Members to make an informed decision regarding
whether to participate in this action.  *See* Ex. 1 (Settlement Agreement) at Ex. A.  The Notice
Packet sufficiently informs Putative Collective Members of the terms of the settlement, including
the allocation formula, the opt-in process, and the scope of the release.  *See Keller v. TD Bank,
N.A.*, No. 12 Civ. 5054, 2014 WL 5591033, at *3 (E.D. Pa. Nov. 4, 2014) (approved notice and
claim informed participants of the settlement, release of claims, allocation formula, and
instructions for submitting a claim form); *see also Morris v. Affinity Health Plan, Inc.*, No. 09
Civ. 1932, 2011 WL 6288035, at *3 (S.D.N.Y. Dec. 15, 2011) ("The Proposed Notice is
appropriate because it describes the terms of the settlement [and] informs the class about the
allocation of attorneys' fees . . ."); *In re Milos Litig.*, No. 08 Civ. 6666, 2010 WL 199688, at *1
(S.D.N.Y. Jan. 11, 2010) (notice should provide "accurate and timely notice concerning the
pendency of the collective action, so that an individual receiving the notice can make an
informed decision about whether to participate." (internal quotation marks omitted) (alterations
in original)).

V.    **The Requested Attorneys' Fees Should Be Approved as Fair and Reasonable.**

Plaintiffs' Counsel should be awarded their requested fee of one-third of the settlement
fund.  The FLSA requires courts to award "a reasonable attorney's fee . . . and costs of the
action." 29 U.S.C. § 216(b).  "Percentage of recovery is the prevailing method used by courts in
the Third Circuit for wage and hour cases." *Kapolka*, 2019 WL 5394751, at *7.  "In determining

16

what constitutes a reasonable percentage fee award, a district court must consider several factors,

'many of which are similar to the *Girsh* factors' discussed above." *Id.* (quoting *In re AT & T*

*Corp.*, 455 F.3d 160, 165 (3d Cir. 2006). Those factors are:

> 1) the size of the fund created and the number of beneficiaries; 2) the presence or absence of substantial objections by members of the class to the settlement terms or the fees requested by counsel; 3) the skill and efficiency of the attorneys involved; 4) the complexity and duration of the litigation; 5) the risk of nonpayment; 6) the time devoted to the case by plaintiffs' counsel; 7) the awards in similar cases; 8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations; and 9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained.

*Kapolka*, 2019 WL 5394751, at *7. These factors are satisfied for the following

reasons:[9]

First, the requested fee of one-third of the Gross Fund ($916,666.67) falls well within the

range of awards typically granted for funds of a similar size. *See Kapolka*, 2019 WL 5394751, at

*8 (collecting cases and noting that "[f]ee awards ranging from thirty to forty-three percent have

been awarded in cases with funds ranging from $400,000 to $6.5 million" (internal quotation

marks omitted)). The Gross Fund is not a "mega-fund" that would require a reduction in the

requested percentage because it is grossly disproportionate to the "efforts of counsel." *In re*

*Cendant Corp., Derivative Action Litig.*, 232 F. Supp. 2d 327, 337 (D.N.J. 2002).[10]

---

[9] "These fee award factors need not be applied in a formulaic way . . ." *Arrington v. Optimum Healthcare IT, LLC.*, 17 Civ. 3950, 2018 WL 5631625, at *10 (E.D. Pa. Oct. 31, 2018). Here, like the second *Girsh* factor, factor 2 – which looks to whether the collective members support the settlement – is not directly applicable because Putative Collective Members who do not wish to participate in the settlement are automatically excluded if they do not return their Consent to Join and Release Forms.

[10] "As a general rule, as the size of a fund increases, the appropriate percentage to be awarded to counsel decreases." *In re Cendant Corp.*, 232 F. Supp. 2d at 337. "The Circuit has explained that the 'basis for this inverse relationship is the belief that 'in many instances [such as, for

<u>Second</u>, Counsel are experienced and nationally recognized for their expertise in litigating complex class and collective actions, including wage and hour cases like this one. Swartz Decl. ¶¶ 4-14; Shavitz Decl. ¶¶ 4-11; Turner Decl. ¶¶ 5-6; Johnston Decl. ¶¶ 5-6.  The award is reasonable because counsel resolved the *Minor* and *Herbin* Actions expeditiously and in doing so provided a good benefit to the Putative Collective Members who will not be required to await years of litigation before receiving a payment.  *Kapolka*, 2019 WL 5394751, at *9 (finding "early settlement of potentially costly litigation" weighed in favor of settlement where "[c]onsiderable judicial time and resources were no doubt conserved by the parties' resolution of this case before dispositive motions or trial").

<u>Third</u>, the requested fee award is reasonable in light of the risks of nonpayment that Plaintiffs' Counsel faced.  Plaintiffs' Counsel took this case on a contingent basis, meaning that there was a substantial risk that they would not be paid.  Swartz Decl. ¶ 31; Shavitz Decl. ¶ 18; Turner Decl. ¶ 46; Johnston Decl. ¶ 46.  As discussed above, in II.B, *supra*, Plaintiffs faced significant legal hurdles in proving liability and damages and "could have lost everything" they invested.  *Matter of Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 570 (7th Cir. 1992) (Posner, J.); *Keller*, 2014 WL 5591033, at *15 (finding factor weighed in favor of the requested fee where "there was some risk that Plaintiffs' claims would fail").

<u>Fourth</u>, with respect to the complexity of the litigation and settlement, off-the-clock claims by their nature involve unrecorded time, and required Plaintiffs to construct a damages model during settlement discussions that could account for the uncompensated time. If the case

---

example, certain "mega-funds"] the increase [in recovery] is merely a factor of the size of the class' and has no direct relationship to the efforts of counsel.'" *Id.* (quoting *In re Prudential*, 148 F.3d at 339) (second modification in original).  However, settlement awards less than $54 million are not mega-funds.  *Id.*

had not been resolved, Counsel would have had to spend significant resources proving the amount of time putative collective members worked off-the-clock. The Actions are additionally complex because they involve the claims of a nationwide putative collective of CSRs who may have different tasks, start times, job locations, and methods of time entry which, Defendants would contend, may bear on liability and damages.[11] *See supra*, II.B.

    <u>Fifth</u>, Plaintiffs' Counsel have spent significant time – collectively 587.7 hours – investigating, litigating, and working toward the resolution of these claims.  Swartz Decl. ¶ 28; Shavitz Decl. ¶ 14; Turner Decl. ¶¶ 24-27, 31, 43; Johnston Decl. ¶¶ 24-27, 31, 43.  Plaintiffs' Counsel estimate that they will also devote additional hours to settlement-related tasks, including communicating with Putative Collective Members and monitoring the claims process, after the Court approves the settlement.  Swartz Decl. ¶ 32; Shavitz Decl. ¶ 19; Turner Decl. ¶¶ 43, 45; Johnston Decl. ¶¶ 43, 45.

    <u>Sixth</u>, Plaintiffs' Counsel's requested award of one-third of the settlement fund comports with awards approved by other courts in the Third Circuit. *See Kapolka*, 2019 WL 5394751, at *10 ("Courts in the Third Circuit have approved FLSA collective and class action settlements providing for fee awards of 20-45%") (collecting cases); *Arrington*, 2018 WL 5631625, at *10 (one-third of the gross settlement amount is reasonable in common fund cases).

    <u>Seventh</u>, "All benefits obtained by Plaintiffs through the proposed settlement can be attributed to the efforts of counsel, rather than to government agencies or other groups." *Kapolka*, 2019 WL 5394751, at *10.

---

[11] Courts have also found that actions that involve the litigation of wage and hour class and collective actions are "admittedly complex." *Leap v. Yoshida*, No. 14 Civ. 3650, 2016 WL 1730693, at *10 (E.D. Pa. May 2, 2016) (finding factor weighed in favor of fee award where "the case is admittedly complex due to the combination of FLSA and class action claims").

Eighth, with respect to the "percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained," *Kapolka*, 2019 WL 5394751, at *7, before initiating this litigation, the *Herbin* Plaintiffs agreed that counsel would request no more than one-third of any future recovery, plus actual out of pocket costs, while the *Minor* Plaintiffs agreed that their counsel would be entitled to a fee of 40% of the total recovery. Swartz Decl. ¶ 29; Shavitz Decl. ¶ 12; Turner Decl. ¶ 46; Johnston Decl. ¶ 46. The requested award is consistent with Plaintiffs' and their Counsel's negotiated contingent fee agreement.

Finally, although the Third Circuit has "suggested it is 'sensible' for district courts to 'cross-check' the percentage fee award against the 'lodestar' method," *see In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005) (quoting *In re Prudential*, 148 F.3d at 333), courts need not engage in a lodestar inquiry with "mathematical precision" and can instead "rely on summaries submitted by the attorneys" rather than "actual billing records." *Id.* at 306-307. Here, Plaintiffs' Counsel have provided summaries of their billing rates and hours and lodestar calculations using each firm's standard hourly rates. Swartz Decl. ¶¶ 33-35; Shavitz Decl. ¶ 17; Turner Decl. ¶¶ 42-43; Johnston Decl. ¶¶ 42-43. Counsel's multiplier is 3.10. Swartz Decl. ¶ 28, Ex. 4; Shavitz Decl. ¶ 14; Turner Decl. ¶ 43; Johnston Decl. ¶ 43. This number is "well within the [1.0 to 4.0] range frequently awarded in common fund cases in this Circuit." *Keller*, 2014 WL 5591033, at *16 (approving multiplier "slightly above 3" and noting that multipliers "within the range of one to four [are] frequently awarded in common fund cases in the Third Circuit" (citing *In re Prudential*, 148 F.3d at 341)); *Arrington*, 2018 WL 5631625, at *10 (approving multiplier of 5.3 and noting that counsel "should not be penalized for settling the case early in the litigation").

**VI.**     <u>**Plaintiffs' Counsel Is Entitled to Recover Their Reasonable Costs.**</u>

In addition to the requested fee award, Plaintiffs' Counsel's request for reimbursement of their reasonable out-of-pocket costs in the amount of $13,626.10 expended in litigating and settling this matter, including filing fees, mediation expenses, legal research, photocopies, and postage, is reasonable and should be approved. *See* Swartz Decl. ¶ 36; Shavitz Decl. Ex. A; Turner Decl. ¶¶ 43, 48; Johnston Decl. ¶¶ 43, 48. These costs shall be paid from the Gross Fund. Ex. 1 (Settlement Agreement) ¶ III(F)(4). Courts in the Third Circuit routinely approve reimbursement of such costs. *See, e.g.*, *Keller*, 2014 WL 5591033, at \*16 (approving complaint filing and mediation costs); *In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 108 (D.N.J. 2001) (approving costs for photocopies, telephone and fax charges, postage and express mail charges, and computer- assisted legal research).

<u>**CONCLUSION**</u>

For the reasons set forth above, Plaintiffs respectfully request that the Court issue an order: (1) approving the settlement; (2) approving the proposed Notice Packet and directing its distribution; (3) approving the requested Service Awards; (4) approving Plaintiffs' requested attorneys' fees and costs; (5) incorporating the terms of the Settlement Agreement; and (6) dismissing the Actions.

Date: January 21, 2020           Respectfully submitted,
                                      By: <u>*/s/ Justin M. Swartz*</u>

                                     **OUTTEN & GOLDEN LLP**
                                     Justin M. Swartz\*
                                     Chauniqua D. Young\*\*
                                     685 Third Avenue, 25th Floor
                                     New York, New York 10017
                                     Telephone: (212) 245-1000
                                     E-mail: jms@outtengolden.com
                                     E-mail: cyoung@outtengolden.com

21

**CARLSON LYNCH, LLP**
Gary F. Lynch
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
E-mail: glynch@carlsonlynch.com

**SHAVITZ LAW GROUP, P.A.**
Gregg I. Shavitz*
Paolo Meireles*
Logan A. Pardell*
951 Yamato Road
Boca Raton, Florida 33431
Telephone: (561) 447-8888
E-mail: gshavitz@shavitzlaw.com
E-mail: pmeireles@shavitzlaw.com
E-mail: lpardell@shavitzlaw.com

*Attorneys for the Herbin Plaintiffs and the
Putative Collective*

**SOMMERS SCHWARTZ, P.C.**
Matthew L. Turner**
Rod M. Johnston*
One Towne Sq., Ste. 1700
Southfield, MI 48076
(248) 355-0300
E-mail: rjohnston@sommerspc.com
E-mail: mturner@sommerspc.com

*Attorneys for the Minor Plaintiffs and the
Putative Collective*

*Admitted *Pro Hac Vice*
**Pro hac vice* motion forthcoming

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TONYA HERBIN, JENNIFER TABOR, and BRETT TYSON, individually and on behalf all others similarly situated, | : | |
| | : | |
| | : | |
| | : | Case No.  2:19-cv-00696-CB |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| THE PNC FINANCIAL SERVICES GROUP, INC. and PNC BANK, N.A., | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| CASEY MINOR and ALEXIS YARBROUGH, individually and on behalf all similarly situated individuals, | : | |
| | : | |
| | : | |
| | : | Case No.  2:20-cv-00058-CB |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| PNC BANK, N.A., | : | |
| | : | |
| Defendant. | : | |

**DECLARATION OF JUSTIN M. SWARTZ IN SUPPORT OF PLAINTIFFS'**
**UNOPPOSED MOTION TO APPROVE COLLECTIVE ACTION SETTLEMENT,**
**AUTHORIZE NOTICE MAILING, AND DISMISS WITH PREJUDICE**

I, Justin M. Swartz, declare, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am a partner in the firm of Outten & Golden LLP ("O&G") in New York, New York, Plaintiffs' counsel herein, and co-chair of its Class Action Practice Group.  O&G is a 70+ attorney firm based in New York City, with additional offices in Chicago, San Francisco, Los Angeles, and Washington, D.C., that focuses on representing plaintiffs in a wide variety of employment matters, including individual and class action litigation involving wage and hour,

discrimination, and harassment claims, as well as contract and severance negotiations.

2.    Along with lawyers from Shavitz Law Group, P.A. ("SLG"), I am one of the lawyers primarily responsible for prosecuting the Plaintiffs' claims in *Herbin v. The PNC Financial Services Group*, No. 19 Civ. 696 (W.D. Pa.).

3.    I make these statements based on personal knowledge and would so testify if called as a witness at trial.

**<u>Background and Experience</u>**

4.    I received a Juris Doctor degree from DePaul University School of Law in 1998 with honors.  Since then, I have exclusively represented plaintiffs in employment litigation and other employee rights matters.

5.    I was admitted to the bar of the State of Illinois in 1998 and the bar of the State of New York in 2002.  I am also admitted to the bars of the Second Circuit Court of Appeals, the United States District Courts for the Western, Eastern, and Southern Districts of New York, and the Northern District of Illinois.  I am a member in good standing of each of these bars.

6.    From September 1998, through February 2002, I was associated with Stowell & Friedman, Ltd. in Chicago, Illinois, where I represented plaintiffs in class actions and multi-plaintiff employment discrimination cases.  From March 2002 through October 2003, I worked for Goodman & Zuchlewski, LLP in New York City, where I represented employees in discrimination cases and other employee rights matters.

7.    Since joining O&G in December 2003, I have been engaged primarily in prosecuting wage and hour class and collective actions and class action discrimination cases.

8.    I am or was co-lead counsel on many wage and hour cases that district courts have certified as class actions and/or collective actions including *Torres v. Gristede's Operating*

*Corp.*, No. 04 Civ. 3316, 2006 WL 2819730 (S.D.N.Y. Sept. 29, 2006), in which the Court

granted summary judgment in favor of Plaintiffs and a class of more than 300 grocery store

employees, *see* 628 F. Supp. 2d 447 (S.D.N.Y. Aug. 28, 2008).  Others include *Lauture v. A.C.*

*Moore Arts & Crafts, Inc.*, No. 17 Civ. 10219, 2017 WL 6460244, at *1 (D. Mass. June 8, 2017)

(same); *Blum v. Merrill Lynch & Co.*, Nos. 15 Civ. 1636, 15 Civ. 2960, slip op. at 2 (S.D.N.Y.

May 6, 2016) (same); *Puglisi v. T.D. Bank, N.A.*, No. 13 Civ. 637, 2015 WL 4608655, at *1

(E.D.N.Y. July 30, 2015) (certifying class and approving settlement of nationwide wage and

hour class and collective action); *Aboud v. Charles Schwab & Co.*, No. 14 Civ. 2712, 2014 WL

5794655, at *2-4 (S.D.N.Y. Nov. 4, 2014) (same); *Perez v. Allstate Ins. Co.*, No. 11 Civ. 1812,

2014 WL 4635745, at *25 (E.D.N.Y. Sept. 16, 2014) (appointing O&G as class counsel); *Clem*

*v. KeyBank*, No. 13 Civ. 789, 2014 WL 2895918, at *2-4 (S.D.N.Y. June 20, 2014) (certifying

class and approving settlement of nationwide wage and hour class and collective action); *Yuzary*

*v. HSBC Bank USA, N.A.*, No. 12 Civ. 3693, 2013 WL 5492998, at *2-4 (S.D.N.Y. Oct. 2, 2013)

(certifying class action under New York Labor Law and appointing O&G as class counsel);

*Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 472-76 (S.D.N.Y. 2013) (certifying class and

approving settlement of nationwide wage and hour class and collective action).

        9.      I am a member of the National Employment Lawyers Association ("NELA") and

formerly served on the Executive Board of its New York Chapter ("NELA/NY").  I recently

served on the Fair Labor Standards Act Protocols Committee formed by the Institute for

Advancement of the American Legal System ("IAALS"), which drafted IAALS's Initial

Discovery Protocols for Fair Labor Standards Act Cases.  I am a former co-chair of NELA's Fair

Labor Standards Act Committee.  I served on the Civil Rights Committee of the New York City

Bar Association of the Bar of the City of New York from 2005 through 2008 and the Committee

3

on Labor and Employment Law from September 2002 until June 2005.  I was co-chair of the

American Bar Association Labor and Employment Law Section Ethics and Professional

Responsibility Committee from 2006 through 2009, and am a member of its Equal Employment

Opportunity Committee.

        10.     I speak frequently on employment law issues, including wage and hour issues and

discrimination issues.  I have recently been a faculty member for continuing legal education

programs focused on employment law and ethics sponsored by the American Bar Association

Section of Labor and Employment Law; the New York State Bar Association Labor and

Employment Law Section; the New York City Bar Committee on Labor and Employment Law,

NELA, and the Practicing Law Institute, among others.

        11.     In connection with my work, I regularly read the New York Law Journal, advance

sheets, and other literature related to employment law and class action law developments.  I

attend workshops and seminars at least four times per year sponsored by NELA, NELA/NY, the

American Bar Association, and other organizations.

**O&G's Expertise**

        12.     O&G is nationally recognized for its expertise in litigating complex class actions,

including wage and hour cases like this one.  *See, e.g.*, *Zamora v. Lyft, Inc.*, No. 03 Civ. 02558,

2018 WL 4657308, at *3 (N.D. Cal. Sept. 26, 2018) (appointing O&G as class counsel and

noting O&G's "outstanding work on this case"); *Craighead v. Full Citizenship of Maryland,*

*Inc.*, No. 17 Civ. 595, 2018 WL 3608743, at *5 (D. Md. July 27, 2018) (finding O&G

"independently demonstrated to the Court the requisite knowledge and experience in this

substantive area of [wage and hour] law, and have shown the capacity to vigorously represent the

class"); *Ballinger v. Advance Magazine Publishers, Inc.*, No. 13 Civ. 4036, 2014 WL 7495092,

at *7 (S.D.N.Y. Dec. 29, 2014) (appointing O&G as class counsel, explaining that "[b]ased on

the firm's performance before [the court] in this and other cases and its work in the foregoing

and other cases, [the court has] no question that it will prosecute the interests of the class

vigorously."); *Beckman*, 293 F.R.D. at 477 (noting that O&G "are experienced employment

lawyers with good reputations among the employment law bar"); *Yuzary v. HSBC USA, N.A.*,

No. 12 Civ. 3693, 2013 WL 1832181, at *4 (S.D.N.Y. Apr. 30, 2013) (appointing O&G as class

counsel); *Capsolas v. Pasta Resources Inc.*, No. 10 Civ. 5595, 2012 WL 1656920, at *2

(S.D.N.Y. May 9, 2012) (appointing O&G as class counsel and noting O&G attorneys "have

years of experience prosecuting and settling wage and hour class actions, and are well-versed in

wage and hour law and in class action law"); *Morris v. Affinity Health Plan, Inc.*, 859 F. Supp.

2d 611, 622 (S.D.N.Y. 2012) (O&G attorneys "have substantial experience prosecuting wage

and hour and other employment-based class and collective actions"); *McMahon v. Olivier Cheng*

*Catering & Events, LLC*, No. 08 Civ. 8713, 2010 WL 2399328, at *6 (S.D.N.Y. Mar. 3, 2010)

(O&G "are experienced employment lawyers with good reputations among the employment law

bar . . . [and] have prosecuted and favorably settled many employment law class actions,

including wage and hour class actions"); *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 158

(2008) (O&G lawyers have "an established record of competent and successful prosecution of

large wage and hour class actions, and the attorneys working on the case are likewise competent

and experienced in the area").

    13.    Chauniqua D. Young is an associate at O&G in its New York office, and is also

one of the attorneys primarily responsible for prosecuting the *Herbin* Plaintiffs' claims on behalf

of the putative collective.  Ms. Young was associated with O&G from 2014 to 2017, and

rejoined the firm in 2018, following a 14-month clerkship with the Honorable Barbara Moses of

the U.S. District Court for the Southern District of New York.  Prior to joining the firm, Ms.

Young was a Bertha Justice Fellow at the Center for Constitutional Rights where she litigated

federal civil rights cases.  Ms. Young received her J.D. and Certificate in Dispute Resolution

from the Benjamin N. Cardozo School of Law in 2012.  She is admitted to the New York State

Bar, as well as the bars of the U.S. District Courts for the Eastern and Southern Districts of New

York and the U.S. Court of Appeals for the Second Circuit.

14.      Cheryl-Lyn D. Bentley was an associate at O&G in Philadelphia, Pennsylvania

from 2015 to 2019.  During her time at O&G, she was one of the attorneys primarily responsible

for prosecuting the *Herbin* Plaintiffs' claims on behalf of the putative collective.  Before joining

the firm, Ms. Bentley clerked for the Honorable Chief Judge Petrese Tucker of the U.S. District

Court for the Eastern District of Pennsylvania.  Prior to her clerkship, Ms. Bentley served as a

fellow and staff attorney at New York Lawyers for the Public Interest, Inc., where she worked on

cases involving violations of federal and state disability laws.  Ms. Bentley received her J.D.

from Yale Law School in 2011.  She is admitted to the state bars of New York and Pennsylvania.

**Factual Allegations**

15.      The *Herbin* Plaintiffs are former employees of Defendants who worked as

Customer Service Representatives ("CSRs") for PNC in Pennsylvania and Michigan.

Defendants employ CSRs to work at home and at call center locations throughout the United

States.  CSRs are responsible for answering customer telephone calls and providing customer

service related to PNC's financial products and services.

16.      The *Herbin* Plaintiffs allege that Defendants violated the Fair Labor Standards

Act, 29 U.S.C. §§ 201 *et seq.*, and Pennsylvania Wage laws, including 43 Pa. Cons. Stat. §

333.104(c), by requiring them to work off the clock and failing to pay them overtime wages,

including for time they spent booting up and shutting down their computers and logging into computer software programs and applications.  Defendants deny that they committed any wrongdoing and dispute Plaintiffs' claims.

**Overview of Investigation, Litigation, and Settlement Negotiations**

17.     Before filing this lawsuit, I, along with other lawyers at O&G and our co-counsel, SLG, conducted a thorough investigation into the merits of the potential claims and defenses, performing in-depth interviews with the *Herbin* Plaintiffs and Opt-in Plaintiff to understand their hours, wages and timekeeping practices, and conducted background research on Defendants' corporate structure and facilities.

18.     On October 15, 2018, counsel for the *Herbin* Plaintiffs contacted PNC to explore a potential pre-suit resolution of CSRs' federal and state law claims.  After months of settlement discussions, the *Herbin* Plaintiffs and PNC agreed to attend a day long mediation on April 30, 2019 with Judge Kenneth Benson (Ret.) in Pittsburgh, Pennsylvania.

19.     In preparation for the mediation, the parties exchanged detailed correspondence setting forth their positions.  Defendants also produced job descriptions, the *Herbin* Plaintiffs' personnel files, workweek and payroll data for CSRs nationwide, and records showing CSRs' duties and responsibilities and Defendants' timekeeping policies, which counsel reviewed and analyzed.

20.     The parties were unable to reach a resolution at the April 30th mediation and, on June 14, 2019, the *Herbin* Plaintiffs filed a Class and Collective Action Complaint on behalf of themselves and similarly situated CSRs who worked for PNC throughout the United States.

21.     On August 6, 2019, the *Herbin* Plaintiffs, the Plaintiffs in *Minor v. PNC Bank N.A.*, No. 20 Civ. 00058 (W.D. Pa.), and Defendants participated in a second mediation, this time

before Arthur H. Stroyd Jr., an experienced mediator who is well-versed in employment law class and collective actions.

22.     With the help of Mr. Stroyd, and building on the progress made before Judge Benson, the parties reached an agreement and executed a settlement term sheet.  During the ensuing months, the parties negotiated and reached agreement on all of the settlement terms, which were memorialized in the Settlement Agreement, which was fully executed on January 7, 2020.

**The Settlement is Fair and Reasonable**

23.     Under the Settlement Agreement, subject to Court approval, Plaintiffs' Counsel will receive one-third of the Gross Settlement Fund as attorneys' fees, plus out-of-pocket costs.

24.     The settlement amount of $2,750,000.00 represents a significant percentage of the Potential Opt-in Plaintiffs' potential recovery, and a substantial portion of what Defendants would be required to pay if faced with a judgment.  Although Plaintiffs believe that they would prevail on any motion for conditional certification, including on the fully-briefed motion in the *Minor* action, there is a risk that they would not succeed in maintaining a collective through trial. Defendants contend that the differences among CSRs' job duties, tasks, start times, supervision, job locations, and methods of time entry preclude conditional certification, or would warrant decertification of any collective.  Although Plaintiffs disagree with these claims, defendants have prevailed on such arguments.

25.     Plaintiffs' Counsel estimates that the settlement represents more than 90% of Putative Collective Members' expected recovery.

**The Service Awards Should Be Approved as Fair and Reasonable**

26.     Plaintiffs request service payments of $8,333.33 each, for themselves and one Opt-in Plaintiff.

27.     Plaintiffs and the Opt-in Plaintiff took substantial actions to protect the interests of Potential Collective Members.  Plaintiffs and the Opt-in Plaintiff sat for extensive pre-suit interviews, provided documents crucial to establishing their claims and the claims of the putative collective, reviewed the claims presented, helped Plaintiffs' counsel prepare for the mediation by providing information relevant to the claims and Defendants' defenses, made themselves available for the mediation, and reviewed the Settlement Agreement.

**Attorney Time Spent on the Negotiations and Litigation**

28.     As of January 21, 2020, O&G has expended approximately 255.60 hours of attorney and paralegal time – an aggregate lodestar of $140,578.00 – litigating and settling this matter.  These hours are reasonable for a case like this and were compiled from contemporaneous time records maintained by each attorney, paralegal, and law clerk participating in the case.

29.     The requested one-third fee is consistent with the retainer agreement entered into by the *Herbin* Plaintiffs, which provides that counsel would receive one-third of any recovery.

30.     O&G's efforts to date have been without compensation, and their entitlement to payment has been wholly contingent upon achieving a good result.

31.     O&G undertook this action without any assurance of payment for their services, litigating the case on a wholly contingent basis in the face of significant risk.  Class and collective wage and hour cases of this type are complicated, time-consuming, and subject to risk. Any lawyer undertaking representation of large numbers of affected employees in wage and hour

9

actions inevitably must be prepared to make a tremendous investment of time, energy and resources.  Due to the contingent nature of the customary fee arrangement, lawyers make this investment with the very real possibility of an unsuccessful outcome and no fee of any kind.  O&G stood to gain nothing in the event the case was unsuccessful.

32.     The requested fee is not based solely on the time and effort already expended; rather, it is also meant to compensate O&G for time that will be spent administering the settlement in the future.  In our experience, overseeing the settlement distribution process will require an ongoing commitment.  O&G will devote additional hours to settlement-related tasks, including communicating with Putative Collective Members and monitoring the claims process, after the Court approves the settlement

33.     The hourly rates used by O&G in calculating our fees are reasonable and appropriate, are the rates we typically charge, and are consistent with prevailing rates.  O&G ordinarily and regularly bills its clients on an hourly fee basis, based upon each attorney's standard hourly rate.  Currently, O&G's rates range from $575 to $1,300 per partner's hour, $525 to $925 per counsel's hour, $315 to $600 per associate's hour, $250 per law clerk's hour, and $270 to $290 per paralegal's hour.  The firm's hourly clients regularly accept and pay O&G's hourly rates.

34.     Below is a chart summarizing the lodestar for the attorneys who worked on this matter:

| OUTTEN & GOLDEN LLP | | | | | | |
|---|---|---|---|---|---|---|
| Attorneys | | | | | | |
| Names | Initials | Position | Hours | Rate | | Total |
| Justin M. Swartz | JMS | Partner | 61.7 | $ | 990.00 | $ 61,083.00 |
| Chauniqua Young | CDY | Associate | 75.7 | $ | 475.00 | $ 35,957.50 |
| Cheryl-Lyn Bentley | CDB | Associate | 56.7 | $ | 475.00 | $ 26,932.50 |
| | | Total: | 194.1 | | | $ 123,973.00 |

35. Below is a chart summarizing the lodestar for the paralegals and law clerk who worked on this matter:

| OUTTEN & GOLDEN LLP | | | |
|---|---|---|---|
| Support Staff | | | |
| | Initials | Hours | Rate | Total |
| Cindy Huang | CYH | 14.8 | $ 270.00 | $ 3,996.00 |
| Miguel Tapia Colin | MXT | 35.5 | $ 270.00 | $ 9,585.00 |
| New York Law Clerk | NYLC | 11.2 | $ 270.00 | $ 3,024.00 |
| | Total: | 61.5 | | $ 16,605.00 |

**Costs and Expenses**

36. As of January 21, 2020, O&G has incurred $6,460.00 in costs:

| Costs | Sum of Amount |
|---|---|
| Computerized Research | $1,181.10 |
| Court Filing Fees | $160.00 |
| FedEx/UPS | $31.09 |
| Meals | $448.14 |
| Mediation | $2,822.00 |
| Printing/Copying | $124.55 |
| Telephone Charges | $5.22 |
| Transportation | $1,688.40 |
| **Total** | **$6,460.50** |

**Exhibits**

37. Attached hereto as **Exhibit 1** is the Joint Stipulation of Settlement and Release ("Settlement Agreement"), which was fully executed on January 7, 2020, and accompanying exhibits.

38. Attached hereto as **Exhibit 2** is the Declaration of Gregg I. Shavitz, dated January 21, 2020, which includes a true and correct summary of the costs incurred by our co-counsel SLG in prosecuting this litigation.

11

39.     Attached hereto as **Exhibit 3** is a true and correct copy of the Proposed Agreed

Order on Plaintiffs' Unopposed Motion for Order Approving Settlement of Collective Action

and Authorizing Notice of Settlement and Opportunity to File Consent to Join and Release

Forms and Dismissal With Prejudice.

40.     Attached hereto as **Exhibit 4** is a chart, compiled from the Declarations of Gregg

I. Shavitz, Matthew L. Turner, and Rod M. Johnston, summarizing the hours, fees, and costs of

O&G, SLG, and Sommers Schwartz, P.C. in these Actions.

*       *       *

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 21, 2020
      New York, New York                  Respectfully submitted,

                                       */s/  Justin M. Swartz*
                                       Justin M. Swartz

                                       **OUTTEN & GOLDEN LLP**
                                       Justin M. Swartz
                                       685 Third Avenue, 25th Floor
                                       New York, New York 10017
                                       Telephone: (212) 245-1000

# Exhibit 1

Case 2:19-cv-00696-CB Document 51-4 Filed 01/21/2020 Page 47 of 32

## JOINT STIPULATION OF SETTLEMENT AND RELEASE

  This Settlement Agreement and Release ("Agreement") is entered into between The PNC Financial Services Group, Inc. and PNC Bank, N.A. (collectively, "PNC"), on the one hand, and Tonya Herbin, Jennifer Tabor, and Brett Tyson (collectively, "*Herbin* Plaintiffs"), and Casey Minor and Alexis Yarbrough (collectively, "*Minor* Plaintiffs," and together with *Herbin* Plaintiffs, the "Named Plaintiffs"), individually and on behalf of themselves and others similarly situated, on the other hand.

## RECITALS

  WHEREAS, the *Minor* Plaintiffs filed *Minor, et al. v. PNC Bank, NA*, No. 19 Civ. 114, in the United States District Court for the Western District of Michigan ("*Minor*") on February 12, 2019, and the *Herbin* Plaintiffs filed *Herbin, et al. v. The PNC Financial Services Group, Inc., et al.*, No. 19 Civ. 696, in the United States District Court for the Western District of Pennsylvania ("*Herbin*") on June 14, 2019;

  WHEREAS, prior to filing *Herbin*, the *Herbin* Plaintiffs and PNC engaged in settlement negotiations, including an exchange of pre-suit discovery, and an all-day mediation session in Pittsburgh, Pennsylvania with the Honorable Kenneth Benson (Ret.);

  WHEREAS, during the *Herbin* Plaintiffs' and PNC's pre-suit settlement efforts, the *Minor* Plaintiffs filed *Minor*;

  WHEREAS, subsequent to the mediation before Judge Benson, the Named Plaintiffs and PNC (collectively, the "Settling Parties") engaged in a second round of settlement negotiations, including an all-day mediation session in Pittsburgh, Pennsylvania with Arthur H. Stroyd, Jr., which resulted in a settlement in principle;

  WHEREAS, Named Plaintiffs' Counsel analyzed and evaluated the merits of the claims asserted in *Herbin* and *Minor* (collectively, the "Litigations"), conducted interviews with putative collective members, obtained and reviewed documents relating to PNC's compensation policies and practices, and analyzed payroll and other data and information;

  WHEREAS, based upon their analysis and evaluation of a number of factors, and recognizing the substantial risks of litigation, including the possibility that these claims, if not settled now, might not result in any recovery or might result in a recovery less favorable, and that any recovery would not occur for several years, Named Plaintiffs' Counsel are satisfied that the terms and conditions of this Agreement are fair, reasonable, and adequate, and that this Agreement, as well as the transfer of *Minor* to the Western District of Pennsylvania in order to facilitate court approval of this Agreement, is in the best interest of the Named Plaintiffs and the Putative Collective Members (as defined below); and

  WHEREAS, PNC denies all the claims and contentions alleged by the Named Plaintiffs in the Litigations but has concluded that further litigation would be protracted and expensive. Given the uncertainty and risks, PNC has concluded that settlement upon the terms and conditions set forth in this Agreement is desirable.

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth in this Agreement, as well as the good and valuable consideration provided for herein, the sufficiency of which is hereby mutually acknowledged, PNC and the Named Plaintiffs (collectively, the "Settling Parties") hereto agree to settle the Litigations on the following terms and conditions.

## I.   CONSENT TO COURT-FACILITATED NOTICE

**A.**   Potential Claimants.  For settlement purposes only, the Settling Parties agree that the Named Plaintiffs and the Putative Collective Members (as defined below) are similarly situated within the meaning of 29 U.S.C. § 216(b) for purposes of the claims asserted in the Litigations under the Fair Labor Standards Act ("FLSA") and consent to Court-facilitated notice to the Named Plaintiffs and Putative Collective Members.  The term "Putative Collective Members" as used in this Agreement shall mean those individuals who work or worked for PNC as Customer Service Representatives, or in similar job positions with different titles (including but not limited to Sales Representatives and/or Customer Service and Support Representatives), in a physical PNC Customer Care Center or working remotely in such a role (collectively, "CSRs"), in the United States at any time between August 6, 2016 through the date of full execution of this Agreement by the Named Plaintiffs following its approval by all Settling Parties (the "FLSA Covered Period").

**B.**   The Settling Parties shall cooperate and present to the Court such information as may be reasonably requested for its consideration in connection with approving this Agreement and the anticipated Court-facilitated notice.

## II.   SETTLEMENT APPROVAL PROCEDURE

**A.**   On or before seven (7) days[1] after full execution of this Agreement, the *Minor* Plaintiffs, which includes the opt-in Plaintiffs, shall submit to the Western District of Michigan an agreed motion to transfer ("Motion to Transfer"), requesting a transfer to the United States District Court for the Western District of Pennsylvania.

If the Motion to Transfer is not granted, the *Minor* Plaintiffs and PNC shall stipulate to dismiss *Minor* without prejudice, with a right to re-file the claims asserted in the *Minor* complaint if the settlement is not approved.  If *Minor* is dismissed but the settlement is not approved, PNC agrees that the limitations period for purposes of any state law claims that were asserted in the original *Minor* complaint and are included in the re-filed matter shall relate back to the initial filing of *Minor*. The federal claims of *Minor* Plaintiffs shall relate back to the date of the filing of their consent to join forms in *Minor*.

**B.**   On or before fourteen (14) days after full execution of this Agreement, the Named Plaintiffs shall file in *Herbin* an Unopposed Motion for Order Approving Settlement of Collective Action and Authorizing Notice of Settlement and Opportunity to File Consent to Join and Release Forms, and Dismissal with Prejudice ("Approval Motion").  The Approval Motion shall attach the following for the Court's review: this Agreement; the Notice of Settlement (to

---

[1] All references to "days" throughout this document refer to calendar days.

reflect each Named Plaintiff's and Putative Collective Member's individual settlement amount and a summary of the basis for settlement) and Consent to Join and Release Form (collectively, the "Notice Packet"), which is attached to this Agreement as Exhibit A, advising the Named Plaintiffs and Putative Collective Members of the material terms and provisions of this settlement, the procedure for submitting Consent to Join and Release Forms, and their rights with respect to this settlement; and an agreed-upon Proposed Order ("Approval Order"), which is attached to this Agreement as Exhibit B.

      **C.**     The Settling Parties agree to do all things reasonably necessary and appropriate to obtain court approval of this Agreement. This Agreement is contingent on approval by the Court and is entered into voluntarily by the Settling Parties.

## III.    MODE, CALCULATION AND TIMING OF PAYMENT OF CLAIMS

      **A.**    **Notice of Claims**

      **1.**     Within seven (7) days of the Court's approval of the settlement becoming a final, non-appealable order, PNC shall provide the Settlement Claims Administrator and Plaintiffs' Counsel an Excel chart listing, for each Named Plaintiff and Putative Collective Member, their name, employee identification number, last known home address, last known telephone number, last known personal e-mail addresses (if such e-mail addresses are readily available in PNC's personnel records), Social Security number, dates of employment as CSRs during the FLSA Covered Period, number of workweeks as a CSR during the FLSA Covered Period, and State(s) of employment during the time periods that they worked as a CSR during the FLSA Covered Period, as that information exists in PNC's electronic employment records for Named Plaintiffs and Putative Collective Members. The Settlement Claims Administrator shall attempt to confirm the accuracy of the Putative Collective Members' addresses through the United States Post Office's National Change of Address database and/or any other commercially available means.

      **2.**     Within twenty-one (21) days of the Court's approval of the settlement becoming a final, non-appealable order, the Settlement Claims Administrator shall send via First Class U.S. Mail all Notice Packets to the Named Plaintiffs and Putative Collective Members along with an enclosed, postage-paid return envelope. At the same time, the Settlement Claims Administrator shall also send Notice Packets to the Putative Collective Members via their personal e-mail addresses (to the extent such e-mail addresses are available). Each Consent to Join and Release shall include a unique number or other mark identifying the Putative Collective Member to whom it was sent. If any Notice Packet is returned as undeliverable for a Named Plaintiff or a Putative Collective Members, the Settlement Claims Administrator shall promptly attempt to locate such Named Plaintiff or Putative Collective Members one time through the United States Post Office's National Change of Address database and/or an electronic search using the Social Security number and/or former address of that person, and shall promptly re-mail the Notice Packet to any updated address obtained therefrom via First Class U.S. Mail.

      **3.**     In order for the Named Plaintiff or any Putative Collective Members to receive any monetary proceeds from the settlement, the Settlement Claims Administrator must receive their properly-executed, and completed Consent to Join and Release Form by e-mail,

facsimile, or electronic/online submission within sixty (60) days (or, if sent by First Class U.S. Mail, postmarked no later than sixty (60) days) after the date the Notice Packets were initially mailed to the Named Plaintiff and Putative Collective Members (the "Opt-in Period"), unless otherwise agreed by the Settling Parties.

4.       Thirty (30) days after the initial mailing of the Notice Packets, the Settlement Claims Administrator will distribute a reminder postcard by First Class U.S. Mail and e-mail to any Named Plaintiff and Putative Collective Member who has not returned a Consent to Join and Release Form.

5.       In the event that, before the Opt-in Period ends, Plaintiffs' Counsel or the Settlement Claims Administrator becomes aware that a Named Plaintiff or Putative Collective Member did not receive the Notice Packet or misplaced the Notice Packet, the Settlement Claims Administrator shall mail (and if applicable email) a substitute Notice Packet to such Named Plaintiff or Putative Collective Member.

6.       To the extent any mailed Notice Packet was not received by a Named Plaintiff or Putative Collective Member and/or is returned as undeliverable within the Opt-in Period, such person shall have until the later of forty-five (45) days from the re-mailing of the Notice Packet or the end of the Opt-in Period to return his or her properly-executed and completed Consent to Join and Release Form ("Re-mailing Opt-in Period"). For such individuals, the Consent to Join and Release Form must be received by the Settlement Claims Administrator postmarked by, or received by e-mail, facsimile or electronic/online submission by, the end of the Re-mailing Opt-in Period.

7.       In the event any Consent to Join and Release Form is timely submitted but does not contain sufficient information, the Settlement Claims Administrator shall send the Named Plaintiff or Putative Collective Member a letter ("Cure Letter") via e-mail (if applicable) and First Class U.S. Mail (with an included postage paid return envelope) requesting the information that was not provided, and giving the Named Plaintiff or Putative Collective Member twenty-one (21) days from the mailing of the Cure Letter or until the end of the Opt-in Period, whichever is longer ("Cure Opt-in Period") to return a properly completed Consent to Join and Release Form. Any Named Plaintiff or Putative Collective Member who fails to respond timely to a Cure Letter shall not be considered a Qualified Claimant (as defined below).

8.       In the case of a dispute over a Named Plaintiff's or Putative Collective Member's dates of employment, PNC's records shall control and shall have a rebuttable presumption of correctness. In the event of any dispute over a Putative Collective Member's late submission of a claim, the Settling Parties shall meet and confer in good faith in an effort to resolve the dispute, and if they are unable to reach an agreement, they shall engage the services of a mutually agreed mediator. If the parties remain unable to resolve their dispute in mediation, the Court, pursuant to section XIV of this Agreement, shall decide the dispute.

9.       The Named Plaintiffs and Putative Collective Members who timely return completed and executed Consent to Join and Release Forms will be considered "Qualified Claimants" entitled to receive a payment from the Net Fund (as defined in paragraph III(F)(1) below).

10.     Within seven (7) days after the close of the later of the Opt-in Period, any open Cure Opt-in Period or any open Re-mailing Opt-in Period, the Settlement Claims Administrator shall provide to PNC's Counsel and Plaintiffs' Counsel a list of Qualified Claimants, electronic copies of all timely received and completed Consent to Join and Release Forms, and a calculation of the total amount needed to cover all payments for Qualified Claimants and for the employer's share of payroll taxes.

11.     At the conclusion of the settlement administration process, the Settlement Claims Administrator shall maintain an electronic copy of all Consent to Join and Release Forms received from Qualified Claimants and shall provide the original Consent to Join and Release Forms to PNC's Counsel.  At the conclusion of the settlement administration process, the Settlement Claims Administrator shall also provide the Settling Parties a register listing all Qualified Claimants and the payment amount made to each Qualified Claimant.

12.     Within seven (7) days after receipt of the Consent to Join and Release Forms from the Settlement Claims Administrator, PNC may, at its option, file redacted versions of all Consent to Join and Release Forms with the Court.  However, PNC's failure to file such forms with the Court shall not impair the effectiveness or enforceability of the release of claims agreed to by any Qualified Claimant.

**B.     PNC's Payment Obligations.**  In consideration for the dismissal with prejudice of the Litigation as well as the release of claims effected by this Agreement and other good and valuable consideration, PNC shall pay a maximum of Two Million Seven Hundred Fifty Thousand Dollars And Zero Cents ($2,750,000.00) (the "Gross Fund") assuming the number of Putative Collective Members is not three percent (3%) greater than 6,855 (the number identified in the data provided by PNC pre-mediation).[2]  Subject to the terms of this Agreement, the Gross Fund is inclusive of payment for: (1) all Qualified Claimants, or their respective authorized legal representatives; (2) the Service Payments (as defined in paragraph III(F)(3) below) approved by the Court for the Service Payment Recipients (as defined in paragraph III(F)(3) below); (3) all attorneys' fees, costs, and litigation expenses approved by the Court, including those in connection with securing Court approval of this Agreement, the claims process and implementing this Agreement, other than fees and costs awarded in connection with any successful proceeding to enforce the terms of this Agreement; (4) all costs incurred by the Settlement Claims Administrator and all costs in connection with the Settlement Fund (as defined in paragraph III(E)(1) below); and (5) the Qualified Claimants' share of applicable federal, state and local taxes required to be withheld by the Settlement Fund (as defined in paragraph III(G)(1) below).  The Gross Fund shall be all that PNC or Released Parties (as defined below) shall pay pursuant to this Agreement  (with the exception of its own attorneys' fees and the employer's share of any payroll taxes in connection with payments hereunder).

**C.     Payment**.  Seven (7) days after the Approval Order has become a final, non-appealable order, PNC will deposit the Gross Fund into the Settlement Fund (as defined in paragraph III(E)(1) below).  Payment will be by wire transfer to a depository bank chosen by the

---

[2] If the final list of Putative Collective Members at issue is more than three percent (3%) greater (i.e., 7,061 or more CSRs), PNC will pay a proportional amount in addition to the Gross Fund, into the Gross Fund, for each additional such Putative Collective Member.

Settlement Claims Administrator. Within three (3) days after PNC deposits the Gross Fund into the Settlement Fund, the Settlement Claims Administrator shall (i) pay via First Class U.S. Mail the Court approved Service Payments to the Service Payment Recipients (as defined in paragraph III(F)(3) below); and (ii) pay to Plaintiffs' Counsel by wire transfer such amount of fees, costs, and litigation expenses as has been approved and ordered by the Court, divided according to the prior agreement among such counsel and per their instructions, which will be provided to the Settlement Claims Administrator before that date. Payment by the Settlement Claims Administrator of the Individual Payments (as defined below) shall be made after the conclusion of the claim procedure, as described below.

### D. Settlement Claims Administration

       1. <u>Selection of Settlement Claims Administrator</u>. The Settlement Claims Administrator shall be selected by Plaintiffs' Counsel subject to PNC's approval.

       2. <u>Settlement Claims Administrator Responsibilities</u>. The Settlement Claims Administrator shall be responsible for: (a) establishing the Settlement Fund; (b) determining and finalizing the calculations of the Individual Payments and tax withholding amounts for the Qualified Claimants, as applicable; (c) preparing, printing and disseminating to the Named Plaintiffs and Putative Collective Members the Notice Packet and return envelope; (d) preparing and launching a website (the content of which will be approved by the Settlement Parties) where Named Plaintiffs and Putative Collective Members may review information regarding the settlement and electronically submit their Consent to Join and Release Forms; (e) copying counsel for all Settling Parties on material correspondence and promptly notifying such counsel of any material requests or communications made by any Settling Party or Putative Collective Member who receives a Notice Packet; (f) receiving and reviewing the Consent to Join and Release Forms submitted by Named Plaintiffs and Putative Collective Members to determine eligibility for payment; (g) determining the final settlement payment for each Qualified Claimant in accordance with this Agreement; (h) mailing the settlement checks to Qualified Claimants; (i) wiring Plaintiffs' Counsel's attorneys' fees, expenses, and costs and mailing the Service Payment and settlement payments in accordance with this Agreement and Order of the Court; (j) paying all payroll tax obligations of PNC in accordance with applicable law and this Agreement; (k) issuing W-2 and 1099 Forms for all amounts paid to Qualified Claimants, and separately issuing a 1099 Form to Named Plaintiffs' Counsel for amounts paid to them for attorneys' fees; (l) ascertaining current address and addressee information for each Notice Packet returned as undeliverable; (m) referring to Plaintiffs' Counsel all inquiries by the Named Plaintiffs and Putative Collective Members the Settlement Claims Administrator cannot resolve and/or which involve matters not within the Settlement Claim Administrator's duties specified herein; (n) responding to inquiries of Plaintiffs' Counsel or PNC's Counsel; (o) promptly apprising counsel for the Settling Parties of the activities of the Settlement Claims Administrator; (p) maintaining adequate records of its activities, including the date of the mailing of the Notice Packets and receipt of Consent to Join and Release Forms, returned mail and other communications and attempted written or electronic communications with the Named Plaintiffs and Putative Collective Members; (q) confirming in writing to Plaintiffs' and PNC's Counsel its completion of the administration of the settlement and retaining copies of all endorsed settlement checks; (r) providing the Settling Parties with any information related to the settlement upon request; and (s)

such other tasks as called for by this Agreement, ordered by the Court, or on which the Settling Parties agree.

        **3.**      <u>Settlement Fund Fees and Expenses.</u>  All fees, expenses, and costs of the Settlement Claims Administrator related directly or indirectly to the Settlement Fund (as defined in paragraph III(E)(1) below), including but not limited to all fees, expenses, and costs in connection with notice, check cutting and mailing, claims processing, court filings, legal and accounting advice relating to the establishment of the Settlement Fund and tax treatment and tax reporting of awards to Qualified Claimants, preparation of tax returns (and the taxes associated with such tax returns as defined below), shall be paid from the Settlement Fund. Such fees, expenses, and costs shall not exceed sixty-seven thousand two hundred and fifty dollars ($67,250.00) without the express authorization of the Settling Parties.

        **4.**      <u>Reporting by Settlement Claims Administrator</u>.  Throughout the period of claims administration, the Settlement Claims Administrator shall provide such reports to the Settling Parties upon request by either Settling Party, regarding the status of the mailing of the Notice Packets to Named Plaintiffs and Putative Collective Members, the claims administration process, the receipt of Consent to Join and Release Forms, distribution of the Settlement Checks, and any other aspect of the claims administration process.

     **E.**     **<u>Creation and Implementation of a Qualified Settlement Fund</u>**

        **1.**      <u>Establishing the Qualified Settlement Fund.</u>  The Gross Fund shall be deposited in an account titled PNC CSR Settlement Fund (the "Settlement Fund"), intended by the Settling Parties to be a "Qualified Settlement Fund" as described in Section 468B of the Internal Revenue Code of 1986, as amended, and Treas. Reg. Section 1.468B-1, <u>et seq</u>. The Settling Parties shall cooperate to ensure such treatment and shall not take a position in any filing or before any tax authority inconsistent with such treatment. The Settling Parties agree to any relation-back election required to effectuate such treatment as of the earliest possible date.

        **2.**      <u>Administering the Settlement Fund</u>.  The Settlement Claims Administrator shall serve as Trustee of the Settlement Fund and shall act as a fiduciary with respect to the handling, management, and distribution thereof, including the handling of tax-related issues and payments.

        **3.**      <u>Tax Withholding and Reporting</u>.

           **a.**      <u>Employment Taxes</u>.  The Settlement Claims Administrator shall allocate fifty percent (50%) of the total paid to each Qualified Claimant to wages (to be reported on an Internal Revenue Service ("IRS") Form W-2) and fifty percent (50%) to non-wage compensation (to be reported on an IRS Form 1099). The Settlement Claims Administrator shall be responsible for withholding and timely remitting and reporting all taxes to the appropriate taxing authorities. The Settlement Claims Administrator shall determine the proper tax reporting treatment for Court-approved Service Payments.

           **b.**      <u>Fund Taxes</u>.  All taxes (including any estimated taxes, interest, or penalties) arising with respect to the income earned by the Settlement Fund, if any, including any taxes or tax detriments that may be imposed on PNC with respect to income earned for any

DocuSign Envelope ID: 723337315-3363-4073-8CEF-EA8A145E541F

period during which the Settlement Fund does not qualify as a "Qualified Settlement Fund" for federal and state income tax purposes (hereinafter "Settlement Fund Taxes"), and expenses and costs incurred in connection with the operation and implementation of this paragraph (including, without limitation, expenses of tax attorneys and/or accountants and mailing and distribution costs and expenses relating to filing (or failing to file) any returns described herein or otherwise required to be filed pursuant to applicable authorities) (hereinafter "Settlement Fund Tax Expenses"), shall be paid out of the Settlement Fund. Further, Settlement Fund Taxes and Settlement Fund Tax Expenses shall be treated as a cost of the administration of the Settlement Fund. The Settling Parties agree to cooperate with the Settlement Claims Administrator, each other, and their tax attorneys and accountants to the extent reasonably necessary to carry out the provisions set forth in this Section.

        **4.**   <u>Other Payments and Indemnification</u>. The Settlement Claims Administrator shall satisfy from the Settlement Fund: all federal, state, local, and other reporting requirements (including any applicable reporting with respect to attorneys' fees and other costs subject to reporting) and any and all taxes, penalties and other obligations with respect to the payments or distributions not otherwise addressed in this Agreement. The Settlement Claims Administrator shall indemnify the Settling Parties for any penalty or interest arising out of an incorrect calculation or late deposit of the same.

        **5.**   <u>Communication with PNC and Plaintiffs' Counsel</u>. PNC, PNC's Counsel, and Plaintiffs' Counsel are authorized to communicate directly with the Settlement Claims Administrator to expedite the settlement administration process. Counsel for the Settling Parties shall have full access to all information relating to claims administration.

    **F.**   <u>**Allocation of the Settlement Fund**</u>

        **1.**   <u>Net Fund.</u> The amount approved by the Court for Service Payments; the amount approved by the Court for attorneys' fees, expenses, and costs; and the fees and expenses of the Settlement Claims Administrator approved by the Court shall be deducted from the Gross Fund to obtain a "Net Fund."

        **2.**   <u>Allocation of Net Fund.</u> All Named Plaintiffs and Putative Collective Members shall be allocated a payment from the Net Fund pursuant to the following allocation formula:

            **a.**   Each Named Plaintiff and Putative Collective Member shall be assigned four (4) points for each week worked as a CSR during the FLSA Covered Period in which they worked more than 38 hours according to PNC's time records, two (2) points for each week in which they worked 36-37.9 hours according to PNC's time records, and one (1) point for each week in which they worked 35.9 or fewer hours according to PNC's time records. Any weeks of job-protected leave pursuant to the Family and Medical Leave Act or similar statutes shall be credited to the Named Plaintiffs and Putative Collective Members as required by law.

    **b.**   The calculation of all workweeks and hours worked pursuant to paragraph (a) above shall be based on PNC's business records.

    **c.**   To calculate each Named Plaintiff's and Putative Collective Member's proportionate share of the Net Fund, the Settlement Claims Administrator shall:

        **(i)**   Add all points for each Named Plaintiff and Putative Collective Members together to obtain the "Total Denominator";

        **(ii)**   Divide the number of points for each Named Plaintiff and Putative Collective Member by the Total Denominator to obtain each Named Plaintiff's and Putative Collective Member's "Portion of the Net Fund."

        **(iii)**   Multiply each Named Plaintiff's and Putative Collective Member's Portion of the Net Fund by the total amount of the Net Fund to determine each Named Plaintiff and Putative Collective Member's Individual Payment. The sum of the Individual Payments for all Named Plaintiffs and Putative Collective Members shall equal the Net Fund. Each Named Plaintiff and Putative Collective Member shall be advised of his/her respective Individual Payment in such person's Notice Packet.

    **d.**   The Individual Payments shall be paid to the Qualified Claimants. Any amounts of the Net Fund not claimed by a Qualified Claimant shall revert to PNC.

    **3.**   <u>Service Payment.</u> From the Gross Fund, Plaintiffs' Counsel shall seek a Service Payment of Eight Thousand Three Hundred Thirty-Three Dollars and Thirty-Three Cents ($8,333.33) each for Named Plaintiffs Tonya Herbin, Jennifer Tabor, Brett Tyson, Casey Minor, and Alexis Yarbrough, as well as for Opt-in Plaintiff Shayna Henderson (collectively, "Service Payment Recipients"), as payment for their involvement in commencing and litigating the claims asserted in the Litigations and resolved in this Agreement and for their involvement in preparing for mediation for the benefit of all Putative Collective Members. PNC shall not oppose this request. The Settling Parties expressly agree that the Court's approval or denial of any request for Service Payments, in whole or in part, is not a material condition to this Agreement, and is to be considered by the Court separately from the fairness, reasonableness, adequacy, and good faith of this Agreement. Any order or proceeding relating to the application by Named Plaintiffs' Counsel for Service Payments shall not operate to terminate or cancel this Agreement.

    **4.**   <u>Attorneys' Fees and Costs Amounts.</u> Plaintiffs' Counsel shall make an application to the Court for an award of attorneys' fees of up to one-third of the Gross Fund, *i.e,* Nine Hundred Sixteen Thousand Six Hundred Sixty-Six Dollars and Sixty-Seven Cents

($916,666.67). In addition, Plaintiffs' Counsel shall seek reimbursement from the Gross Fund of their reasonable costs and expenses incurred in the Litigations. PNC shall not oppose these applications. This Agreement is not conditioned upon the Court's approval of either application in whole or in part. Payment of such attorneys' fees, expenses, and costs to Plaintiffs' Counsel shall be made in accordance with this Agreement and shall constitute full satisfaction of any and all obligations by PNC to pay any person, attorney or law firm for attorneys' fees, expenses or costs incurred on behalf of Qualified Claimants. The Settlement Claims Administrator shall report the payment of these fees, expenses and costs to Plaintiffs' Counsel on an IRS Form 1099. The Settling Parties expressly agree that the Court's approval or denial of any request for attorneys' fees and costs is not a material condition to this Agreement, and is to be considered by the Court separately from the fairness, reasonableness, adequacy, and good faith of the settlement. Any order or proceeding relating to the application by Plaintiffs' Counsel for an award for fees and costs shall not operate to terminate or cancel this Agreement.

**G.    Payments to Qualified Claimants**

**1.**    Funding of Payments to Qualified Claimants. Within seven (7) days after the later of the end of the Opt-in Period, the end of any open Cure Opt-in Periods, or the end of any open Re-Mailing Opt-in Period, the Settlement Claims Administrator shall provide PNC with a register of all Qualified Claimants, the total amount to be paid to them under the terms of the Agreement, the total amount necessary to satisfy all individual payments to the Qualified Claimants, and the total amount necessary to pay the employer's share of payroll taxes arising out of the individual payments to Qualified Claimants. Within seven (7) days of receiving this register and calculations from the Settlement Claims Administrator, PNC shall pay into the Settlement Fund a sum equivalent to PNC's share of payroll taxes in respect of payments to Qualified Payments, unless the Settlement Fund at that time already contains sufficient amounts to pay such taxes. In the event an additional payment by PNC is required pursuant to this section, such Payment shall be by wire transfer to a depository bank chosen by the Settlement Claims Administrator.

**2.**    Timing of Payments. Within seven (7) days after PNC makes payment to the Settlement Fund described in paragraph III(G)(1), above, the Settlement Claims Administrator shall transmit all payments to Qualified Claimants by First Class U.S. Mail to the last known address for each Qualified Claimant, or such other address provided by the Qualified Claimant to the Settlement Claims Administrator.

**3.**    Tax Advice. Named Plaintiffs, on behalf of themselves and Putative Collective Members, acknowledge and agree that they have not relied upon any advice from PNC or Plaintiffs' Counsel as to the taxability of the payments received pursuant to this Agreement.

**4.**    Negotiation of Settlement Checks. Qualified Claimants shall have one hundred twenty (120) days after the date on the settlement checks (the "Check Issuance Date") in which to negotiate the checks. If any Qualified Claimant does not negotiate his or her settlement check within that period, the check shall be void. Sixty (60) days after the distribution of settlement checks, the Settlement Claims Administrator shall send reminder postcards via e-mail (if available) and First Class U.S. Mail to Qualified Claimants who have not yet negotiated their

checks reminding them to negotiate their checks prior to the 120-day deadline. The Settlement Claims Administrator shall advise Plaintiffs' Counsel of any uncashed checks thirty (30) days prior to the 120 day deadline and shall provide contact information for any Qualified Claimants who have not cashed their checks at that time.

    **5.** Any funds remaining in the Qualified Settlement Fund after payment to: (1) all Qualified Claimants who timely negotiate their settlement checks; (2) all attorneys' fees, costs, and litigation expenses approved by the Court; (3) all costs incurred by the Settlement Claims Administrator and all costs in connection with the Settlement Fund including, but not limited to, those related to notice, check cutting and mailing, claims processing, court filings, legal and accounting advice relating to the establishment of the Qualified Settlement Fund and tax treatment and tax reporting of awards to Named Plaintiffs and Qualified Claimants, preparation of tax returns (and the taxes associated with such tax returns as defined below), as approved by the Court; and (4) applicable federal, state and local income taxes, and all federal and state unemployment taxes required to be withheld and/or paid by PNC, shall revert to PNC and shall be returned to PNC thirty (30) days after the close of the 120-day period to negotiate settlement checks.

## IV. <u>RELEASE</u>

    **A.** <u>Release By Qualified Claimants</u>. By executing a Consent to Join and Release Form and receiving a settlement payment, the Qualified Claimants shall release PNC and its current and former owners, officials, directors, officers, shareholders, affiliates, subsidiaries, agents, employee benefit plans, plan administrators, representatives, servants, employees, former employees, attorneys, subsidiaries, parents, divisions, branches, units, successors, predecessors, and assigns (collectively the "Released Parties") from: any and all federal and state wage and hour claims that accrued during the FLSA Covered Period while employed by PNC as a CSR, relating back to the full extent of the federal and state statutes of limitations and continuing through the date of execution of this Agreement, including, without limitation, all state and federal claims for unpaid overtime wages, and related claims for penalties, interest, liquidated damages, attorneys' fees, costs, and expenses.

    **B.** <u>General Release of Known and Unknown Claims By Service Payment Recipients</u>. In addition to the claims released as set forth in paragraph A above, the Service Payment Recipients, in exchange for accepting and receiving an approved Service Payment pursuant to paragraph III(F)(3) above, hereby release and forever discharge the Released Parties of and from any and all claims, whether in law or in equity, which the Service Payment Recipients assert or could assert, whether known or unknown, at common law or under any statute, rule, regulation, order or law, whether federal, state, or local, or on any grounds whatsoever, including without limitation, claims under the Age Discrimination in Employment Act (the "ADEA"), Title VII of the Civil Rights Act of 1964, the federal Equal Pay Act, the Rehabilitation Act of 1973, the Americans with Disabilities Act, the Family and Medical Leave Act of 1993 (the "FMLA"), the Employee Retirement Income Security Act of 1974, the Racketeer Influenced and Corrupt Organizations Act, the Financial Reform Recovery and Enforcement Act of 1989, Section 1981 of Title 42 of the United States Code, the federal Worker Adjustment and Retraining Notification (WARN) Act, any other federal, state, or city laws concerning workplace rights or obligations or payment of wages, claims for violation of privacy rights, claims for violation of civil rights,

DocuSign Envelope ID: 7233373D-3363-4073-92FF-5A9146E5FA1F

claims for denial of equal rights, discrimination, wrongful termination, retaliation, breach of contract, equitable remedies, interference with advantageous relations, all tort claims, and all claims that were or could have been raised by the Service Payment Recipients in the Litigations or which arose prior to the date the particular Service Payment Recipient signs this Agreement with respect to any event, matter, claim, damage or injury arising out of the Service Payment Recipient's employment with the PNC, the termination of such employment, any application for employment with PNC, and/or the Service Payment Recipient's eligibility for employment with PNC, and/or with respect to any other claim, matter, or event arising prior to execution of this Agreement by the particular Service Payment Recipient.

## V.    **NOTICES**

All notices, requests, demands and other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be delivered personally or mailed, postage prepaid, by first-class mail and e-mail to the undersigned persons at their respective addresses as set forth herein:

Counsel for Plaintiffs:

Justin M. Swartz
Chauniqua D. Young
Outten & Golden LLP
685 Third Avenue, Floor 25
New York, NY 10017
Telephone: (212) 245-1000
Fax: (646) 509-2060
jms@outtengolden.com
cyoung@outtengolden.com

Gregg I. Shavitz
Shavitz Law Group, P.A.
951 Yamato Rd, Suite 285
Boca Raton, FL 33431
Telephone: (561) 447-8888
Fax: (561) 447-8831
gshavitz@shavitzlaw.comturn

Matthew L. Turner
Rod Johnston
Sommers Schwartz
One Towne Square, Suite 1700
Southfield, MI 48076
Telephone: (248) 213-8587
Fax: (248) 936-1973
MTurner@sommerspc.com

DocuSign Envelope ID: 72337385-3363-4973-8D55-5A9A16F5A15F

Counsel for PNC:                              Robert S. Whitman
                                              Seyfarth Shaw LLP
                                              620 Eighth Avenue
                                              New York, NY 10018
                                              Telephone: (212) 218-5629
                                              Fax: (917) 344-1258
                                              rwhitman@seyfarth.com

## VI.     REPRESENTATION BY COUNSEL

All of the Settling Parties acknowledge that they have been represented by counsel throughout all negotiations that preceded the execution of this Agreement and that this Agreement has been executed voluntarily, without duress, and with the consent and advice of counsel.

## VII.    NO ADMISSION OF LIABILITY

PNC enters into this Agreement to avoid further expense and disruption to its business. The Settling Parties acknowledge and agree that liability for the actions that are the subject matter of the Litigation is disputed by PNC.  This Agreement and the settlement are a compromise and shall not be construed as an admission of liability at any time or for any purpose, under any circumstances, by the Settling Parties to this Agreement.  The Settling Parties further acknowledge and agree that this Agreement and the settlement shall not be used to suggest an admission of liability in any dispute the Settling Parties may have now or in the future with respect to any person or entity.  Neither this Agreement nor anything herein, nor any part of the negotiations had in connection herewith, shall constitute evidence with respect to any issue or dispute other than for purposes of enforcing this Agreement.

## VIII.   MODIFICATION OF AGREEMENT

This Agreement may not be modified or amended except in writing, signed by the affected Settling Parties or the duly authorized respective counsel for the Settling Parties, and as approved by the Court with respect to material modifications or amendments.

## IX.     CONSTRUCTION AND INTERPRETATION

**A.**    Entire Agreement.  This Agreement constitutes the entire agreement between the Settling Parties with respect to the subject matter contained herein and shall supersede all prior and contemporaneous negotiations between the Settling Parties.  This Agreement shall be construed as a whole according to its fair meaning and intent, and not strictly or presumptively for or against any party, regardless of who drafted or who was principally responsible for drafting this Agreement, or any specific term or condition thereof.  The Named Plaintiffs and PNC participated mutually in the negotiation and drafting of this Agreement and had available to them the advice and assistance of independent counsel.  As such, neither the Named Plaintiffs nor PNC may claim that any ambiguity in this Agreement should be construed presumptively against the other.

**B.**     <u>No Reliance on Representations or Extrinsic Evidence.</u>  Except as expressly provided herein, this Agreement has not been executed in reliance upon any other oral or written representations or terms, and no such extrinsic oral or written representations or terms shall modify, vary or contradict its terms.  In entering into this Agreement, the Settling Parties agree that this Agreement is to be construed according to its terms and may not be varied or contradicted by extrinsic evidence.

**C.**     <u>Controlling Law.</u>  This Agreement shall be subject to, governed by, construed, enforced and administered in accordance with the laws of the State of Pennsylvania, both in its procedural and substantive aspects, and without regard for the principle of conflict of laws.

**D.**     <u>No Assignment.</u>  Plaintiffs' Counsel and the Named Plaintiffs represent and warrant that they have not assigned or transferred, or purported to assign or transfer, to any person or entity, any claim or any portion thereof or interest therein, including, but not limited to, any interest in the Litigations, or any related action.  A similar representation shall be included on the Consent to Join and Release Form sent to the Putative Collective Members with the Notice.

## X.     **COUNTERPARTS**

This Agreement, any amendments or modifications to it, and any other documents required or contemplated to be executed in order to consummate this Agreement, may be executed in one or more counterparts, each of which shall be deemed an original of this Agreement.  All counterparts of any such document together shall constitute one and the same instrument.  A photocopy, facsimile, or digital image of an executed counterpart shall be enforceable and admissible as an original.

## XI.     **BINDING EFFECT**

This Agreement is binding upon and shall inure to the benefit of the Settling Parties.  Without limiting the foregoing, this Agreement specifically shall inure to the benefit of PNC as well as all Released Parties and all persons acting by, through, under, or in concert with any of them.  Also without limiting the foregoing, this Agreement shall be binding upon the spouses, children, heirs, assigns, administrators, executors, beneficiaries, conservators, successors and offspring of all Qualified Claimants.

## XII.     **ATTORNEYS' FEES, COSTS AND EXPENSES**

Except as otherwise specifically provided herein, the Settling Parties and all Qualified Claimants shall bear responsibility for their own attorneys' fees, costs and expenses, taxable or otherwise, incurred by them or arising out of this litigation and shall not seek reimbursement thereof from any of the Settling Parties.  However, in the event of any dispute to enforce the terms of this Agreement, the prevailing party shall be entitled to an award of their reasonable attorneys' fees and costs from the non-prevailing party.

## XIII.   AUTHORITY OF COUNSEL

**A.**      Facsimile, Electronic, and E-mail Signatures.  Any Settling Party may execute this Agreement by signing or by causing its counsel to sign, or by e-signature, on the designated signature block below and transmitting that signature page via facsimile, e-mail, or other electronic means to counsel for the other Settling Party.  Any signature made and transmitted by facsimile, e-signature, or e-mail for the purpose of executing this Agreement shall be deemed an original signature for purposes of this Agreement and shall be binding upon the Settling Party whose counsel transmits the signature page by facsimile, e-signature or e-mail.

**B.**      Warranty of Counsel.  Plaintiffs' Counsel warrant and represent that they are expressly authorized by the Named Plaintiffs to take all appropriate action required or permitted to be taken pursuant to this Agreement in order to effectuate its terms.  PNC's Counsel warrant and represent that they are authorized to take all appropriate action required or permitted to be taken by PNC pursuant to this Agreement in order to effectuate its terms.

## XIV.   CONTINUING JURISDICTION

The Settling Parties hereto agree to request that the United States District Court for the Western District of Pennsylvania retain continuing jurisdiction to construe, interpret and enforce the provisions of this Agreement; to supervise the administration and distribution of the resulting settlement funds; and to hear and adjudicate any dispute or litigation arising from or related to this Agreement or the issues of law and facts asserted in the Litigation.

## XV.   REQUIREMENT OF COURT APPROVAL AND EFFECT OF NON-APPROVAL

This Agreement shall not take effect or become enforceable unless and until it is approved by the Court.  In the event that the Agreement is not approved by the Court for any reason in substantially the form submitted by the Settling Parties, the Settling Parties shall attempt in good faith to address any concerns raised by the Court and submit a revised settlement agreement for approval.  If the Court denies the approval of a revised settlement agreement and fails to enter Judgment in accordance with this Agreement, or the Agreement otherwise does not become effective, then: (i) this Agreement shall have no force or effect, other than with respect to (a) this Paragraph XV, (b) the *Minor* Plaintiffs' right to re-file claims asserted in the current *Minor* complaint in accordance with Paragraph II(A), and (c) PNC's denial of liability in accordance with Paragraph VII; (ii) neither this Agreement, nor any related papers or orders, nor the negotiations leading to this Agreement, shall be cited to, used, or admissible in any judicial, administrative, or arbitral proceeding for any purpose or with respect to any issue, substantive or procedural; (iii) none of the Settling Parties shall be deemed to have waived any claims, objections, defenses, or arguments with respect to the issue of class or collective action certification or the merits of Named Plaintiffs' claims or any other issue; and (iv) the Litigations shall proceed and/or be renewed as if no settlement had been attained, including, subject to court approval, the transfer and/or refiling of *Minor* in the Western District of Michigan.

SIGNATURES ON FOLLOWING PAGE

15

DocuSign Envelope ID: 723337DF-3363-4A71-9DEF-FA9A145E5A1F

ACCEPTED AND AGREED:

| DATED: 1/7/2020 | The PNC Financial Services Group, Inc. and PNC Bank, N.A.:<br><br>By: _____<br>Its: _Executive Vice President_____ |
|---|---|
| DATED: 12/12/2019 | Tonya Herbin:<br><br>DocuSigned by:<br>_____<br>CE872A422BE2425... |
| DATED: _____ | Jennifer Tabor:<br><br>_____ |
| DATED: _____ | Brett Tyson:<br><br>_____ |
| DATED: _____ | Casey Minor:<br><br>_____ |
| DATED: _____ | Alexis Yarbrough:<br><br>_____ |
| DATED: _____ | Shayna Henderson:<br><br>_____ |

16

DocuSign Envelope ID: 912861C1-DBEB-4350-BEE4-6E432E7DE557

ACCEPTED AND AGREED:

| DATED: _____ | The PNC Financial Services Group, Inc. and PNC Bank, N.A.: <br><br> By:_____ <br> Its:_____ |
|---|---|
| DATED: _____ | Tonya Herbin: <br><br><br> _____ |
| DATED: 12/12/2019 | Jennifer Tabor: <br><br> DocuSigned by: <br> *Jennifer Tabor* <br> ABEE2B7A5A7D4DA... |
| DATED: _____ | Brett Tyson: <br><br><br> _____ |
| DATED: _____ | Casey Minor: <br><br><br> _____ |
| DATED: _____ | Alexis Yarbrough: <br><br><br> _____ |
| DATED: _____ | Shayna Henderson: <br><br><br> _____ |

16

DocuSign Envelope ID: 9502750F-ACFF-4823-BF34-8F376B0197C6

ACCEPTED AND AGREED:

| DATED: _____ | The PNC Financial Services Group, Inc. and PNC Bank, N.A.:<br><br>By:_____<br>Its:_____ |
|---|---|
| DATED: _____ | Tonya Herbin:<br><br>_____ |
| DATED: _____ | Jennifer Tabor:<br><br>_____ |
| DATED: 12/12/2019 | Brett Tyson:<br><br>_____ |
| DATED: _____ | Casey Minor:<br><br>_____ |
| DATED: _____ | Alexis Yarbrough:<br><br>_____ |
| DATED: _____ | Shayna Henderson:<br><br>_____ |

16

DocuSign Envelope ID: 2327D761-000E-40BE-8335-CB4282CCF7C3

ACCEPTED AND AGREED:

| DATED: _____ | The PNC Financial Services Group, Inc. and PNC Bank, N.A.:<br><br>By:_____<br>Its:_____ |
| --- | --- |
| DATED: _____ | Tonya Herbin:<br><br>_____ |
| DATED: _____ | Jennifer Tabor:<br><br>_____ |
| DATED: _____ | Brett Tyson:<br><br>_____ |
| DATED: _____ | Casey Minor:<br><br>_____ |
| DATED: _____ | Alexis Yarbrough:<br><br>_____ |
| DATED: 12/12/2019 | Shayna Henderson:<br><br>DocuSigned by:<br>_____<br>9605AB281E074A3... |

16

ACCEPTED AND AGREED:

| DATED: _____ | The PNC Financial Services Group, Inc. and PNC Bank, N.A.:<br><br>By:_____<br>Its:_____ |
|---|---|
| DATED: _____ | Tonya Herbin:<br><br><br>_____ |
| DATED: _____ | Jennifer Tabor:<br><br><br>_____ |
| DATED: _____ | Brett Tyson:<br><br><br>_____ |
| DATED: 12/20/19 | Casey Minor:<br><br>_Casey Y Minor_ (signature)<br>_____ |
| DATED: _____ | Alexis Yarbrough:<br><br><br>_____ |
| DATED: _____ | Shayna Henderson:<br><br><br>_____ |

ACCEPTED AND AGREED:

| DATED: _____ | The PNC Financial Services Group, Inc. and PNC Bank, N.A.:<br><br>By:_____<br>Its:_____ |
|---|---|
| DATED: _____ | Tonya Herbin:<br><br><br>_____ |
| DATED: _____ | Jennifer Tabor:<br><br><br>_____ |
| DATED: _____ | Brett Tyson:<br><br><br>_____ |
| DATED: _____ | Casey Minor:<br><br><br>_____ |
| DATED: 12/24/2019 | Alexis Yarbrough:<br><br>_alexis Yarber_____ |
| DATED: _____ | Shayna Henderson:<br><br><br>_____ |

16

DocuSign Envelope ID: 72333795-3363-4971-9D55-FA9146F5A15F

# EXHIBIT A

DocuSign Envelope ID: 72337B5D3363-4073-82FE-5A8446F5A15F
Case 2:19-cv-00696-CCF Document 51-4 Filed 03/24/20 Page 69 of 128
Case 2:19-cv-00696-CB Document 13-1 Filed 01/23/20 Page 24 of 32

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**
*Herbin et al. v. The PNC Financial Services Group et al.*, No. 19 Civ. 0696 (W.D. Pa.)
*Minor et al. v. PNC Bank, N.A.*, No. XX Civ. XX (W.D. Pa.)

**NOTICE OF SETTLEMENT OF COLLECTIVE ACTION LAWSUIT AND**
**OPPORTUNITY TO MAKE A CLAIM**

**[NAME]**
**[ADDRESS]**
**[CITY, STATE ZIP]**

---

**If you worked for PNC Bank ("PNC") as a Customer Service Representative ("CSR") at any time between August 6, 2016 and [the date of full execution of the agreement], you may be entitled to a payment from the settlement of a collective action lawsuit if you complete and return the enclosed form.**

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

- This notice is being sent to you because you worked for PNC as a Customer Service Representatives (or in a similar job position such as a Sales Representative and/or Customer Service and Support Representative), remotely or at a PNC Customer Care Center, at any time from August 6, 2016 and [the date of full execution of the Agreement].

- Former CSRs (the "Named Plaintiffs") have sued PNC, alleging that CSRs were required to work off the clock and not permitted to record all hours worked and that PNC failed to pay them properly for all hours worked.

- PNC denies the allegations in the lawsuit and maintains that it at all times properly compensated its CSRs. The parties have entered into this settlement solely with the intention to avoid further disputes and litigation with the attendant inconvenience and expense. The Court has not made any ruling on the merits of the Named Plaintiffs' claims, and no party has prevailed in this action.

- Under the allocation formula created by the settlement, your settlement share is $_____, less deductions for applicable taxes. This amount is based on the number of weeks you worked for PNC as a CSR, and the hours you worked based on PNC's records, during the time period covered by this settlement.

DocuSign Envelope ID: 72337B5D3261-4073-8D55-FA9A16F5A15F Document 51-4 Filed 03/24/20 Page 70 of 128

**Your legal rights may be affected, and you have a choice to make now:**

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT: | |
|---|---|
| **RETURN THE CONSENT FORM** | By returning a properly completed Consent to Join and Release Form, you agree to participate in the settlement, receive a monetary settlement payment, and release your claims. |
| **DO NOT RETURN THE CONSENT FORM** | If you do not wish to participate in, or be bound by, the settlement, you should not return the Consent to Join and Release Form. If you do not timely return a properly completed Consent to Join and Release Form, you will not receive a monetary settlement payment. |

- These rights and options – **and the deadlines to exercise them** – are explained in this notice.

## BASIC INFORMATION

### 1. What is a collective action?

In a "Collective Action," one or more people called "Named Plaintiffs" sue on behalf of people who have similar unpaid wage claims. CSRs who opt into the Collective Action are "Collective Members."

## BENEFITS – WHAT YOU GET

### 2. What does the settlement provide?

PNC has agreed to pay up to $2,750,000.00 into a settlement fund ("Settlement Fund") to pay Collective Members' settlement payments, Court-approved attorneys' fees and costs of $_____, Court-approved Service Payments totaling $_____ to the Named Plaintiffs and one other individual in recognition of their service to the Collective Action, the Settlement Claims Administrator's fees and costs, and payroll and other applicable taxes (except for the employer's share of payroll taxes).

After deducting the Court-approved attorneys' fees and costs, Court-approved Service Payments, the Settlement Claims Administrator's fees and costs, and payroll and other applicable taxes (except for the employer's share of payroll taxes), the remaining amount is divided among current and former CSRs who are covered by the settlement, based on the number of weeks they worked in the covered position and the number of hours they worked during the period covered by the settlement and the hours they worked, according to PNC's records.

DocuSign Envelope ID: 72337B5D3363-4073-82E5-5A9145E5A15F

**3. How much will my payment be and how was it calculated?**

Based on the formula that has been approved by the Court, in exchange for properly executing and timely returning your Consent to Join and Release Form, you are estimated to receive approximately $_____, half of which is subject to deductions for applicable taxes and withholdings like any other paycheck, and for which you will receive a W-2; and half of which will be reported on an IRS Form 1099. Plaintiffs and PNC do not make any representation concerning the tax consequences of this settlement, or your participation in it, and you are advised to seek your own personal tax advice should you have questions before acting in response to this notice.

The settlement allocation formula takes into account the number of weeks you worked as a CSR and the hours you worked during the period covered by the settlement according to PNC's records. The Settlement Agreement contains the exact allocation formula. You may obtain a copy of the Settlement Agreement by following the instructions in Paragraph 9, below.

# HOW YOU GET A PAYMENT

**4. How can I get my payment?**

To get your payment, you must fully complete the enclosed Consent to Join and Release Form and mail it in the enclosed envelope to the Settlement Claims Administrator postmarked no later than [date 60 days from mailing of Notice]. You may also e-mail or fax the Consent to Join and Release Form to the Settlement Claims Administrator, or submit it electronically online at www._____.com, so that it is received no later than [date 60 days from mailing of Notice]. The Settlement Claims Administrator's complete contact information is:

Settlement Claims Administrator
[address]
[city state zip]
Phone: (___) ___-____
Facsimile (___) ___-____
E-mail: _____
Website: _____

**5. When will I get my payment?**

You will be sent a check within approximately five months of submitting your Consent to Join and Release Form. Please be patient.

**Settlement checks that are not cashed within 120 days of issuance will be null and void.**

**6. What am I giving up to get a payment and join the Collective?**

Once you become part of the Collective Action, you cannot sue, continue to sue, or be a party in any other lawsuit against PNC about any of the claims at issue in this case or any other federal, state and/or local wage and hour claims related to your time as a CSR within the period covered

DocuSign Envelope ID: 72333795-3353-4073-92E5-5A7A45E5A15F

by this settlement.  Becoming part of the Collective Action also means that all of the Court's orders will apply to you and legally bind you.

# THE LAWYERS REPRESENTING YOU

| **7.  Do I have a lawyer in this case?** |
|---|

The Court has decided that the lawyers at the law firms of the Shavitz Law Group, P.A., Outten & Golden LLP, and Sommers Schwartz are qualified to represent you and all Collective Action Members.  These lawyers are called "Plaintiffs' Counsel."  You will not be charged for these lawyers.  They will be paid from the Settlement Fund.  You can find more information about Plaintiffs' Counsel at: www.shavitzlaw.com,  www.outtengolden.com, and www.sommerspc.com.

Otherwise, if you have any questions, you may contact Plaintiffs' Counsel at:

| | | |
|---|---|---|
| Gregg I. Shavitz | Justin M. Swartz | Matthew L. Turner |
| Paolo Meireles | Chauniqua Young | Rod Johnston |
| Shavitz Law Group, P.A. | Outten & Golden LLP | Sommers Schwartz |
| 951 Yamato Rd, Suite 285 | 685 Third Avenue, 25th Floor | One Towne Square, Suite 1700 |
| Boca Raton, FL 33431 | New York, NY 10017 | Southfield, MI 48076 |
| Telephone: (561) 447-8888 | Telephone: (212) 245-1000 | Telephone: (248) 213-8587 |
| slg@shavitzlaw.com | PNC_settlement@outtengolden.com | MTurner@sommerspc.com |

You do not need to retain your own attorney in order to participate in the settlement.  However, if you want to be represented by your own lawyer, you may hire one at your own expense.

| **8.  How will the lawyers be paid?** |
|---|

The Court has approved payment of $_____ for attorneys' fees for Plaintiffs' Counsel.  These fees will compensate Plaintiffs' Counsel for investigating the facts, litigating the case, and negotiating the settlement.  The Court also has approved reimbursement to Plaintiffs' Counsel of $_____ for their out-of-pocket costs.

# GETTING MORE INFORMATION

| **9.  Are there more details about the settlement?** |
|---|

This notice summarizes the proposed settlement.  More details are in a Settlement Agreement.  If there is any discrepancy between this notice and the Settlement Agreement, the terms of the Settlement Agreement will control.  You can view a copy of the Settlement Agreement at www._____.com, or you can obtain a copy of the Settlement Agreement by sending a request in writing to the Settlement Claims Administrator at the contact information listed in Paragraph 4, above.  Additionally, you may contact Plaintiffs' Counsel at Shavitz Law Group, P.A., Outten & Golden LLP, and Sommers Schwartz at the contact information listed at Paragraph 7, above.

DATED: _____

DocuSign Envelope ID: 723337B5-3362-4073-92EE-5A7A16F5A15F

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TONYA HERBIN, JENNIFER TABOR, and BRETT TYSON, individually and on behalf all others similarly situated, | : <br> : <br> : <br> : <br> : |
| Plaintiffs, | Case No. 2:19-cv-00696-CB <br> : <br> : |
| v. | : <br> : <br> : |
| THE PNC FINANCIAL SERVICES GROUP, INC. and PNC BANK, N.A., | : <br> : <br> : |
| Defendants. | : <br> : |

| | |
|---|---|
| CASEY MINOR and ALEXIS YARBROUGH, individually and on behalf all similarly situated individuals, | : <br> : <br> : |
| Plaintiffs, | Case No.  XX-cv-XX-CB <br> : |
| v. | : <br> : <br> : |
| PNC BANK, N.A., | : <br> : |
| Defendant. | : <br> : |

## I.   CONSENT TO JOIN

I hereby consent to join and opt-in to become a plaintiff for settlement purposes in the above-captioned lawsuit (the "Litigation") against The PNC Financial Services Group, Inc. and PNC Bank, N.A. (collectively, "PNC"), and to be bound by the settlement approved in the Litigation.  I further agree that the Plaintiffs in the Litigation shall act as my agent and make all decisions on my behalf concerning the Litigation, including the settlement thereof.  I also agree to be bound by the collective action settlement described in the accompanying Notice.  I hereby designate the law firms Outten & Golden LLP, Shavitz Law Group, P.A., and Sommers Schwartz to represent me in the Litigation.

## II.   RELEASE

In exchange for the consideration described in the Notice of Settlement of Lawsuit and approved by the Court in this matter, I, by my signature below, fully and completely release PNC

DocuSign Envelope ID: 723337B5-3363-4073-80EF-5A0146F5A15F

and their current or former owners, officials, directors, officers, shareholders, affiliates, subsidiaries, agents, employee benefit plans, plan administrators, representatives, servants, employees, former employees, attorneys, subsidiaries, parents, divisions, branches, units, successors, predecessors, and assigns (collectively, the "Released Parties") from: any and all federal, state and local wage and hour claims that accrued from August 6, 2016, while employed by PNC as a CSR, relating back to the extent of the federal and state statutes of limitations and continuing through [the date of full execution of the settlement agreement], including, without limitation, all state and federal claims for unpaid overtime wages, and related claims for penalties, interest, liquidated damages, attorneys' fees, costs, and expenses. I represent and warrant that I have not assigned or transferred any interest in the Litigation.

_____
Full Legal Name (print)

_____
Signature

_____
Maiden or Other Names Worked Under

_____
Street Address*

_____
E-mail Address*

_____
City, State and Zip Code*

_____
Cell phone*

_____
Home Telephone Number*

*This information will be redacted and will not be filed in the public record. This information will be used solely for Plaintiffs' Counsel and the Settlement Claims Administrator to communicate with you.

DocuSign Envelope ID: 72333785-3361-4971-82EE-EA9146F5A1EF

# EXHIBIT B

DocuSign Envelope ID: 723337BD3363-4973-9DEE-5A9146F5A15F
Case 2:19-cv-00696-CB Document 51-4 Filed 03/24/20 Page 76 of 128
Case 2:19-cv-00696-CB Document 18-21 Filed 01/23/20 Page 31 of 32

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TONYA HERBIN, JENNIFER TABOR, and BRETT TYSON, individually and on behalf all others similarly situated, | : <br> : <br> : <br> : <br> : Case No. 2:19-cv-00696-CB |
| Plaintiffs, | : <br> : |
| v. | : <br> : |
| THE PNC FINANCIAL SERVICES GROUP, INC. and PNC BANK, N.A., | : <br> : <br> : |
| Defendants. | : <br> : |

| | |
|---|---|
| CASEY MINOR and ALEXIS YARBROUGH, individually and on behalf all similarly situated individuals, | : <br> : <br> : |
| Plaintiffs, | : Case No. XX-cv-XX-CB <br> : |
| v. | : <br> : |
| PNC BANK, N.A., | : <br> : <br> : |
| Defendant. | : <br> : |

### AGREED ORDER ON PLAINTIFFS' UNOPPOSED MOTION FOR ORDER APPROVING SETTLEMENT OF COLLECTIVE ACTION AND AUTHORIZING NOTICE OF SETTLEMENT AND OPPORTUNITY TO FILE CONSENT TO JOIN AND RELEASE FORMS AND DISMISSAL WITH PREJUDICE

This matter came before the Court upon Plaintiffs' Unopposed Motion for Order

Approving Settlement of Collective Action and Authorizing Notice of Settlement and

Opportunity to File Consent to Join and Release Forms and Dismissal with Prejudice (the

"Motion"). Having reviewed the Motion, the Joint Stipulation of Settlement and Release

DocuSign Envelope ID: 72337BD3363-4073-8955-FA4A4SF5A1F

("Settlement Agreement"), and the exhibits attached thereto, and the Court being otherwise fully advised in the premises, it is **ORDERED AND ADJUDGED** as follows:

1.      The Motion is GRANTED.

2.      The Court approves the Settlement Agreement.  The Court finds that the parties' settlement resolves a bona fide dispute, is fair, reasonable, and adequate, and does not impermissibly frustrate the "implementation of the [Fair Labor Standards Act] in the workplace." *See Bettger v. Crossmark, Inc.*, 2015 WL 279754, at *4 (M.D. Pa. Jan. 22, 2015).

3.      The Court approves the Notice of Settlement and Consent to Join and Release Form and directs its distribution.

4.      The Court approves the requested Service Payments to the Plaintiffs and the Opt-in Plaintiff.

5.      The Court approves Plaintiffs' request for attorneys' fees and expenses.

6.      All other terms described in the Agreement are fair, reasonable and adequate as to the Settling Parties, Service Payment Recipients, Putative Collective Members, and Qualified Claimants and are approved.

7.      This Action is DISMISSED WITH PREJUDICE in its entirety.

8.      The Court will RETAIN JURISDICTION to enforce the Agreement.

9.      The case is CLOSED and all pending motions are DENIED as moot.

DONE AND ORDERED, in Chambers, UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA, this _____ day of _____, 20____.

                                                        _____
                                                        Honorable Cathy Bissoon
                                                        United States District Judge

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

TONYA HERBIN, JENNIFER TABOR, and
BRETT TYSON, individually and on behalf
all others similarly situated,

             Plaintiffs,

             v.

THE PNC FINANCIAL SERVICES GROUP,
INC. and PNC BANK, N.A.,

             Defendants.

Case No.  2:19-cv-00696-CB

CASEY MINOR and ALEXIS
YARBROUGH, individually and on behalf all
similarly situated individuals,

             Plaintiffs,

             v.

PNC BANK, N.A.,

             Defendant.

Case No.  2:20-cv-0058-CB

**DECLARATION OF GREGG I. SHAVITZ IN SUPPORT OF PLAINTIFFS'
UNOPPOSED MOTION TO APPROVE COLLECTIVE ACTION SETTLEMENT,
AUTHORIZE NOTICE MAILING, AND DISMISS WITH PREJUDICE**

I, Gregg I. Shavitz, declare as follows:

      1.      I am a partner and founder of the Shavitz Law Group, P.A. ("SLG") in Boca Raton, Florida.  SLG is an eight attorney firm based in Boca Raton, Florida with an office in New York, New York, that focuses on representing workers as plaintiffs in employment-related matters,

including claims based upon individual and class-wide violations of state and federal wage and hour laws. We serve as Plaintiffs' Counsel in this matter, along with Outten & Golden LLP ("O&G") and Sommers Schwartz ("SS").

2. Along with lawyers from O&G and SS, I have been one of the lawyers primarily responsible for prosecuting Plaintiffs' claims on behalf of the proposed collective.

3. I make these statements based on personal knowledge and would so testify if called as a witness.

**Firm and Attorney Background**

4. I am a graduate of the University of Miami School of Law with an undergraduate degree from Tufts University.

5. I am an experienced trial attorney and member of the bar of the U.S. District Court for the Southern District of Florida and the Florida Bar since 1994, and am also admitted to U.S. District Courts for the Middle and Northern Districts of Florida, the United States Eleventh Circuit Court of Appeals, and United States Third Circuit Court of Appeals.

6. Additionally, I have lectured in the past at seminars sponsored by the Labor and Employment Section of the Florida Bar, and have spoken at the Labor and Employment Section Certification Review Seminar on two separate occasions as well as the Academy of Florida Trial Lawyers Workhorse Seminars. I have also been awarded Florida Trend Magazine's Legal Elite for various years including 2014 and 2015 in the area of Labor & Employment law; Florida Super Lawyers – Super Lawyer, Employment & Labor – 2013-2019; Top Lawyer Up and Comer – Wage and Hour law – 2004, 2006 and 2009; and South Florida Legal Guide – Top Lawyers List – 2009-2019, among other awards and honors. I have also earned the distinction of Top Lawyer in Palm Beach Illustrated (2011) and am a lifelong fellow of the Florida Bar Foundation.

7.     I have held the highest AV Peer Review Rating from LexisNexis Martindale-Hubbell for preeminent attorneys from 2000 to the present.

8.     My practice concentrates on representing plaintiffs in FLSA cases.  Since the founding of SLG in 1999, the firm has represented employees in employment-related matters, including claims based upon individual and class-wide violations of state and federal wage and hour laws in Florida and across the United States.

9.     Attorney Paolo C. Meireles became an Associate Attorney with SLG in 2012, and became a Partner in January 2018.  After receiving his Juris Doctor degree from Fordham University in 2010, he was admitted to the New Jersey and New York Bars in November 2010 and February 2011, respectively.  Mr. Meireles relocated to Florida and became a member of the Florida Bar in September 2011.  Mr. Meireles is also admitted to the Second Circuit Court of Appeals and the U.S. District Courts for the Southern District of Florida, the Middle District of Florida, the Northern District of Florida, the Northern District of New York, the Southern District of New York, the District of New Jersey, the Eastern District of Michigan, the Northern District of Ohio, and the District of Colorado.

10.     Attorney Logan A. Pardell became an Associate Attorney with SLG in 2017.  Since joining SLG, Mr. Pardell has represented employees in in federal and state courts throughout the United States, primarily litigating complex wage and hour class and collective cases.  After receiving his Juris Doctor and Masters and Business Administration degrees, *cum laude,* from the University of Florida in 2015, Mr. Pardell was admitted to the Florida Bar in September 2015.  Mr. Pardell is also admitted to the U.S. District Courts for the Southern District of Florida and the Middle District of Florida.

11.     SLG has significant experience prosecuting wage and hour class and collective

actions such as this one.  In recent years, the firm has served or been appointed as class counsel or co-class counsel in the following cases, among others:

*Aboud v. Charles Schwab & Co.*, No. 14 Civ. 2712 (S.D.N.Y.)

*Amador v. Morgan Stanley & Co, LLC.*, Case 11 Civ 4326 (S.D.N.Y.)

*Beckman v. KeyBank, N.A.*, Case No. 12 Civ. 7836 (S.D.N.Y.)

*Besic v. Byline Bank, Inc., et al.*, Case No.15 C 8003 (N.D. Ill.)

*Biscoe-Grey v. Sears Holding Corp.*, Case No. 09-81408-Civ-Marra / Johnson (S.D. Fla.)

*Blum, et al. v. Merrill Lynch & Co., Inc.*, Case No. 15-cv-1636 (S.D.N.Y.)

*Briggs v. PNC Fin. Servs. Gr.*, No. 15 Civ. 10447 (N.D. Ill.)

*Calabresi  v. TD Bank, N.A.,* Case No. 13 Civ. 0637 (E.D.N.Y.)

*Cerrone v. KB Home Florida, LLC et al.*, Case No. 07-14402-Civ-Martinez (S.D. Fla.)

*Clem v. Keybank, N.A.*, Case No. 13 Civ. 789 (S.D.N.Y.)

*Danley v. Office Depot, Inc., et al.*, Case No. 9:14-cv-81469-KAM (S.D. Fla)

*Davis v. Armed Forces Bank, N.A.,* Case No. 562015 CA 000814 (July 29, 2015 Order – Circuit Court 19th Judicial Circuit in & for St. Lucie County).

*Ellerd v. County of Los Angeles,* Case No. CV05-1211 SVW (CWX) (C.D. Cal.)

*Fiore v. Goodyear Tire & Rubber Co.*, Case No. 2:09-CV-843-FtM-29SPC (M.D. Fla.)

*Heitzenrater, et al. v. Officemax, Inc., et al.,* No. 12 Civ. 900S (W.D.N.Y.)

*Hernandez v. Merrill Lynch & Co., Inc., et al.*, Case No. 11 Civ. 8472 (S.D.N.Y.)

*Hirst, et al. v. M&T Bank, et al.*, No. 511428/2015 (N.Y. Sup. Ct.)

*Hosier v. Mattress Firm, Inc.*, Case No. 3:10-cv-00294-TJC-JRK (M.D. Fla.)

*Koszyk v. Country Fin.*, No. 16 Civ. 3571 (N.D. Ill.)

*Lewis v. Iowa College Acq. Corp. & Kaplan Higher Educ. Corp.*, Case No. 08-61011-Civ-Jordan (S. D. Fla.)

*Long v. HSBC USA Inc.*, Case No. 14-cv-6233 (S.D.N.Y.)

*Mancia V. HSBC Securities (USA) Inc.,* No. 9400/2015 (S. Ct. NY)

*Mayfield v. Lennar Corp*., Case No. 6:08-cv-426-Orl-31-DAB (M.D. Fla.)

*McCue v. MB Financial, Inc. et al.*, Case No. 15 cv 988 (E.D. Ill.)

*Nash v. CVS Caremark Corp.*, Case No. 09 Civ 79 (D.R.I.)

*Palacio v. E\*TRADE Financial Corp., et al.*, Case No. 10 Civ. 4030 (S.D.N.Y.)

*Patterson v. Palm Beach County School Board*, No. 07 Civ. 80240 (S.D. Fla.)

*Prena v. BMO Financial Corp.*, et al., Case No. 1:14-cv-09175 (N.D. Ill.)

*Puglisi v. TD Bank N.A.*, Case 13 Civ 6037 (E.D.N.Y.)

*Raley v. Kohl's Corporation, et al.*, Case No. 8:09-cv-2340 (M.D. Fla.)

*Reiburn, et al. v. Merrill Lynch & Co., Inc.*, Case No. 15-cv-2960 (S.D.N.Y.)

*Robbins v. Abercrombie & Fitch Co*., Case No. 15-cv-6187 (W.D.N.Y.)

*Roberts v. TJX Companies, Inc., et al.*, Case No. 13-cv-13142 (D. Mass)

*Romero v. Florida Power & Light Company*, Case No. 6:09-cv-1401-Orl-35-GJK (M.D. Fla.)

*Saliford v. Regions Financial Corp. et al.*, Case No. 10-610310-CIV-Torres (S.D. Fla.)

*Simpkins v. Pulte Home Corporation*, 6:08-cv-00130-PCF-DAB (M.D. Fla.)

*Snodgrass v. Bob Evans Farms, Inc.*, No. 12-cv-768 (S.D. Ohio)

*Stallard v. Fifth Third Bank, et al*, Case No. 2:12-cv-01092 (W.D. Pa.)

*Stewart v. Prince Telecom, et al.*, Case No. 10-civ-4881 (S.D.N.Y.)

*Waggoner v. U.S. Bancorp. et al.,* No. 14-cv-1626 (N.D. Ohio)

*Watson v. BMO Financial Corp., et al.,* No. 15 cv 11881 (E.D. Ill.)

*Wright v. Flagstar Bank FSB et al.*, Case No. 13 Civ. 15069 (E.D. MI.)

*Yuzary v. HSBC Bank USA, N.A.*, Case No. 12 Civ. 3693 (S.D.N.Y.)

*Zeltser v. Merrill Lynch & Co., Inc., et al.*, Case No. 13 Civ 1531 (S.D.N.Y.)

*Zolkos v. Scriptfleet, Inc.*, No. 12 Civ. 8230 (N.D. Ill.)

**Time Spent on the Litigation**

12.     Plaintiffs' Counsel is requesting one-third of the settlement fund for attorneys' fees.  In our experience, law firms that represent plaintiffs in employment matters like this matter typically charge their clients legal fees of at least one-third of their gross recoveries when they represent them on a contingency fee basis.  Likewise, before initiating this litigation, Plaintiffs agreed that SLG would request no more than one-third of any future recovery, plus actual out of pocket costs.

13.     Counsel's skill and experience were directly responsible for bringing about the positive settlement in the instant case and weigh in favor of granting the requested fees.

14.     As of January 16, 2020, SLG has spent more than 167.1 hours investigating, researching, litigating, mediating, and settling this case, in addition to the lodestar of O&G and SS.  This number includes approximately 162.7 attorney hours and 4.4 paralegal hours.  As of January 16, 2020, SLG's lodestar on the case was $84,690.00.

15.     Due to the experience of its attorneys in representing workers in litigation of this type, SLG is adept at minimizing duplication of efforts and maximizing billing judgment.  SLG makes every effort to have the work performed by the attorney or paralegal with the lowest hourly rate who is able to effectively perform each task.

16.     The hours reported are reasonable for a case of this complexity and size and were compiled from contemporaneous time records maintained by each attorney and paralegal participating in the case.

17.     SLG ordinarily and regularly bills legal time on an hourly fee basis by the tenth of an hour, based upon each attorney's standard hourly rate.  Currently, SLG's complex litigation rates range from $300 to $700 per counsel's hour, $150 per law clerk's hours, and $150 per hour for paralegals and legal assistants.  The rates of the SLG attorneys who worked on this matter are as follows:

Gregg I. Shavitz, Esq.          $700

Paolo C. Meireles, Esq.         $500

Logan A. Pardell, Esq.          $300

18.     When SLG lawyers spend time on selected contingency matters, they do so at significant risk and opportunity cost for the firm.  SLG frequently turns away additional cases, including hourly litigation matters and other contingency matters, in order to enable its attorneys to work on pending contingency matters, primarily (though not exclusively) class or collective actions.

19.     The requested attorneys' fees are not based solely on time and effort already expended; they are also meant to compensate Plaintiffs' Counsel for time that they will be required to spend administering the settlement in the future.  In our experience, administering class settlements of this nature and size requires a substantial and ongoing commitment.  Plaintiffs' Counsel expects to respond to more inquiries after final approval.

**Costs Incurred in the Litigation**

20.     In addition to its fees, SLG has incurred approximately $4,409.18 in out-of-pocket costs prosecuting this litigation (in addition to those costs incurred by O&G and SS), which were incidental and necessary to the representation of the class and which include investigation of Plaintiffs' claims and travel to and from out-of-state mediation.  *See* Exhibit A (costs summary).

\*        \*        \*

I declare under penalty of perjury, under 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated: January 21, 2020

Respectfully submitted,

_____

Gregg I. Shavitz

# Exhibit A

| Expense Category | Costs |
|---|---|
| Travel: | $2,398.91 |
| Lodging and Meals: | $50.27 |
| Mediation: | $1,750.00 |
| Filing Fees: | $210.00 |

| Total: | $4,409.18 |
|---|---|

# Exhibit 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TONYA HERBIN, JENNIFER TABOR, and BRETT TYSON, individually and on behalf all others similarly situated, | : : : : : | |
| | : | Case No.  2:19-cv-00696-CB |
| Plaintiffs, | : : | |
| v. | : : : | |
| THE PNC FINANCIAL SERVICES GROUP, INC. and PNC BANK, N.A., | : : : | |
| Defendants. | : : | |

| | | |
|---|---|---|
| CASEY MINOR and ALEXIS YARBROUGH, individually and on behalf all similarly situated individuals, | : : : : | |
| | : | Case No.  2:20-cv-0058-CB |
| Plaintiffs, | : : | |
| v. | : : : | |
| PNC BANK, N.A., | : : : | |
| Defendant. | : : | |

## AGREED ORDER ON PLAINTIFFS' UNOPPOSED MOTION FOR ORDER APPROVING SETTLEMENT OF COLLECTIVE ACTION AND AUTHORIZING NOTICE OF SETTLEMENT AND OPPORTUNITY TO FILE CONSENT TO JOIN AND RELEASE FORMS AND DISMISSAL WITH PREJUDICE

This matter came before the Court upon Plaintiffs' Unopposed Motion to Approve Collective Action Settlement, Authorize Notice Mailing, and Dismiss With Prejudice (the "Motion").  Having reviewed the Motion, the Joint Stipulation of Settlement and Release ("Settlement Agreement"), and the exhibits attached thereto, and the Court being otherwise fully advised in the premises, it is **ORDERED AND ADJUDGED** as follows:

1.     The Motion is GRANTED.

2.     The Court approves the Settlement Agreement.  The Court finds that the parties'
settlement resolves a bona fide dispute, is fair, reasonable, and adequate, and does not
impermissibly frustrate the "implementation of the [Fair Labor Standards Act] in the workplace."
*See Bettger v. Crossmark, Inc.*, 2015 WL 279754, at *4 (M.D. Pa. Jan. 22, 2015).

3.     The Court approves the Notice of Settlement and Consent to Join and Release
Form and directs its distribution.

4.     The Court approves the requested Service Payments to the Plaintiffs and the Opt-
in Plaintiff.

5.     The Court approves Plaintiffs' request for attorneys' fees and expenses.

6.     All other terms described in the Agreement are fair, reasonable and adequate as to
the Settling Parties, Service Payment Recipients, Putative Collective Members, and Qualified
Claimants and are approved.

7.     This Action is DISMISSED WITH PREJUDICE in its entirety.

8.     The Court will RETAIN JURISDICTION to enforce the Agreement.

9.     The case is CLOSED and all pending motions are DENIED as moot.

DONE AND ORDERED, in Chambers, UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA, this _____ day of
_____, 20____.

_____
Honorable Cathy Bissoon
United States District Judge

# Exhibit 4

| Law Firm | Hours | Fees | Costs |
|---|---|---|---|
| Outten & Golden LLP | 255.6 | $ 140,578.00 | $  6,460.50 |
| Shavitz Law Group, P.A. | 167.1 | $  84,690.00 | $  4,409.18 |
| Sommers Schwartz, P.C. | 165 | $  70,000.00 | $  2,756.42 |
| **Total** | **587.7** | **$ 295,268.00** | **$ 13,626.10** |

The lodestar multiplier calculated by Plaintiffs is 3.10.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| TONYA HERBIN, JENNIFER TABOR, and BRETT TYSON, individually and on behalf all others similarly situated, | : : : : : | |
| Plaintiffs, | : : | Case No.  2:19-cv-00696-CB |
| v. | : : : | |
| THE PNC FINANCIAL SERVICES GROUP, INC. and PNC BANK, N.A., | : : : | |
| Defendants. | : : | |

|  |  |  |
|---|---|---|
| CASEY MINOR and ALEXIS YARBROUGH, individually and on behalf all similarly situated individuals, | : : : : | |
| Plaintiffs, | : : | Case No. 2:20-cv-0058-CB |
| v. | : : : | |
| PNC BANK, N.A., | : : : | |
| Defendant. | : : | |

## DECLARATION OF MATTHEW L. TURNER

After being duly sworn, I, Matthew L. Turner, hereby state:

1.      I make this Declaration in support of Plaintiffs' Unopposed Motion To Approve Collective Action Settlement, Authorize Notice Mailing, And Dismiss With Prejudice (the "Approval Motion"). The Approval Motion is being filed concurrently with this Declaration.

2.      This Declaration is filed to support representations and facts submitted to the Court as to: the complexities of this litigation and the events leading up to the settlement; the difficulties and risks that this case entailed; the benefits of the settlement; that the Joint Stipulation of

Settlement and Release ("Settlement") is fair, reasonable, and adequate to the collective action members and should be approved under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*; that the form of the proposed Notice of Settlement and Consent to Join and Release Form ("Notice Packet") and the method of disseminating the Notice Packet fully satisfy the requirements of the FLSA; and other related matters, all in support of the Approval Motion.

**A.** **Practice Background**

3.  I, along with Rod M. Johnston, am the lead attorney for Plaintiffs Casey Minor and Alexis Yarbrough ("the *Minor* Plaintiffs") and the putative collective action members in the action, *Minor et al. v. PNC Bank, NA*, Case No. 2:20-cv-0058-CB (the "*Minor* Action"). I am personally familiar with, and have personal knowledge of, the files and records of the *Minor* Action.

4.  I received my Juris Doctor (J.D.) degree, *summa cum laude*, from Detroit College of Law. I am licensed and have practiced law in the State of Michigan. In addition to Michigan State Courts, I am admitted to practice in the following courts: U.S. Supreme Court; U.S. Third Circuit Court of Appeals; U.S. Sixth Circuit Court of Appeals; U.S. District Court for the Eastern District of Michigan; U.S. District Court for the Western District of Michigan; and U.S. District Court for the Northern District of Ohio.

5.  I am a Senior Shareholder in the law firm of Sommers Schwartz, P.C. ("Sommers Schwartz") in Southfield, Michigan. I work in the firm's Personal Injury and Complex Litigation Departments, focusing my practice on medical malpractice, legal malpractice, ERISA, and class action matters. My Biography from the firm website is attached as Tab A to this Declaration.

6.  Founded over 40 years ago, Sommers Schwartz is one of the preeminent contingent fee law firms in the Midwest, if not the country. The firm's primary practice areas include: employment litigation; commercial litigation; class action litigation; medical malpractice

litigation; and personal injury litigation. The firm has been lead counsel and/or held positions of substantial responsibility on steering committees in lawsuits concerning antitrust violations, mass torts, defective products, dangerous drugs, wage and hour violations, and numerous other types of cases against large corporations. The firm's shareholders are experienced trial attorneys, with active cases pending in both state and federal courts throughout the country. Sommers Schwartz has been appointed class counsel or co-class counsel in numerous class actions, obtaining substantial recoveries for thousands of employees. (*See https://www.sommerspc.com/recently-filed-cases/*).

7. Sommers Schwartz is lead counsel in the *Minor* Action, filed on behalf of current and former customer service representatives ("CSRs") employed by PNC Bank, NA.

**B.** **Procedural History**

8. The *Minor* Action was filed by the *Minor* Plaintiffs against PNC Financial Services Group, Inc.[1] in the United States District Court for the Western District of Michigan, Southern Division, on February 12, 2019.

9. The *Minor* Plaintiffs, on behalf of themselves and all similarly situated employees, allege that they were employed by PNC as CSRs in Kalamazoo, Michigan and were required to perform unpaid overtime work before and after their scheduled shifts and during their unpaid lunch breaks, such as booting up and shutting down computers and logging into computer software programs and applications that were integral and necessary for the performance of their work. The *Minor* Plaintiffs alleged that PNC violated the FLSA, 29 U.S.C. §§ 201 *et seq.*, and Michigan state laws, with respect to themselves and a putative class and collective.

10. PNC answered the Complaint on April 29, 2019, contesting each substantive

---

[1] Subsequent to the filing of the *Minor* Action, the *Minor* Plaintiffs agreed to substitute PNC Bank, NA ("PNC") for PNC Financial Services Group, Inc. as the defendant in the *Minor* Action.

allegation pertaining to the *Minor* Plaintiffs' off-the-clock work and asserting various defenses, including that PNC's written timekeeping policies ensure that CSRs properly record their time and that any uncompensated time that CSRs worked was *de minimis*.

11.     On May 1, 2019, the *Minor* Plaintiffs filed a Pre-Discovery Motion for Conditional Collective Certification and Court-Authorized Notice to Potential Opt-In Plaintiffs Pursuant to 29 U.S.C. § 216(b) (the "Conditional Certification Motion"), seeking to conditionally certify a collective action class under the FLSA, 29 U.S.C. § 216(b), defined as: All current and former Customer Service & Support Representatives who worked for PNC Bank, NA at any of its call center facilities at any time on or after February 12, 2016 through judgment. PNC opposed the Conditional Certification Motion on May 29, 2019. The motion was fully briefed on June 11, 2019.

12.     Subsequent to the *Minor* Plaintiffs' and PNC's briefing on the Conditional Certification Motion, a substantially similar putative class and collective action lawsuit was initiated against The PNC Financial Services Group, Inc. and PNC Bank, N.A. (collectively, "PNC") on June 14, 2019 in the United States District Court for the Western District of Pennsylvania, *Herbin et al. v. The PNC Financial Services Group, Inc. et al.*, Case No. 2:19-cv-00696-CB (W.D. Pa.) ("the *Herbin* Action").

13.     The *Herbin* Action seeks to recover unpaid overtime compensation for three named plaintiffs (collectively, the "*Herbin* Plaintiffs") and similarly situated telephone customer service representatives, including but not limited to Customer Service Representatives, Sales Representatives, Customer Service and Support Representatives, Customer Support Representatives, and/or other similar positions with different titles, who have worked for PNC throughout the United States, whether in call centers or "virtually" (outside of a call center and/or from home).

4

14.     The *Herbin* Plaintiffs allege violations nearly identical to those alleged in the *Minor* Action, namely, that PNC routinely required CSRs to work off-the-clock uncompensated overtime hours by instructing CSRs not to clock in for the start of their shift until CSRs boot up their computers, log in to their desktops, load all necessary programs and software, and read all necessary emails and reference materials.

15.     Prior to filing the *Herbin* Action, the *Herbin* Plaintiffs and PNC engaged in settlement negotiations, including an exchange of pre-suit discovery and an all-day mediation session in Pittsburgh, Pennsylvania with the Honorable Kenneth Benson (Ret.).

16.     During the *Herbin* Plaintiffs' and PNC's pre-suit settlement efforts, the *Minor* Plaintiffs filed the *Minor* Action.

17.     The *Herbin* and *Minor* Plaintiffs (collectively, "Named Plaintiffs") and PNC subsequently engaged in further settlement negotiations, including an all-day mediation session in Pittsburgh, Pennsylvania with Arthur H. Stroyd, Jr., which resulted in the Settlement now in front of the Court for approval.

18.     Named Plaintiffs and PNC have executed the Settlement, which resolves all claims asserted in the *Herbin* and *Minor* Actions, subject to court approval pursuant to 29 U.S.C. § 216(b).

19.     On January 7, 2020, the *Minor* Plaintiffs and PNC stipulated and agreed to the entry of an Order, pursuant to 28 U.S.C. § 1404, transferring the *Minor* Action to the United States District Court for the Western District of Pennsylvania.

20.     Consolidation of the *Herbin* and *Minor* Actions for purposes of judicial consideration and approval of the Settlement will conserve the resources of the courts and the parties and will be more efficient than proceeding separately in two venues for such purposes.

21.     On January 10, 2020, United States District Court Judge Paul L. Maloney ordered

5

that the *Minor* Action be transferred from the United States District Court for the Western District of Michigan, Southern Division, to the United States District Court for the Western District of Pennsylvania, with each party bearing its own costs and fees relating to the transfer. Judge Maloney further ordered the Clerk for the United States District Court for the Western District of Michigan to forward all filings in the *Minor* Action to the Clerk for the United States District Court for the Western District of Pennsylvania.

### C.    <u>Work Performed in Connection with this Lawsuit</u>

22.    I have been involved in this litigation from the outset and have been responsible for, among other things, supervising the efforts of all attorneys who performed services on behalf of the *Minor* Plaintiffs and the putative collective action members since the *Minor* Action was commenced.

23.    In addition to myself, the following individuals have performed services in connection with the *Minor* Action: Rod M. Johnston (Sommers Schwartz Associate Attorney); Jason J. Thompson (Sommers Schwartz Senior Shareholder); Kevin J. Stoops (Sommers Schwartz Senior Shareholder); Debra A. Nichols (Sommers Schwartz Paralegal); Wendy E. Vaughn (Sommers Schwartz Legal Assistant); and Janice L. Koehler (Sommers Schwartz Legal Assistant).

24.    I was responsible for overseeing all of the following work in connection with the *Minor* Action: initial client interviews; intake and document review; drafting initial pleadings including the Complaint; drafting the Conditional Certification Motion pursuant to the FLSA, 29 U.S.C. 216(b); drafting the reply brief in support of the Conditional Certification Motion; telephonic meetings with clients; interviewing potential opt-in plaintiffs; communicating with opposing counsel; obtaining and reviewing informal discovery production; reviewing damages models; legal research concerning FLSA and state wage and hour laws; selecting the mediator;

reviewing mediation materials; reviewing settlement documents; selecting and hiring the settlement administrator; and preparing and reviewing settlement approval motions and related documents.

25.    I attended the mediation and was heavily involved in all aspects of preparing for mediation, including selecting and hiring the mediator; participating in numerous telephone conferences with PNC and the *Herbin* counsel; reviewing the damages model and mediation statement; and prepping for the mediation, including numerous telephone conference calls with the *Herbin* counsel regarding the asserted claims, the value of the claims, the status of negotiations, mediation strategy, and the structure of any potential settlement.

26.    With respect to informal discovery production, I was responsible for overseeing and coordinating efforts relatring to reviewing and analyzing voluminous documents and substantial electronic data pertaining to the number of CSRs employed by PNC during the statute of limitations period applicable to the case, along with metrics related to: rate of pay; dates of employment; location worked; hours worked per week; total weeks worked; total shifts worked; average hours worked per week; percentage of shifts worked that equaled or exceeded eight hours; and percentage of weeks worked that equaled or exceeded 40 hours. From this information, Named Plaintiffs' counsel were able to ascertain information critical to constructing a damages model that accurately and adequately valued the class members' claims.

27.    Additionally, I was responsible for overseeing all matters relative to the *Minor* Action, including scheduling, informal discovery, negotiations, damage analysis, and all disputes. I was also responsible for overseeing all client contact with the *Minor* Plaintiffs, court communications, and all other matters related to the *Minor* Action.

28.    All the above efforts, coupled with Named Plaintiffs' counsel's ability to prosecute

the collective action strategy, contributed to reaching the Settlement with PNC that is currently before the Court for approval.

**D.**    **Reasonableness of Settlement**

29.     Subject to Court approval, the Settlement provides for a gross settlement fund ("Gross Fund") equal to $2,750,000. The Gross Fund covers Putative Collective Members' settlement awards;[2] the employees' share of payroll taxes arising from those awards; attorneys' fees and costs; service payments; and the fees and costs of the Settlement Claims Administrator.

30.     While the details and final structure of the Settlement are clearly set forth in the Approval Motion, the complexities that the parties encountered in reaching the Settlement were significant, to say the least.

31.     As the lead attorney for the *Minor* Action, I can attest to the numerous complications that arose each step of the way in determining how to structure a settlement in this case. Identification of the compensable off-the-clock time involved extensive review of substantial document and data production and substantial legal research. I can further attest to the level of effort, expertise, dedication and creativeness of both Named Plaintiffs' counsel and defense counsel in ensuring that the Settlement was fair, reasonable and adequate to both sides. Had all those efforts not occurred, and the hurdles and obstacles overcome, the settlement would never have been realized.

32.     PNC asserted numerous legal and factual defenses to the *Minor* Plaintiffs' claims and collective certification efforts including, *inter alia*, that:

        a.  PNC maintains written employment policies prohibiting off-the-clock work,

---

[2] The Putative Collective Members are individuals who were employed as CSRs by PNC anywhere in the United States between August 16, 2016 through the date of full execution of the Settlement Agreement.

prohibiting overtime without authorization, and prohibiting the performance of work before CSRs' scheduled shifts.

b. PNC will tender manager and supervisor testimony indicating that CSRs are not instructed to complete the log-in process prior to the time their shifts start, but only to begin the process at their scheduled start of shift time.

c. The putative collective action members completed aspects of the log-in and log-out process in different ways that varied by class member or day or both.

d. The putative collective action members engaged in personal activities at the beginning of their shifts.

e. The *Minor* Plaintiffs' allegations as to the amount of off-the-clock work grossly overstates how long it takes to perform the tasks they describe.

f. The putative collective action members will be unable to prove their off-the-clock time because no records exist identifying the exact amount of time they spent each shift performing off-the-clock duties.

g. PNC maintains a lawful meal period policy and the putative collective action members do not perform off-the-clock tasks during their meal periods.

h. Many of the putative collective action members do not work 40 hours per week, and, thus, do not maintain actionable overtime claims.

i. The putative collective action members will not satisfy the similarly situated element necessary to obtain conditional FLSA collective certification.

j. The putative collective action members' claims fail because the alleged off-the-clock time is *de minimis*.

k. The *Minor* Plaintiffs and the putative collective action members will not be able to establish that PNC's alleged violations were willful.

l. The *Minor* Plaintiffs and the putative collective action members will not be able to recover liquidated damages.

m. Individual issues, both as to liability and damages, dominate the dispute, rendering collective action treatment improper.

33. The existence of PNC's factual and legal arguments weighed on the parties' decision to resolve the case. While Named Plaintiffs' counsel understandably takes issue with the viability of some of these defenses, the risks associated with the continued litigation of Named Plaintiffs' wage claims simply cannot be disregarded in measuring the reasonableness of the

Settlement. Specifically, settling this case now saves the parties from years of litigation and tremendous uncertainty as to the ultimate outcome of the litigation. Should the parties have continued to litigate the case, they would have been faced with no less than 6 to 12 months of formal, class-wide discovery (individual class member depositions; interrogatories and requests for production of documents; electronic data production; 30(b)(6) depositions; etc.). Discovery, once completed, would be followed by an FLSA decertification motion (assuming that FLSA conditional collective action certification would have been granted), dispositive motions, and eventually one or more trials. It is very likely that this litigation would extend for another two to three years and cost the parties $1,000,000 (or more) each in attorneys' fees and expenses.

34. Based on the damage analysis conducted by Named Plaintiffs' counsel, and in light of the factual and legal defenses identified above, the settlement amount is substantial, completely reasonable, and marks a fair compromise of the claims.

35. The claims that will be released by the Named Plaintiffs and the participating class members were extensively scrutinized and negotiated by the attorneys involved in this litigation. It represents a fair compromise and constitutes a fairly negotiated bargain for release of claims that arose from the facts as alleged in the Complaint. Named Plaintiffs have consented to the release, as well as the Settlement, and have been afforded full access to counsel throughout the entirety of this litigation.

36. The Settlement was the result of arm's-length negotiations, with assistance by esteemed and very experienced mediator Arthur H. Stroyd, Jr., conducted by experienced counsel for all parties, and reached after extensive negotiation and informal discovery. Prior to settlement, each side independently and thoroughly investigated the claims and defenses at issue. The work performed allowed each party to intelligently, and in good faith, weigh both the risks and benefits

of settlement as compared to continued litigation. These efforts culminated in a substantial settlement which provides Named Plaintiffs and the collective action members with an opportunity to resolve their claims against PNC in a meaningful way.

37.     Based on my past experience in litigating wage and hour cases, I fully endorse the Settlement and believe that it is truly in the best interests of all parties. For all the reasons set forth herein, I believe this Court should honor and approve the terms of the Settlement.

**E.     Reasonableness of Requested Fee Award**

38.     Subject to Court approval, the Settlement provides for one-third of the Gross Fund, or $916,666.67, as attorneys' fees, plus reimbursement of actual out-of-pocket costs.

39.     In preparing this Declaration, I reviewed the time records of all participating attorneys/paralegals from Sommers Schwartz, confirming the accuracy, utility, efficiencies and reasonableness of the amount of time spent by the *Minor* Plaintiffs' counsel working on this litigation, as well as the expenses incurred.

40.     I have reviewed all of the time and expenses and can attest that they are reasonable as to both the hourly rates, time spent, work allocation and totals, as well as being absolutely necessary to reach the settlement in this case. Named Plaintiffs' counsel diligently worked to avoid duplication of efforts and expenses, while at the same time not sacrificing work quality on behalf of the Named Plaintiffs and the collective action members. The settlement obtained in this litigation was directly impacted by the efforts and expenses advanced by Named Plaintiffs' counsel in this lawsuit.

41.     Based on my personal experience, the requested fee award (one-third of the Gross Fund) for the legal services rendered in the *Herbin* and *Minor* Actions falls well within the range of awards typically granted for funds of a similar size and reflects the reasonable value of the legal

11

services rendered in this case in light of the complex nature of the case, the result obtained, the quality of representation, the risks of the litigation, customary fee awards in similar collective action cases, and other applicable considerations as set forth by the law.

42.     I typically charge $685 per hour for my legal services in FLSA and state wage law class action cases. I am familiar with rates customarily charged in the legal market for FLSA and state wage law class action litigation. The rates charged by my firm for my services and those of Senior Shareholders, Shareholders, Associates and Paralegals are, on the whole, lower than prevailing rates charged for equivalent services by attorneys of similar skill, experience, and reputation. Therefore, I believe that we are reasonable in charging lodestar rates of $685 per hour for myself, $350 for Mr. Johnston, $615 per hour for Mr. Stoops, $735 per hour for Mr. Thompson, and lower rates for paralegals and legal assistants who worked on this matter.

43.     To date, the *Minor* Plaintiffs' counsel has incurred over 165 hours and approximately $70,000 in fees, before accounting for the time that will be incurred in taking this action through settlement. The *Minor* Plaintiffs' counsel has also incurred $2,756.42 in litigation costs, which will surely increase in connection with the necessary travel and administrative expenses that will be incurred in effectuating approval of the settlement. Presently, these litigation costs include: (a) postage ($7.32); (b) outside courier ($33.87); (c) air fare ($1,664.21); (d) local travel ($95.52); (e) car rental ($105.52); (f) meals ($81.96); (g) filing fees ($400.00); (h) service fees ($157.80); and (i) publications and online media fees ($209.82).

44.     The requested fee award is reasonable because, *inter alia*, Named Plaintiffs' counsel resolved the *Minor* and *Herbin* Actions expeditiously and in doing so provided a substantial benefit to the Named Plaintiffs and participating class members who will not be required to await years of litigation before receiving a payment.

12

45.     In addition to the substantial resources already devoted to the *Minor* and *Herbin* Actions, Named Plaintiffs' counsel will incur additional fees relating to settlement-related tasks, including communicating with putative collective members and monitoring the claims process, after the Court approves the settlement.

46.     The requested fee award is reasonable in light of the risks of nonpayment that Named Plaintiffs' counsel faced. Sommers Schwartz took the *Minor* Action on a contingent basis in which they were entitled to a fee of 40% of the total recovery, meaning that there was a substantial risk that they would not be paid. As discussed above in this Declaration, Named Plaintiffs' counsel faced significant legal hurdles in proving liability and damages and could have lost everything they invested had the *Minor* and *Herbin* Actions been litigated through dispositive motions and trial.

47.     In my opinion, and based on my experience in, and research of, other FLSA and state wage law class action settlements in this Circuit, and nationwide, the requested fee award is reasonable and appropriate, especially in light of the amount of work performed by Named Plaintiffs' counsel in this case and the substantial recovery obtained on behalf of the Named Plaintiffs and the collective action members.

48.     In addition to the requested fee award, Named Plaintiffs' counsel is seeking reimbursement of reasonable and necessary litigation expenses. The litigation expenses incurred in association with the *Minor* Action are reflected on the books and records of Sommers Schwartz and are available for submission to the Court upon request. I have reviewed Sommers Schwartz's expenses and find them to be reasonable, necessary, and customary for FLSA and state wage and hour cases. All expenses were incurred in the normal course of litigation, directly benefited the *Minor* Plaintiffs and the collective action members, and contributed to the overall success of this

case.

### F.   Reasonableness of Requested Named Plaintiff Incentive Awards

49.     The *Minor* Plaintiffs worked diligently to assist counsel in their activities during the pendency of this litigation. In particular, the *Minor* Plaintiffs took part in multiple telephonic interviews, provided substantial records and documentation to counsel, and made themselves available for the mediation. The *Minor* Plaintiffs were counseled on the rights and responsibilities of serving as FLSA collective representatives and agreed to serve in that capacity in connection with the filing of the Complaint and the litigation of the *Minor* Action.

50.     The requested amount of $8,333.33 to be allocated to each of the Named Plaintiffs and the opt-in plaintiff for service awards is commensurate with other service awards I have been involved in nationally and, as documented by research of other similar awards, is reasonable under the circumstances.

### G.   Reasonableness of Settlement Administration Expenses

51.     The Settlement will be serviced by professional services provider Rust Consulting, Inc. ("Rust"), who will serve as settlement administrator. Rust has been consistently approved by courts across the country and is one of the leading settlement administrators for class actions in the country.

52.     Estimates provided by Rust indicate that settlement administration for this case will amount to approximately $67,250. The amount is reasonable given the number of individuals involved in the Settlement.

### H.   Conclusion

53.     In light of the significant efforts outlined above and the significant risks faced by the parties in continuing to litigate this case, it is my professional and experienced opinion that the

14

Settlement before the Court of $2,750,000 is not only adequate, fair and reasonable, but also meets the requirements of § 216(b) of the FLSA.

54.     The Settlement achieves substantial benefits for the Named Plaintiffs and the collective action members, represents finality to a long-standing wage and hour issue facing PNC's CSRs, and avoids extended adversary proceedings years into the future, let alone the uncertainties of additional motions, trials and appeals. Ultimately, the process outlined above produced a meaningful monetary recovery that would not have otherwise occurred without the extensive efforts of counsels and the parties described herein. If not for this case and the diligent efforts of Named Plaintiffs and their counsel, there would be no class-wide settlement, let alone a $2,750,000 settlement fund.

Executed on January 21, 2020.

_____
Matthew L. Turner

# TAB A



 



## *Matthew Turner*

Shareholder
**Direct Dial**  (248) 746-4039
**Direct Fax**  (248) 936-1973
**Email**  mturner@sommerspc.com

### Education
Detroit College of Law, Juris Doctor, summa cum laude
  - Detroit College of Law Class of 1961 Cup
  - Detroit College of Law William B. Giles Award
  - American Jurisprudence Award- Torts
  - American Jurisprudence Award-Legal Profession
Ohio State University, Bachelor of Science

### Areas of Practice
Medical Malpractice
Personal Injury

## PROFILE

### Bar Admissions

| | |
|---|---|
| Michigan | U.S. Sixth Circuit Court of Appeals |
| U.S. Supreme Court | U.S. District Court for the Eastern District of Michigan |
| U.S. Third Circuit Court of Appeals | U.S. District Court for the Western District of Michigan |
| | U.S. District Court for the Northern District of Ohio |

**Matthew Turner** is a shareholder with Sommers Schwartz, and focuses his practice on medical malpractice, legal malpractice, ERISA, and class action matters.

Fighting for and protecting the rights of his clients is the most important part of Matt's profession. During law school, he was a law clerk for Oakland County Circuit Court Judge Richard Kuhn, and after graduation, he joined his family's law firm where he litigated a broad range of matters involving business disputes, employment discrimination, dental malpractice, auto accident, slip and fall, and significant cases of death and catastrophic loss.

Matt has appeared before the United States Supreme Court, and prevailed in a 9-0 decision establishing precedent that has been followed throughout the country. He has argued a number of appeals before the Michigan Supreme Court, the United States Sixth Circuit Court of Appeals, and the Michigan Court of Appeals. At the trial level, he obtained a verdict in excess of $1 million dollars in a medical malpractice case, and has secured a number of other highly successful trial verdicts and settlements.

In addition to his legal career, Matt has been a varsity high school football coach for over 20 years. In 2002, the Michigan High School Football Coaches Association named him an Assistant Coach of the Year. He currently serves as the offensive line coach and offensive coordinator at Birmingham Groves High School.

## ACCOMPLISHMENTS

- Serbay v. DialogDirect, Inc. (Class Counsel)
- Padan v. West Corporation (Class Counsel)
- Atkinson v. TeleTech, LLC (Class Counsel)
- Toliver v. JBS Plainwell, Inc. et al (Class Counsel)
- Terry v. TMX Finance LLC et al (Class Counsel)
- 2016: $3.5 million class action settlement on behalf of Teletech home-based customer service agents who claimed their employer unlawfully withheld compensation in violation of the Fair Labor Standards Act's wage and hour provisions
- 2016: $855,000 verdict in a wrongful death case alleging an oral surgeon's failure to diagnose cancer of the tongue
- 2015: $475,000 personal injury settlement on behalf of a man rendered blind in one eye when struck by a vacuum cleaner attachment
- 2014: $360,000 class action settlement on behalf of call center employees claiming to have been denied overtime pay in violation of the federal Fair Labor Standards Act
- 2014: $1.86 million medical malpractice settlement for the estate of a man who died three weeks after an elective surgery for which the defendant anesthesiologist should not have cleared him
- 2014: $96,000 verdict for a plaintiff who sustained permanent physical injury, mental anxiety, depression, and economic loss when his motorcycle was struck after the defendant driver ran a red light
- 2014: $337,500 settlement for a man who failed to receive timely treatment of an ulcer due to a hospital laboratory's failure to report a finding of MRSA on the culture, resulting in a systemic infection, permanent damage to his right eye, and significant tissue damage to his right knee
- 2014: $250,000 hospital malpractice settlement for a woman who developed pressure sores and contractures during recovery from a hip fracture and corrective surgery, all due to the defendant's failure to take precautions to prevent the pressure ulcers
- 2014: $82,500 medical malpractice settlement on behalf of a woman who claimed that her internal medicine physician failed to timely advise her of test results showing a cancerous mass on her ovary
- 2014: $300,000 hospital malpractice settlement for a man injured when a nursing staff's negligence in placing an IV resulted in compartment syndrome requiring fasciotomy procedures and causing development of extensive scarring and nerve and muscle damage
- 2014: Significant class action verdict involving claims that food-processing workers were required to put on or "don" protective gear at the beginning of their shifts and remove or "doff" the gear after their shifts ended, but were not paid for the time spent conducting these tasks
- 2013: $275,000 medical malpractice settlement for a woman who suffered a brachial plexus injury requiring surgery and extensive rehabilitation due to an ER physician's unsuccessful attempts to put her dislocated shoulder back in place
- Assistant Coach of the Year, Michigan High School Football Coaches Association, 2002

**Honors/Awards**
- Super Lawyers (Michigan) – 2007 - Present
- Best Lawyers in America– 2019
- DBusiness Top Lawyer – 2016
- Leading Lawyers – Class Action & Mass Tort Law
- AV Preeminent Lawyer – Peer Review Rating of 5.0 out of 5.0 (Martindale-Hubbell)

**Seminars/Lectures**

- State Bar of Michigan Negligence Law Section's Lien Seminar (October 2017)
- "Advanced Trial Skills – Voir Dire," Federal Bar Association of the Western District of Michigan (November 2016)
- Great Lakes Mass Torts Institute
- Michigan Association for Justice, Medical Malpractice Seminar
- Michigan High School Football Coaches Association Clinic
- Contributor, Fox 2 News

## MEMBERSHIPS

- State Bar of Michigan
- Michigan Association for Justice - Former Executive Board Member
- American Association for Justice
- American Board of Trial Advocates
- Case Evaluator – Wayne, Oakland, and Macomb County Circuit Courts
- Assistant Varsity Football Coach, Offensive Coordinator – Birmingham Groves High School
- Board Member – Hickory Point Homeowners Association
- Former Assistant High School Football Coach for Bloomfield Hills Andover High School, Dublin (Ohio) High School, Birmingham Seaholm High School, and Troy Athens High School

  

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| TONYA HERBIN, JENNIFER TABOR, and BRETT TYSON, individually and on behalf all others similarly situated, | : : : : : | |
| Plaintiffs, | : : | Case No. 2:19-cv-00696-CB |
| v. | : : : | |
| THE PNC FINANCIAL SERVICES GROUP, INC. and PNC BANK, N.A., | : : : | |
| Defendants. | : : | |

|  |  |  |
|---|---|---|
| CASEY MINOR and ALEXIS YARBROUGH, individually and on behalf all similarly situated individuals, | : : : : | |
| Plaintiffs, | : : | Case No. 2:20-cv-00058-CB |
| v. | : : : | |
| PNC BANK, N.A., | : : : | |
| Defendant. | : : | |

## DECLARATION OF ROD M. JOHNSTON

After being duly sworn, I, Rod M. Johnston, hereby state:

1. I make this Declaration in support of Plaintiffs' Unopposed Motion To Approve Collective Action Settlement, Authorize Notice Mailing, And Dismiss With Prejudice (the "Approval Motion"). The Approval Motion is being filed concurrently with this Declaration.

2. This Declaration is filed to support representations and facts submitted to the Court as to: the complexities of this litigation and the events leading up to the settlement; the difficulties and risks that this case entailed; the benefits of the settlement; that the Joint Stipulation of

Settlement and Release ("Settlement") is fair, reasonable, and adequate to the collective action members and should be approved under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*; that the form of the proposed Notice of Settlement and Consent to Join and Release Form ("Notice Packet") and the method of disseminating the Notice Packet fully satisfy the requirements of the FLSA; and other related matters, all in support of the Approval Motion.

A.  **Practice Background**

3.  I, along with Matthew L. Turner, am the lead attorney for Plaintiffs Casey Minor and Alexis Yarbrough ("the *Minor* Plaintiffs") and the putative collective action members in the action, *Minor et al. v. PNC Bank, NA*, Case No. 2:20-cv-0058-CB (the "*Minor* Action"). I am personally familiar with, and have personal knowledge of, the files and records of the *Minor* Action.

4.  I received my Juris Doctor (J.D.) degree, *magna cum laude*, from Western Michigan University Thomas M. Cooley Law School in May 2015. I am licensed and have practiced law in the State of Michigan. In addition to Michigan State Courts, I am admitted to practice in the following courts: U.S. District Court for the Eastern District of Michigan; U.S. District Court for the Western District of Michigan; U.S. District Court for the District of Colorado; and U.S. District Court for the Northern District of Illinois. In addition, I have appeared *pro hac vice* in numerous courts, including the U.S. District Court for the Central District of California; U.S. District Court for the Southern District of California; U.S. District Court for the Northern District of California; U.S. District Court for the District of New Jersey; U.S. District Court for the District of Nevada; U.S. District Court for the Western District of Washington; U.S. District Court for the Northern District of Ohio; U.S. District Court for the Northern District of New York; U.S. District Court for the Western District of North Carolina; Superior Court of the

State of California, County of Los Angeles; Superior Court of the State of California, County of

Alameda; and Superior Court of the State of California, County of Riverside.

5.      I am an Associate Attorney in the law firm of Sommers Schwartz, P.C. ("Sommers

Schwartz") in Southfield, Michigan, and have worked for the firm since 2015 as a member of the

Complex Litigation Department, participating in the firm's direct and class action litigation on

behalf of those harmed as a result of wage and overtime violations and consumer fraud. Most, if

not all, of my time is devoted to challenging illegal wage and hour practices on behalf of current

and former employees. Representative wage and hour cases in which I have served as the lead

Associate Attorney include the following:

a.   *Salas et al. v. CMR, Inc.*, Case No. 5:18-cv-02238-DSF (SHKx) (C.D. Cal. Oct. 19, 2018 - Collective/class action lawsuit on behalf of hourly customer service representatives in which the parties engaged in pre-certification mediation, resulting in a $275,000 class-wide settlement (pending preliminary and final approval).

b.   *Danford et al. v. Lowe's Home Centers, LLC et al.*, Case No. 5:19-cv-041-KDB-DCK (W.D.N.C. Apr. 11, 2019) – Collective/class action lawsuit on behalf of hourly managers in which conditional collective action certification was granted and notice was sent to approximately 50,000 hourly managers nationwide.

c.   *Beattie et al. v. TTEC Healthcare Solutions, Inc. et al.*, Case No. 1:18-cv-03098-RM-NRN (D. Colo. Dec. 3, 2018) - Collective/class action lawsuit on behalf of hourly customer service representatives in which conditional collective action certification was granted, and, after fending off a motion for reconsideration, numerous motions to compel arbitration, and an emergency mandamus appeal to the Tenth Circuit Court of Appeals, notice was sent to approximately 40,000 customer service representatives nationwide.

d.   *Greene et al. v. Omni Limousine, Inc.*, Case No. 2:18-cv-01760-GMN-VCF (D. Nevada Sept. 11, 2018) - Collective/class action lawsuit on behalf of hourly chauffeurs/limousine drivers in which conditional collective action certification was granted and notice was sent to approximately 100 chauffeurs/limousine drivers statewide.

e.   *Dodds et al. v. US National Personal Care, LLC et al.*, Case No. 2:18-cv-01517-RFB-DJA (D. Nevada August 15, 2018) - Collective/class action lawsuit on behalf of hourly personal care attendants in which conditional collective action certification was granted and ordering that notice be sent to approximately 100

3

personal care attendants statewide.

f.   *Moreno v. Dash Lube et al.*, Case No. 3:18-cv-1922-DMS-NLS (S.D. Cal. Aug. 17, 2018) - Collective/class action lawsuit on behalf of hourly Jiffy Lube service technicians in which conditional collective action certification was granted and notice was sent to approximately 100 Jiffy Lube service technicians across Southern California.

g.   *Tucker v. Sneaker Villa, Inc.*, Case No. 2:18-cv-10086-RHC-MKM (E.D. Mich. Jan. 9, 2018) - Collective/class action lawsuit on behalf of hourly key holders, sales associates and other hourly employees in which the parties stipulated to conditional collective action certification for 16 Michigan and Ohio retail stores resulting in the dissemination of notice to 437 hourly employees and a gross settlement fund of $90,000 for the 35 plaintiffs who opted into the action.

h.   *Baudin v. Resource Marketing Corp., LLC*, Case No. 1:19-cv-386 [MAD/CFH] (N.D.N.Y. Apr. 1, 2019) - Collective/class action lawsuit on behalf of hourly customer service representatives in which the parties engaged in pre-certification mediation, resulting in a $247,000 class-wide settlement (pending preliminary and final approval).

i.   *Purnell et al. v. Clearview Centers, LLC et al.*, Case No. 2:18-cv-01172-DSF-SS (C.D. Cal. Feb. 12, 2018) - Collective/class action lawsuit on behalf of hourly community counselors in which the parties engaged in pre-certification mediation, resulting in a $447,000 class-wide settlement.

6.   Founded over 40 years ago, Sommers Schwartz is one of the preeminent contingent fee law firms in the Midwest, if not the country. The firm's primary practice areas include: employment litigation; commercial litigation; class action litigation; medical malpractice litigation; and personal injury litigation. The firm has been lead counsel and/or held positions of substantial responsibility on steering committees in lawsuits concerning antitrust violations, mass torts, defective products, dangerous drugs, wage and hour violations, and numerous other types of cases against large corporations. The firm's shareholders are experienced trial attorneys, with active cases pending in both state and federal courts throughout the country. Sommers Schwartz has been appointed class counsel or co-class counsel in numerous class actions, obtaining substantial recoveries for thousands of employees. (*See https://www.sommerspc.com/recently-filed-cases/*).

7.   Sommers Schwartz is lead counsel in the *Minor* Action, filed on behalf of current

4

and former customer service representatives ("CSRs") employed by PNC Bank, NA.

**B.    Procedural History**

8.     The *Minor* Action was filed by the *Minor* Plaintiffs against PNC Financial Services Group, Inc.[1] in the United States District Court for the Western District of Michigan, Southern Division, on February 12, 2019.

9.     The *Minor* Plaintiffs, on behalf of themselves and all similarly situated employees, allege that they were employed by PNC as CSRs in Kalamazoo, Michigan and were required to perform unpaid overtime work before and after their scheduled shifts and during their unpaid lunch breaks, such as booting up and shutting down computers and logging into computer software programs and applications that were integral and necessary for the performance of their work. The *Minor* Plaintiffs alleged that PNC violated the FLSA, 29 U.S.C. §§ 201 *et seq*., and Michigan state laws, with respect to themselves and a putative class and collective.

10.    PNC answered the Complaint on April 29, 2019, contesting each substantive allegation pertaining to the *Minor* Plaintiffs' off-the-clock work and asserting various defenses, including that PNC's written timekeeping policies ensure that CSRs properly record their time and that any uncompensated time that CSRs worked was *de minimis*.

11.    On May 1, 2019, the *Minor* Plaintiffs filed a Pre-Discovery Motion for Conditional Collective Certification and Court-Authorized Notice to Potential Opt-In Plaintiffs Pursuant to 29 U.S.C. § 216(b) (the "Conditional Certification Motion"), seeking to conditionally certify a collective action class under the FLSA, 29 U.S.C. § 216(b), defined as: "All current and former Customer Service & Support Representatives who worked for PNC Bank, NA at any of its call

---

[1] Subsequent to the filing of the *Minor* Action, the *Minor* Plaintiffs agreed to substitute PNC Bank, NA ("PNC") for PNC Financial Services Group, Inc. as the defendant in the *Minor* Action.

center facilities at any time on or after February 12, 2016 through judgment." PNC opposed the Conditional Certification Motion on May 29, 2019. The Conditional Certification Motion was fully briefed on June 11, 2019.

12.    Subsequent to the *Minor* Plaintiffs' and PNC's briefing on the Conditional Certification Motion, a substantially similar putative class and collective action lawsuit was initiated against The PNC Financial Services Group, Inc. and PNC Bank, N.A. (collectively, "PNC") on June 14, 2019 in the United States District Court for the Western District of Pennsylvania, *Herbin et al. v. The PNC Financial Services Group, Inc. et al.*, Case No. 2:19-cv-00696-CB (W.D. Pa.) ("the *Herbin* Action").

13.    The *Herbin* Action seeks to recover unpaid overtime compensation for three named plaintiffs (collectively, the "*Herbin* Plaintiffs") and similarly situated telephone customer service representatives, including but not limited to Customer Service Representatives, Sales Representatives, Customer Service and Support Representatives, Customer Support Representatives, and/or other similar positions with different titles, who have worked for PNC throughout the United States, whether in call centers or "virtually" (outside of a call center and/or from home).

14.    The *Herbin* Plaintiffs allege violations nearly identical to those alleged in the *Minor* Action, namely, that PNC routinely required CSRs to work off-the-clock uncompensated overtime hours by instructing CSRs not to clock in for the start of their shift until CSRs boot up their computers, log in to their desktops, load all necessary programs and software, and read all necessary emails and reference materials.

15.    Prior to filing the *Herbin* Action, the *Herbin* Plaintiffs and PNC engaged in settlement negotiations, including an exchange of pre-suit discovery and an all-day mediation

session in Pittsburgh, Pennsylvania with the Honorable Kenneth Benson (Ret.).

16.    During the *Herbin* Plaintiffs' and PNC's pre-suit settlement efforts, the *Minor* Plaintiffs filed the *Minor* Action.

17.    The *Herbin* and *Minor* Plaintiffs (collectively, "Named Plaintiffs") and PNC subsequently engaged in further settlement negotiations, including an all-day mediation session in Pittsburgh, Pennsylvania with Arthur H. Stroyd, Jr., which resulted in the Settlement now in front of the Court for approval.

18.    Named Plaintiffs and PNC have executed the Settlement, which resolves all claims asserted in the *Herbin* and *Minor* Actions, subject to court approval pursuant to 29 U.S.C. § 216(b).

19.    On January 7, 2020, the *Minor* Plaintiffs and PNC stipulated and agreed to the entry of an Order, pursuant to 28 U.S.C. § 1404, transferring the *Minor* Action to the United States District Court for the Western District of Pennsylvania.

20.    Consolidation of the *Herbin* and *Minor* Actions for purposes of judicial consideration and approval of the Settlement will conserve the resources of the courts and the parties and will be more efficient than proceeding separately in two venues for such purposes.

21.    On January 10, 2020, United States District Court Judge Paul L. Maloney ordered that the *Minor* Action be transferred from the United States District Court for the Western District of Michigan, Southern Division, to the United States District Court for the Western District of Pennsylvania, with each party bearing its own costs and fees relating to the transfer. Judge Maloney further ordered the Clerk for the United States District Court for the Western District of Michigan to forward all filings in the *Minor* Action to the Clerk for the United States District Court for the Western District of Pennsylvania.

## C.     Work Performed in Connection with this Lawsuit

22.     I have been involved in this litigation from the outset and have been responsible for, among other things, coordinating and directing the efforts of all attorneys who performed services on behalf of the *Minor* Plaintiffs and the putative collective action members since the *Minor* Action was commenced.

23.     In addition to myself, the following individuals have performed services in connection with the *Minor* Action: Matthew L. Turner (Sommers Schwartz Senior Shareholder); Jason J. Thompson (Sommers Schwartz Senior Shareholder); Kevin J. Stoops (Sommers Schwartz Senior Shareholder); Debra A. Nichols (Sommers Schwartz Paralegal); Wendy E. Vaughn (Sommers Schwartz Legal Assistant); and Janice L. Koehler (Sommers Schwartz Legal Assistant).

24.     I was responsible for, performed, and oversaw all of the following work in connection with the *Minor* Action: initial client interviews; intake and document review; drafting initial pleadings including the Complaint; drafting the Conditional Certification Motion pursuant to the FLSA, 29 U.S.C. 216(b); drafting the reply brief in support of the Conditional Certification Motion; telephonic meetings with clients; interviewing potential opt-in plaintiffs; communicating with opposing counsel; obtaining and reviewing informal discovery production; reviewing damages models; legal research concerning FLSA and state wage and hour laws; selecting the mediator; reviewing mediation materials; reviewing settlement documents; selecting and hiring the settlement administrator; and preparing and reviewing settlement approval motions and related documents.

25.     I attended the mediation and was heavily involved in all aspects of preparing for mediation, including selecting and hiring the mediator; participating in numerous telephone conferences with the *Minor* Plaintiffs, PNC, and the *Herbin* counsel; reviewing the damages model

and mediation statement; and prepping for the mediation, including numerous telephone conference calls with the *Minor* Plaintiffs and *Herbin* counsel regarding the asserted claims, the value of the claims, the status of negotiations, mediation strategy, and the structure of any potential settlement.

26.     With respect to informal discovery production, I was responsible for reviewing and analyzing voluminous documents and substantial electronic data pertaining to the number of CSRs employed by PNC during the statute of limitations period applicable to the case, along with metrics related to: rate of pay; dates of employment; location worked; hours worked per week; total weeks worked; total shifts worked; average hours worked per week; percentage of shifts worked that equaled or exceeded eight hours; and percentage of weeks worked that equaled or exceeded 40 hours. From this information, Named Plaintiffs' counsel were able to ascertain information critical to constructing a damages model that accurately and adequately valued the class members' claims.

27.     Additionally, I served as the primary contact with PNC's counsel in all matters relative to the *Minor* Action, including scheduling, informal discovery, negotiations, damage analysis, and all disputes. I was responsible for all client contact with the *Minor* Plaintiffs, court communications, and all other matters related to the *Minor* Action.

28.     All the above efforts, coupled with Named Plaintiffs' counsel's ability to prosecute the collective action strategy, contributed to reaching the Settlement with PNC that is currently before the Court for approval.

**D.     <u>Reasonableness of Settlement</u>**

29.     Subject to Court approval, the Settlement provides for a gross settlement fund ("Gross Fund") equal to $2,750,000. The Gross Fund covers Putative Collective Members'

settlement awards;[2] the employees' share of payroll taxes arising from those awards; attorneys' fees and costs; service payments; and the fees and costs of the Settlement Claims Administrator.

30.     While the details and final structure of the Settlement are clearly set forth in the Approval Motion, the complexities that the parties encountered in reaching the Settlement were significant, to say the least.

31.     As the lead Associate Attorney for the *Minor* Action, I can attest to the numerous complications that arose each step of the way in determining how to structure a settlement in this case. Identification of the compensable off-the-clock time involved extensive review of substantial document and data production and substantial legal research. I can further attest to the level of effort, expertise, dedication and creativeness of both Named Plaintiffs' counsel and defense counsel in ensuring that the Settlement was fair, reasonable and adequate to both sides. Had all those efforts not occurred, and the hurdles and obstacles overcome, the settlement would never have been realized.

32.     PNC asserted numerous legal and factual defenses to the *Minor* Plaintiffs' claims and collective certification efforts including, *inter alia*, that:

    a.    PNC maintains written employment policies prohibiting off-the-clock work, prohibiting overtime without authorization, and prohibiting the performance of work before CSRs' scheduled shifts.

    b.    PNC will tender manager and supervisor testimony indicating that CSRs are not instructed to complete the log-in process prior to the time their shifts start, but only to begin the process at their scheduled start of shift time.

    c.    The putative collective action members completed aspects of the log-in and log-out process in different ways that varied by class member or day or both.

    d.    The putative collective action members engaged in personal activities at the

---

[2] The Putative Collective Members are individuals who were employed as CSRs by PNC anywhere in the United States between August 16, 2016 through the date of full execution of the Settlement Agreement.

beginning of their shifts.

e.   The *Minor* Plaintiffs' allegations as to the amount of off-the-clock work grossly overstates how long it takes to perform the tasks they describe.

f.   The putative collective action members will be unable to prove their off-the-clock time because no records exist identifying the exact amount of time they spent each shift performing off-the-clock duties.

g.   PNC maintains a lawful meal period policy and the putative collective action members do not perform off-the-clock tasks during their meal periods.

h.   Many of the putative collective action members do not work 40 hours per week, and, thus, do not maintain actionable overtime claims.

i.   The putative collective action members will not satisfy the similarly situated element necessary to obtain conditional FLSA collective certification.

j.   The putative collective action members' claims fail because the alleged off-the-clock time is *de minimis*.

k.   The *Minor* Plaintiffs and the putative collective action members will not be able to establish that PNC's alleged violations were willful.

l.   The *Minor* Plaintiffs and the putative collective action members will not be able to recover liquidated damages.

m.   Individual issues, both as to liability and damages, dominate the dispute, rendering collective action treatment improper.

33.   The existence of PNC's factual and legal arguments weighed on the parties' decision to resolve the case. While Named Plaintiffs' counsel understandably takes issue with the viability of some of these defenses, the risks associated with the continued litigation of Named Plaintiffs' wage claims simply cannot be disregarded in measuring the reasonableness of the Settlement. Specifically, settling this case now saves the parties from years of litigation and tremendous uncertainty as to the ultimate outcome of the litigation. Should the parties have continued to litigate the case, they would have been faced with no less than 6 to 12 months of formal, class-wide discovery (individual class member depositions; interrogatories and requests for production of documents; electronic data production; 30(b)(6) depositions; etc.). Discovery,

once completed, would be followed by an FLSA decertification motion (assuming that FLSA conditional collective action certification would have been granted), dispositive motions, and eventually one or more trials. It is very likely that this litigation would extend for another two to three years and cost the parties $1,000,000 (or more) each in attorneys' fees and expenses.

34.     Based on the damage analysis conducted by Named Plaintiffs' counsel, and in light of the factual and legal defenses identified above, the settlement amount is substantial, completely reasonable, and marks a fair compromise of the claims.

35.     The claims that will be released by the Named Plaintiffs and the participating class members were extensively scrutinized and negotiated by the attorneys involved in this litigation. It represents a fair compromise and constitutes a fairly negotiated bargain for release of claims that arose from the facts as alleged in the Complaint. Named Plaintiffs have consented to the release, as well as the Settlement, and have been afforded full access to counsel throughout the entirety of this litigation.

36.     The Settlement was the result of arm's-length negotiations, with assistance by esteemed and very experienced mediator Arthur H. Stroyd, Jr., conducted by experienced counsel for all parties, and reached after extensive negotiation and informal discovery. Prior to settlement, each side independently and thoroughly investigated the claims and defenses at issue. The work performed allowed each party to intelligently, and in good faith, weigh both the risks and benefits of settlement as compared to continued litigation. These efforts culminated in a substantial settlement which provides Named Plaintiffs and the collective action members with an opportunity to resolve their claims against PNC in a meaningful way.

37.     Based on my past experience in litigating wage and hour cases, I fully endorse the Settlement and believe that it is truly in the best interests of all parties. For all the reasons set forth

herein, I believe this Court should honor and approve the terms of the Settlement.

**E.     Reasonableness of Requested Fee Award**

38.     Subject to Court approval, the Settlement provides for one-third of the Gross Fund, or $916,666.67, as attorneys' fees, plus reimbursement of actual out-of-pocket costs.

39.     In preparing this Declaration, I reviewed the time records of all participating attorneys/paralegals from Sommers Schwartz, confirming the accuracy, utility, efficiencies and reasonableness of the amount of time spent by the *Minor* Plaintiffs' counsel working on this litigation, as well as the expenses incurred.

40.     I have reviewed all of the time and expenses and can attest that they are reasonable as to both the hourly rates, time spent, work allocation and totals, as well as being absolutely necessary to reach the settlement in this case. Named Plaintiffs' counsel diligently worked to avoid duplication of efforts and expenses, while at the same time not sacrificing work quality on behalf of the Named Plaintiffs and the collective action members. The settlement obtained in this litigation was directly impacted by the efforts and expenses advanced by Named Plaintiffs' counsel in this lawsuit.

41.     Based on my personal experience, the requested fee award (one-third of the Gross Fund) for the legal services rendered in the *Herbin* and *Minor* Actions falls well within the range of awards typically granted for funds of a similar size and reflects the reasonable value of the legal services rendered in this case in light of the complex nature of the case, the result obtained, the quality of representation, the risks of the litigation, customary fee awards in similar collective action cases, and other applicable considerations as set forth by the law.

42.     I typically charge $350 per hour for my legal services in FLSA and state wage law class action cases. I am familiar with rates customarily charged in the legal market for FLSA and

state wage law class action litigation. The rates charged by my firm for my services and those of Senior Shareholders, Shareholders, Associates and Paralegals are, on the whole, lower than prevailing rates charged for equivalent services by attorneys of similar skill, experience, and reputation. Therefore, I believe that we are reasonable in charging lodestar rates of $350 per hour for myself, $685 for Mr. Turner, $615 per hour for Mr. Stoops, $735 per hour for Mr. Thompson, and lower rates for paralegals and legal assistants who worked on this matter.

43.     To date, the *Minor* Plaintiffs' counsel has incurred over 165 hours and approximately $70,000 in fees, before accounting for the time that will be incurred in taking this action through settlement. The *Minor* Plaintiffs' counsel has also incurred $2,756.42 in litigation costs, which will surely increase in connection with the necessary travel and administrative expenses that will be incurred in effectuating approval of the settlement. Presently, these litigation costs include: (a) postage ($7.32); (b) outside courier ($33.87); (c) air fare ($1,664.21); (d) local travel ($95.52); (e) car rental ($105.52); (f) meals ($81.96); (g) filing fees ($400.00); (h) service fees ($157.80); and (i) publications and online media fees ($209.82).

44.     The requested fee award is reasonable because, *inter alia*, Named Plaintiffs' counsel resolved the *Minor* and *Herbin* Actions expeditiously and in doing so provided a substantial benefit to the Named Plaintiffs and participating class members who will not be required to await years of litigation before receiving a payment.

45.     In addition to the substantial resources already devoted to the *Minor* and *Herbin* Actions, Named Plaintiffs' counsel will incur additional fees relating to settlement-related tasks, including communicating with putative collective members and monitoring the claims process, after the Court approves the settlement.

46.     The requested fee award is reasonable in light of the risks of nonpayment that

14

Named Plaintiffs' counsel faced. Sommers Schwartz took the *Minor* Action on a contingent basis in which they were entitled to a fee of 40% of the total recovery, meaning that there was a substantial risk that they would not be paid. As discussed above in this Declaration, Named Plaintiffs' counsel faced significant legal hurdles in proving liability and damages and could have lost everything they invested had the *Minor* and *Herbin* Actions been litigated through dispositive motions and trial.

47.    In my opinion, and based on my experience in, and research of, other FLSA and state wage law class action settlements in this Circuit, and nationwide, the requested fee award is reasonable and appropriate, especially in light of the amount of work performed by Named Plaintiffs' counsel in this case and the substantial recovery obtained on behalf of the Named Plaintiffs and the collective action members.

48.    In addition to the requested fee award, Named Plaintiffs' counsel is seeking reimbursement of reasonable and necessary litigation expenses. The litigation expenses incurred in association with the *Minor* Action are reflected on the books and records of Sommers Schwartz and are available for submission to the Court upon request. I have reviewed Sommers Schwartz's expenses and find them to be reasonable, necessary, and customary for FLSA and state wage and hour cases. All expenses were incurred in the normal course of litigation, directly benefited the *Minor* Plaintiffs and the collective action members, and contributed to the overall success of this case.

F.    **Reasonableness of Requested Named Plaintiff Incentive Awards**

49.    The *Minor* Plaintiffs worked diligently to assist counsel in their activities during the pendency of this litigation. In particular, the *Minor* Plaintiffs took part in multiple telephonic interviews, provided substantial records and documentation to counsel, and made themselves

available for the mediation. The *Minor* Plaintiffs were counseled on the rights and responsibilities of serving as FLSA collective representatives and agreed to serve in that capacity in connection with the filing of the Complaint and the litigation of the *Minor* Action.

50.     The requested amount of $8,333.33 to be allocated to each of the Named Plaintiffs and the opt-in plaintiff for service awards is commensurate with other service awards I have been involved in nationally and, as documented by research of other similar awards, is reasonable under the circumstances.

**G.     Reasonableness of Settlement Administration Expenses**

51.     The Settlement will be serviced by professional services provider Rust Consulting, Inc. ("Rust"), who will serve as settlement administrator. Rust has been consistently approved by courts across the country and is one of the leading settlement administrators for class actions in the country.

52.     Estimates provided by Rust indicate that settlement administration for this case will amount to approximately $67,250. The amount is reasonable given the number of individuals involved in the Settlement.

**H.     Conclusion**

53.     In light of the significant efforts outlined above and the significant risks faced by the parties in continuing to litigate this case, it is my professional and experienced opinion that the Settlement before the Court of $2,750,000 is not only adequate, fair and reasonable, but also meets the requirements of § 216(b) of the FLSA.

54.     The Settlement achieves substantial benefits for the Named Plaintiffs and the collective action members, represents finality to a long-standing wage and hour issue facing PNC's CSRs, and avoids extended adversary proceedings years into the future, let alone the uncertainties

of additional motions, trials and appeals. Ultimately, the process outlined above produced a meaningful monetary recovery that would not have otherwise occurred without the extensive efforts of counsels and the parties described herein. If not for this case and the diligent efforts of Named Plaintiffs and their counsel, there would be no class-wide settlement, let alone a $2,750,000 settlement fund.

Executed on January 21, 2020.

_____

Rod M. Johnston